IN THE
UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

———————————

DREW ADAMS,

*Plaintiff-Appellee*,

v.

THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Middle District of Florida, Jacksonville Division
District Court No. 3:17-cv-00739-TJC-JBT

———————————

**BRIEF OF *AMICUS CURIAE* WALT HEYER
IN SUPPORT OF APPELLANT**

———————————

Gregory H. Teufel*
OGC Law, LLC
615 Washington Road, Suite 405
Pittsburgh, PA 15228
(412) 253-4622
Gteufel@OGCLaw.net
*Pro Hac Vice* Pending

ROBERT H. TYLER
TYLER & BURSCH, LLP
25026 Las Brisas Road
Murrieta, CA 92562
(951) 600-2733
rtyler@tylerbursch.com

Nathan W. Kellum
*Counsel of Record*
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117
Telephone: (901) 684-5485
nkellum@crelaw.org

*Counsel for Amicus Curiae Walt Heyer*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Local Rules 26.1-1 through 26.1-3 and 28-1(b), Amicus Walt Heyer certifies that the name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action — including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to any party in the case is limited to the following:

1. Heyer, Walt – *Amicus Curiae*

2. OGC Law, LLC – Counsel for *Amicus Curiae*

3. Teufel, Gregory H. – Counsel for *Amicus Curiae*

4. Tyler & Bursch, LLP – Counsel for *Amicus Curiae*

5. Tyler, Robert H. – Counsel for *Amicus Curiae*

6. Center for Religious Expression – Counsel for *Amicus Curiae*

7. Nathan W. Kellum – Counsel for *Amicus Curiae*

The undersigned certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal. The undersigned will enter this

information into the web-based CIP contemporaneous with the filing of this Certificate of Interested Persons and Corporate Disclosure Statement.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................ 1

STATEMENT OF THE ISSUE ................................................................... 2

SUMMARY OF ARGUMENT ..................................................................... 2

ARGUMENT ........................................................................................ 4

    I.   *Amicus* Walt Heyer's personal background brings a valuable perspective to this case. ......................................................................... 4

    II.  The School Board's policy serves the interest of protecting students with gender identity issues rather than harming them. ..................... 15

CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

**Other**                                                      **Page(s)**

Bigad Shaban, et al., *Transgender Kids Could Get Hormone Therapy at Earlier Ages* (9/13/17) ...................................................................... 19

Cecilia Dhejne et al., *Long-term follow-up of transsexual persons undergoing sex reassignment surgery* (Feb. 22, 2011) ...................................................... 17

Francine Russo, *Is There Something Unique about the Transgender Brain*? (1/1/16) ............................................................................................. 23

J. Michael Baily, Ph.D., et al., *Suicide or transition: The only options for gender dysphoric kids?* (9/8/17) ........................................................ 19

Joost A. Campo, et al., *Psychiatric Comorbidity of Gender Identity Disorders: A Survey Among Dutch Psychiatrists*, American Journal of Psychiatry 160(7): 1332-6 (8/03) ........................................................................................ 23

Meybodi A. Mazaheri et al., *Psychiatric Axis I Comorbidities among Patients with Gender Dysphoria* (8/11/14) .................................................... 23

Richard B. Corradi, *Psychiatry Professor: 'Transgenderism' Is Mass Hysteria Similar To 1980s-Era Junk Science,* (11/17/16), .................................... 24

## INTEREST OF AMICUS CURIAE[1]

*Amicus* Walt Heyer is a man who was diagnosed with gender dysphoria, took hormones and underwent surgery to look like the opposite sex, and lived for eight years appearing to be a woman. But those steps did not resolve his problems and he attempted suicide. He was diagnosed with dissociative disorder and was able to resolve his gender dysphoria through psychotherapy to effectively treat the dissociative disorder. His feelings of wanting to be the opposite sex went away, and he was able to return to living with a male appearance and be happy.

Mr. Heyer has a particular interest in the outcome of the instant case because of his own experience. He is also interested because he mentors people who suffer from "sex change regret" and want to "detransition" back from the mistake of gender affirming changes. Such people typically attempt to do so by doing things such as adopting a different name consistent with the opposite sex and using the corresponding pronouns, wearing clothing and hairstyles typically associated with the opposite sex, using sex-segregated spaces and engaging in sex-segregated activities that correspond to the opposite sex, and/or by changing their appearance to that of the opposite sex through surgery and/or hormones. Mr. Heyer has seen firsthand the harm that can come from encouraging people down that path. This brief

---

[1] Parties to this case received timely notice of the intent to file this brief and consented to its filing. *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than the *amicus* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

is submitted to illustrate these points to the Court and demonstrate why this Court should reverse the District Court's Final Judgment in favor of Appellee.

## STATEMENT OF THE ISSUE

Was the District Court authorized to interpret Title IX and the Equal Protection Clause in a manner not supported by text and precedent to supplant the decisions of School Board personnel, informed by its constituency, expertise and duty to care for all 40,000 students in the School District?

## SUMMARY OF ARGUMENT

*Amicus* makes the point in this brief that the School Board's policy serves the interest of protecting students with gender identity issues rather than harming them. Affirming the dysphoria in people suffering from gender identity issues as if they really were persons of the opposite sex only serves to lead those that are suffering with such issues away from finding the serenity and wholeness of being at peace with their bodies and identities.

As a threshold matter, we define two key terms used in this brief. "Gender" is used in the sense that the District Court and the proponents of gender identity theory use it: a malleable, subjectively discerned continuum that ranges from male to

female to something else. "Sex," on the other hand, refers to male and female as grounded in biology—it is binary, fixed at conception, and objectively verifiable.[2]

This definition of "sex" is contrary to the District Court's flawed definition of "sex" as something "assigned at birth." <u>See</u> Doc. 192, pp. 2, 5, 7, 9, 18-19, 22, 35-37, 41, 47-49, 56, 62-63. Differences exist between males and females at conception at the biochemical and cellular levels and result directly from the defining genotypic difference between male and female mammals: an XY (male) sex chromosome constitution versus an XX (female) sex chromosome constitution. Every cell of a male is male, and every cell of a female is female. The distinction between the two sexes is not limited to the appearance of external genitalia or determined exclusively thereby.

The District Court should not have accepted Appellee's assertions that it was discrimination to prohibit Appellee from using opposite sex facilities and that such prohibition caused Appellee harm. Taking steps to deny reality, such as by

---

[2] As a matter of biological accuracy, the use of pronouns herein is consistent with the referenced person's sex.

encouraging and allowing use of sex-segregated spaces that correspond to the opposite sex is more likely to cause harm than good.

## ARGUMENT

This Court should reverse the District Court's Final Judgment in favor of Appellee because compelling schools to allow students with gender identity issues to access communal privacy facilities of the opposite sex so that their perceived sex is affirmed as real by school authorities is actually counterproductive and harmful to students with gender identity issues.

## I.   *Amicus* Walt Heyer's personal background brings a valuable perspective to this case.

*Amicus* Walt Heyer's personal background brings a valuable perspective to this case. Mr. Heyer is a male who started his transgender journey in 1944 at 4 years of age. That is when his desire to become female first took hold. He brings over 70 years of personal life experience to the discussion of transgenderism. He underwent surgery to appear as female and presented himself publicly as the opposite sex for eight years, only to see firsthand it was not the proper treatment for gender dysphoria. Instead of helping, it inflicted great harm.

Mr. Heyer's view of the transgender experience comes from the perspective of having lived his life as a someone who wanted to be the opposite sex and underwent surgery and hormones in pursuit of that, bolstered by relevant education, employment, and mentoring of other people who, like Mr. Heyer, regret surgical alteration and having presented as a person of the opposite sex.

Mr. Heyer studied at UC Santa Cruz in the late 1980s and completed the course requirements for a certificate in psychology and pharmacology, working to become a counselor. He interned as a counselor to drug dependent individuals in San Jose, California, earning over 1500 hours of supervised counseling experience.

He was employed at a Santa Monica hospital near Los Angeles in the lockdown psychiatric unit. As part of his internship, he earned another 800 hours of supervised counseling experience as a counselor to the dual diagnosed psychiatric patients in the hospital who needed 24-hour care. Later, he became the Director of Care/Counseling Ministries in Indian Wells, California at a church of over 3,000 regular attendees and served in that position for 3½ years. Twelve years ago, he launched a website to reach out to those who regret having undergone a surgery to appear as the opposite sex and want to live in conformity with their biological sex.

Mr. Heyer's story of restoration gives much needed hope to individuals contemplating suicide and provides a roadmap back to living life in conformity with their biological sex. Mr. Heyer has authored six books[3] and has been interviewed for television, radio and print media around the world. Hundreds of thousands of people visit his website www.sexchangeregret.com each year. He is considered a leading authority by many on the subject of transgender ideology. His blog and books all serve to help individuals return to the gender they lost and to help third parties' understanding.

For more than ten years Mr. Heyer has informally mentored and assisted scores of persons identifying as transgender who regret changing their appearance to that of the opposite sex. He encourages those who contact him who have gender dysphoria to seek psychological and psychiatric assessment for other disorders that

---

[3] *A Transgender's Faith* – Walt Heyer's autobiography.

*Trans Life Survivors* – Emails from 30 people who turned away from the transgender life, the latest research and a special section on children.

*Paper Genders* – the history of failed attempts to resolve psychiatric or psychological disorders with surgery.

*Gender, Lies and Suicide* – The tragedy of transgender suicide, with personal stories and research data.

*Perfected with Love* –Walt Heyer's story gives insight into how to show God's love to a transgender person.

*Kid Dakota and the Secret at Grandma's House* – a novel based on Walt Heyer's life.

are also present, which is the case in a majority of those who desire to live as persons of the opposite sex.

Over seventy years ago, at four years of age, Mr. Heyer was drawn to cross-dressing for reasons that were unknown to him. His grandmother encouraged him and she enjoyed their secret times of playing dress-up. He liked how he felt dressed like a little girl and liked how his grandmother fawned over him. The desire to not only cross-dress but to actually become a female took root and grew stronger every day. From that onset in 1944, the persistent unrelenting desire never went away for even a day.

His grandmother made him a full-length purple chiffon evening dress to wear in those secret play times. Her excitement of seeing him in that hand-made dress was affirmation to him that he should have been born a girl and made the feelings to want to change into a girl even stronger. Mr. Heyer started dreaming as if he were already a little girl.

Those feelings never went away. Mr. Heyer kept his feelings inside and did not share his desire for a female identity with his older brother or talk about his feelings with his parents. He lived his life as a boy outside and as the girl in the purple dress

inside. He preferred keeping secret that he wanted to become a female someday. No one would know to ask him uncomfortable questions like why he felt that way or how his feelings started.

High school was a great time and he did typical boy activities: football team, car club, dating girls. He told his best friend about his cross-sex desire. They never talked about it again and remained great friends. Like most transgender individuals, Mr. Heyer has known over the last 35 years that he was not homosexual. He just wanted to become a female. Transgenderism for Mr. Heyer was not a sexual issue but rather a strong desire to express publicly his female feelings about a female identity. In his secret world, Mr. Heyer even took on a female name. Throughout his childhood, high school and college years, he continued the secret cross-dressing he enjoyed so much.

Eventually Mr. Heyer got engaged and told his future wife about his cross-dressing and his early childhood. She was undaunted by the idea, and they married in 1962. By 1968, they had two kids and Mr. Heyer's career was unfolding in incredible ways.

After some specialized education in printed circuitry and electrical drafting, Mr. Heyer became an associate design engineer on the Apollo space missions program, working in the area of cryogenics as part of a team that prepared specifications for NASA. Later, in the automotive manufacturing business, Mr. Heyer quickly worked his way up to the executive level. Yet the desire to cross-dress and become female never went away, even for one day.

By the time he was in his thirties in the 1970s, Mr. Heyer started to hear about individuals who were presenting as the opposite sex. They said they had a strong desire, just like he did, and there was a name for it: gender identity disorder (the forerunner of what is now called gender dysphoria). At the cross-dressing bars in San Francisco that he frequented, people were talking about a doctor who would administer cross-sex gender hormones. Mr. Heyer wanted to fulfill the dream that started at his grandmother's house when he was four years old—to become a girl.

Mr. Heyer needed to find out if he had gender identity disorder and scheduled an appointment with a leading expert, Dr. Paul Walker, Ph.D., the distinguished chairperson and one of the original authors of the Harry Benjamin International

Standards of Care, the same standards published today by the successor organization, World Professional Association for Transgender Health (WPATH).

The WPATH organization is so focused on advocacy that they have lost their way in caring for the long-term health and welfare of the transgender population. WPATH has failed to set effective, sound standards for diagnosing co-existing psychiatric and psychological disorders that lead to regret and too many suicides among transgender people.

Dr. Walker diagnosed Mr. Heyer with gender identity disorder and provided an approval letter that said Mr. Heyer was someone who would benefit from hormone therapy and so-called "gender reassignment" surgery. Mr. Heyer started hormone therapy at the direction of Dr. Walker. Mr. Heyer waited more than two years, then returned to see Dr. Walker again to see if he had changed his diagnosis of Mr. Heyer.

Dr. Walker was steadfast in his diagnosis and the need for Mr. Heyer to be treated with hormones and so-called "gender reassignment" surgery. Dr. Walker prepared an updated letter, again approving Mr. Heyer for surgery to appear female.

Mr. Heyer looked forward to finally having resolution to his life-long desire to be female and he scheduled the surgery. As a result, Mr. Heyer's wife filed for

divorce. Mr. Heyer went ahead with the surgery in the hands of the world-renowned Dr. Stanley Biber, who over his lifetime performed over 4,000 such surgeries. Surgery for males to appear female consists of removing the testicles while retaining the penis, but surgically inverting the penis into a pouch to create the appearance of female genitalia. Mr. Heyer changed his name to Laura Jensen.

Mr. Heyer presented as female for nearly 8 years while living in San Francisco and working for the federal government at the FDIC and the US Postal Service. Mr. Heyer then began studying psychology at the University of Santa Cruz. He wanted to better understand addictive behaviors and wanted to learn how he could help other people who were struggling from difficult childhoods.

There were happy times when he first presented as a female. Yet, as the years passed, Mr. Heyer's gender dysphoria re-emerged. Mr. Heyer became concerned and depressed because the surgery had introduced a huge life change. Mr. Heyer was switching between Laura and Walt every few days. He was even more confused than he had been before his change to Laura. Mr. Heyer consulted a psychologist who told him to "give it time." Eight years seemed like enough time to Mr. Heyer. But

the counselor, a specialist in gender dysphoria, told Mr. Heyer that adapting to Laura would take time, even years.

A new awareness came while Mr. Heyer was employed in a psychiatric unit. A staff psychiatrist pulled him aside to ask Mr. Heyer questions about his childhood. After a few days of talking with Mr. Heyer, he suggested that Mr. Heyer might have a previously undiagnosed and untreated disorder. At his suggestion Mr. Heyer spent time with a psychologist who could assess whether or not Mr. Heyer had a co-existing disorder, and if so, what it was.

That was a turning point for Mr. Heyer. He was taken aback when he learned from the psychologists that people who identified as the opposite sex could have additional undiagnosed and untreated disorders such as depression, anxiety, bipolar disorder, obsessive-compulsive disorder, dissociative disorder, schizophrenia and body dysmorphic disorder.

With the knowledge that he had been suffering all his life from a co-existing disorder in addition to gender dysphoria, Mr. Heyer went headlong into psychotherapy. There Mr. Heyer learned that sexual abuse at the hands of a male

family member (after he heard about the cross dressing) was a major factor of his dissociative disorder.

Dissociative disorder is an extreme coping mechanism, usually a result of, but not limited to, sexual abuse, emotional trauma, physical harm, abandonment, broken homes, and deep personal loss. Dissociative disorders are a survival mode, a way to cope. The person dissociates from who he really is and attempts to become someone he is not. The person's identity splits into fragmented identities who do not feel the pain of the past. They are all parts of the original person. In Mr. Heyer's case, Laura was a fragment identity who had the reassignment surgery. There were other fragments: Andrea, Crystal and Nicole were female; JJ and Jimmy were male. To heal, Mr. Heyer would need psychological treatment to re-integrate the fragmented identities.

The stunning moment for Mr. Heyer came when a psychologist told him that the treatment he had undergone for gender dysphoria—hormone therapy and surgery to appear as the opposite sex—would make re-integration of the identities extremely difficult. This was because he had a body that was fashioned to look like Laura, but

according to the additional diagnosis of dissociative disorder, Mr. Heyer needed to reintegrate all the fragments into the surgically mutilated male body of Walt.

Because Dr. Walker only focused his attention and diagnosis on gender dysphoria (a correct diagnosis), he failed to take the next step; exploring the existence of co-existing disorders that might also be causing Mr. Heyer's gender distress. Dissociative disorder often mimics gender dysphoria and as a result is overlooked and undiagnosed. It was clear that his co-existing psychological disorder should have been treated prior to any hormones or gender surgery. Hope of living a happy life was fading away. Mr. Heyer attempted suicide because he was so distressed. A change of gender identity did not resolve the problems that started in his early childhood.

It took a long time, and restoration was extremely difficult. Mr. Heyer was in counseling for years, sometimes meeting every day. But he was finally able to put his gender dysphoria to rest through psychotherapy that effectively treated the co-existing dissociative disorder. When the dissociative disorder and the childhood pain that had led to it were treated, the feelings of wanting to be a girl went away. It was then that Mr. Heyer was able to return to living with a male appearance and achieve

the serenity and happiness he had always wanted. Mr. Heyer's feelings of wanting to be the opposite sex went away, and he was able to return to living with a male appearance and be happy.

Mr. Heyer now mentors people who have also come to regret attempting to live as a person of the opposite sex, such as by adopting a different name consistent with the opposite sex and using the corresponding pronouns, wearing clothing and hairstyles typically associated with the opposite sex, using sex-segregated spaces and engaging in sex-segregated activities that correspond to the opposite sex, and/or by changing their appearance to that of the opposite sex through makeup, clothing, surgery and/or hormones. Mr. Heyer has seen firsthand the harm that can come from encouraging people down that path. Every person Mr. Heyer has mentored has concluded that they were not born with transgenderism. Transgenderism is a learned behavior, a social ideology, not an innate condition from birth. Mr. Heyer has seen too much unhappiness and regret over the years from hormone therapy and surgeries.

## II.    The School Board's policy serves the interest of protecting students with gender identity issues rather than harming them.

The School Board's policy serves the interest of protecting students with gender identity issues rather than harming them. Affirming people suffering from gender

identity issues as if they really were persons of the opposite sex, as the District Court insists that the law requires, only serves to lead those who are suffering with such issues away from finding the serenity and wholeness of being at peace with their bodies and identities.

The proponents of gender identity theory see sex-specific privacy facilities as a tool to affirm a student's self-perception of gender. But placing people of the opposite sex into facilities meant to ensure the separation of the sexes when students are changing clothes, showering, or attending to personal hygiene needs, pretending they actually are persons of the same sex, is not likely to benefit anyone and is more likely to cause harm. There is limited evidence on whether social transitioning is an appropriate treatment for a particular individual, and no evidence specific to students' use of opposite-sex facilities. The risk that gender-affirmation treatments might ultimately harm, rather than help, troubled students cannot be dismissed without evidence.

The District Court should not have accepted Appellee's assertions as to how best to help students suffering from gender identity issues without requiring specific proof. Walt Heyer does not claim to know the best treatment for gender identity

issues for everyone. But seeking to align one's mind with reality has always been the preferred method for treating dysphorias, such as anorexia, xenomelia (the feeling that one or more limbs do not belong), or transdisability (believing one has a physical disability that does not actually exist). No school would ever address anorexic students' needs by providing only minute portions of low-calorie food in their lunches. But one of the most comprehensive scientific studies tracking individuals who underwent sex-reassignment surgery revealed that (1) the rate of psychiatric hospitalization was approximately three times higher for postoperative individuals than a control group; (2) mortality rates and rates of criminal conviction also increased; (3) suicide attempts were almost five times more likely than before surgery; and (4) the likelihood of suicide following surgery was 19 times higher than the control group, adjusted for prior psychiatric illness. Cecilia Dhejne et al., *Long-term follow-up of transsexual persons undergoing sex reassignment surgery* (Feb. 22, 2011), https://bit.ly/2xl6HDr. Taking steps to deny reality, such as by encouraging and allowing use of sex-segregated spaces that correspond to the opposite sex, is more likely to cause harm than good.

The proponents of gender identity theory tell parents and schools that they must support and affirm a child's transgender journey to prevent the child from attempting suicide. However, it is an open question scientifically whether supporting a child's desire to appear as the opposite sex adds stress rather than reducing it. In Mr. Heyer's case, that approach undeniably made things worse.

Children are encouraged, affirmed and assisted in "coming out" as transgendered without one word about the dangers of that path. Today, the politically correct response expected from adults, especially parents, is to affirm the child in the desired gender. But affirmation gives young people false hope that they can really become a different sex. It is a lie—a lie told with compassionate motives, but a lie nonetheless. Lying is not compassion.

Lying to people hurts them. For a vulnerable young person, pursuing a dream that is physically impossible to achieve can lead to depression, and depression is the leading cause of attempted suicide. This may help explain some of the startling suicide rates noted by the lower court in this case. See Doc. 192 at p.9, n.15.

Doctors and parents tell daughters they can become sons and sons they can become daughters. It is important to tell people the truth and stop pretending. We need to stop

pretending that doctors have scientific backing for their recommendations for children with gender dysphoria. The truth is that no one can predict whether a gender-dysphoric child will feel the same way years later.

Kristina Olson, a research psychologist at the University of Washington, puts it this way: "We just don't have definitive data one way or another." Bigad Shaban, et al., *Transgender Kids Could Get Hormone Therapy at Earlier Ages*, (September 13, 2017), https://www.nbcbayarea.com/investigations/Transgender-Kids-Eligible-for-Earlier-Medical-Intervention-Under-New-Guidelines-423082734.html. That's why Olson is leading a study of 300 trans children that will track outcomes over 20 years, "to be able to, hopefully, answer which children should or should not transition," she said. In other words, we simply do not know right now, yet parents and children are herded in one direction as if we do. J. Michael Bailey, Ph.D., professor of Psychology at Northwestern University, and Ray Blanchard, Ph.D. explain that "There is no persuasive evidence that gender transition reduces gender dysphoric children's likelihood of killing themselves." J. Michael Baily, Ph.D. et al., *Suicide or transition: The only options for gender dysphoric kids?*, (September 8, 2017),

https://4thwavenow.com/2017/09/08/suicide-or-transition-the-only-options-for-gender-dysphoric-kids/comment-page-1/.

Some young people desire to identify as the opposite sex to escape the pain of a traumatic event or a perceived abandonment or loss. They subconsciously want to dissociate from who they are and become someone else. Appearing as the opposite sex promises a fresh start, free from the past. Like many psychological coping mechanisms, however, appearing as the opposite sex and having that affirmed provides only a temporary reprieve.

Some teens or pre-teens today want to appear as the opposite sex for social reasons or to become the center of attention. Younger children can simply be curious about the opposite sex. This does not mean adults should encourage or affirm such experimentation.

The documentary, "Tranzformed" explores the journeys of 15 individuals who eventually walked out of the transgender life. "Tranzformed" provides transgendered people a voice to share in their own words, with authenticity and emotion, how they came to the decision to change genders and why they changed back. The film made the

point clearly: people who identify as the opposite sex have deep emotional pain and need true compassion.

For those who look at the issue objectively and see the explosion of young people with gender identity issues, this emerging group of young people with gender identity issues are suffering from emotional, psychological, or social identity discomfort far deeper than new pronouns can rectify. Courts should not ignore that fact. Doctors admit they do not know which children will remain gender-dysphoric into adulthood, yet they condone gender identity change, socially and medically, for youth. This is child abuse. Walt Heyer knows this from his own life. It is child abuse to tell a child he or she can select a gender and truly become the opposite sex. It is a false hope. Such a suggestion is factually a lie, a lie with life-long destructive ramifications.

The effect of such "affirmation" is the destruction of core identity. It plants the notion inside the minds of young people that the essence of who they are is wrong. They are not someone to be loved or embraced, but eradicated. Affirming someone as the opposite sex reinforces the deep discomfort already undermining his or her identity. Overwhelmed by the weight of these messages cloaked as "affirmation" and a lack of attention to the real issues driving their desire to switch gender appearances, more than

50% attempt suicide (according to the District Court, Doc. 192, n.15). By engaging in what they call "affirmation," adults are complicit in turning young psyches against themselves and against the factual truth of who they really are. "Affirmation" is unwise in light of the fact that doctors themselves admit they cannot tell who the "real" long-term gender-dysphoric children are and "affirmed" children are suffering and dying needlessly.

In this case, the Appellee testified to hating the feminine parts of Appellee's body and stated that after "transition":

> I don't hate myself anymore. And I don't hate the person I am. I don't hate my body anymore. There are some parts I don't like, of course, but I don't look at myself and think all those negative thoughts anymore.

Doc. 192, pp. 10, 12.  It is those unhealthy thoughts of hating oneself and one's body that are "affirmed" through "transition."

The proponents of gender identity theory claim that gender transition, whether social, medical, or both, is the answer that will solve all of the problems of those who suffer from gender dysphoria. Yet, studies show that two-thirds of people with gender dysphoria also have other co-existing psychological disorders, which if treated, could ease or eliminate the gender distress without the need for social gender

transition, surgery or cross-sex hormones. Meybodi A Mazaheri *et al.*, *Psychiatric Axis I Comorbidities among Patients with Gender Dysphoria*, (August 11, 2014), https://www.ncbi.nlm.nih.gov/pubmed/25180172; Joost A. Campo, et al., *Psychiatric Comorbidity of Gender Identity Disorders: A Survey Among Dutch Psychiatrists*, American Journal of Psychiatry 160(7): 1332-6 (August 2003) https://www.researchgate.net/publication/10686328_Psychiatric_Comorbidity_of_Gender_Identity_Disorders_A_Survey_Among_Dutch_Psychiatrists.

The proponents of gender identity theory claim that people with gender dysphoria are born that way—that the transgender brain is wired that way from birth. But no definitive evidence has been found to support that belief. An article in Scientific American that begins by saying that "Imaging studies and other research suggest that there is a biological basis for transgender identity" concludes with the following contradictory statement: "But given the variety of transgender people and the variation in the brains of men and women generally, it will be a long time, if ever, before a doctor can do a brain scan on a child and say, 'Yes, this child is trans.'" Francine Russo, *Is There Something Unique about the Transgender Brain?*, (January 1, 2016),

https://www.scientificamerican.com/article/is-there-something-unique-about-the-transgender-brain/.

Psychiatrist Richard Corradi, professor of psychiatry at Case Western Reserve University School of Medicine, Cleveland, Ohio, calls transgenderism a "contagion of mass delusion." Richard B. Corradi, *Psychiatry Professor: 'Transgenderism' Is Mass Hysteria Similar To 1980s-Era Junk Science,* (November 17, 2016), https://thefederalist.com/2016/11/17/psychiatry-professor-transgenderism-mass-hysteria-similar-1980s-era-junk-science/.

> Ironically, individuals are robbed of their personal identity and become anonymous members of the gender identity community—the "transgendered." Rather than the individual assessments and personalized psychotherapy that the sufficiently distressed should receive, the remedy is one-size-fits-all. A transgender person can become any gender he or she chooses, or be no gender at all. They can call themselves any names they choose, take hormones, and have their sex surgically "reassigned." All this is with the credulous support of people and institutions who have succumbed to the contagion of a cultural delusion.

Id.

Based on his experience and the experiences relayed to him by many others, for people who identify as transgender, true reality is found in what is called "de-transitioning," which involves coming to terms with and accepting one's sex. The claim

that students with gender identity issues must access communal privacy facilities of the opposite sex so that their perceived sex is affirmed as real by school authorities and fellow students is misguided and unsupported by science. Indulging that concept not only fails to advance any equal protection interest, but also harms those whom it is intended to benefit.

## CONCLUSION

*Amicus* urges this honorable Court to reverse the District Court's Final Judgment in favor of Appellee.

Respectfully submitted,

<table>
<tr>
<td>

/s/GREGORY H. TEUFEL<br>
GREGORY H. TEUFEL<br>
OGC Law, LLC<br>
615 Washington Rd., Suite 405<br>
Pittsburgh, PA 15228<br>
(412) 253-4622<br>
gteufel@OGCLaw.net<br>
*Pro Hac Vice* Pending

</td>
<td>

/s/ROBERT H. TYLER<br>
ROBERT H. TYLER<br>
TYLER & BURSCH, LLP<br>
25026 LAS BRISAS ROAD<br>
MURRIETA, CA 92562<br>
(951) 600-2733<br>
rtyler@tylerbursch.com

</td>
</tr>
</table>

/s/NATHAN W. KELLUM<br>
NATHAN W. KELLUM<br>
*Counsel of Record*<br>
Center for Religious Expression<br>
699 Oakleaf Office Lane, Suite 107<br>
Memphis, TN 38117<br>
Telephone: (901) 684-5485

nkellum@crelaw.org

December 27, 2018

**CERTIFICATE OF COMPLIANCE**

I CERTIFY that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). This brief contains 4,972 words (within the limit of 6,500) not including the parts of the brief exempted by Fed. R. App. P. 32(f).

I FURTHER CERTIFY that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word Home and Student Version 2016 in 14-point Times New Roman.

/s/Nathan W. Kellum
Nathan W. Kellum

## CERTIFICATE OF SERVICE

I hereby certify one true and accurate copy of the foregoing document has been furnished by electronic means to all counsel of record as well as by U.S. Certified Mail, Postage Prepaid and Return Receipt Requested.

One originally signed version and six copies of this brief with green covers have been delivered via Federal Express to:

David J. Smith, Clerk
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St. N.W.
Atlanta, GA 30303

/s/Nathan W. Kellum
Nathan W. Kellum