APPEAL NO. 18-13592-EE
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

DREW ADAMS,
Plaintiff-Appellee,

v.

THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA
Defendant-Appellant.
_____

On Appeal from the United States District Court
for the Middle District of Florida, Jacksonville Division
District Court No. 3:17-cv-00739-TJC-JBT
_____

**PETITION FOR REHEARING EN BANC OF APPELLANT
THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA**
_____

Terry J. Harmon FBN 0029001
Jeffrey D. Slanker FBN 0100391
Robert J. Sniffen FBN 000795
Michael P. Spellman FBN 937975

SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Fax: (850) 205-3004
Counsel for Appellant

Adams v. The School Board of St. Johns County, Florida

Appeal No. 18-13592-EE

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Local Rules 26.1-1 through 26.1-3 and 28-1(b), Appellant certifies that the name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action — including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to *any* party in the case is limited to the following:

1.  AAPL – *Amicus Curiae*

2.  AAUW – *Amicus Curiae*

3.  A Better Balance - *Amicus Curiae*

4.  Aberli, Thomas A. – *Amicus Curiae*

5.  Achievement First Public Charter Schools – *Amicus Curiae*

6.  Adams, Drew – Appellee

7.  Adams, Scott – Appellee's Father

8.  Adecco Group AG - Parent company for Amicus Curiae General Assembly Space, Inc.

9.  Adecco, Inc. - Parent company for Amicus Curiae General Assembly Space, Inc.

10. ADL – *Amicus Curiae*

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

11.    Advocates for Youth – *Amicus Curiae*

12.    Airbnb, Inc. – *Amicus Curiae*

13.    Akin Gump Strauss Hauer & Feld LLP - Counsel for Amici Curiae

14.    Alger, Maureen P. – Counsel for Amicus Curiae

15.    Allen, Tommy – Board Member of Appellant

16.    Alliance Defending Freedom – Counsel for Amicus Curiae

17.    Alphabet, Inc. (GOOG) - Parent company for Amicus Curiae Google LLC

18.    Altman, Jennifer G. – Counsel for Appellee

19.    Amend, Andrew – (New York State Office of the Attorney General) - Counsel for Amicus Curiae

20.    American Academy of Child and Adolescent Psychiatry (AACAP) – *Amicus Curiae*

21.    American Academy of Nursing – *Amicus Curiae*

22.    American Academy of Pediatrics – *Amicus Curiae*

23.    American Association of University Women (AAUW) - *Amicus Curiae*

24.    American College of Physicians – *Amicus Curiae*

25.    American Medical Association – *Amicus Curiae*

26.    American Medical Women's Association – *Amicus Curiae*

Adams v. The School Board of St. Johns County, Florida

Appeal No. 18-13592-EE

27.   American Nurses Association – *Amicus Curiae*

28.   American School Counselor Association – *Amicus Curiae*

29.   Apple Inc. – *Amicus Curiae*

30.   Asana, Inc. – *Amicus Curiae*

31.   Association of Medical School Pediatric Department Chairs – *Amicus Curiae*

32.   Atlanta Women for Equality – *Amicus Curiae*

33.   Baker & Hostetler LLP - Counsel for Amicus Curiae

34.   Banks, Emily – *Amicus Curiae*

35.   Barden, Robert Chris – Counsel for Appellant, Terminated

36.   Barrera, Kelly – Board Member of Appellant

37.   Barth, Morgan – *Amicus Curiae*

38.   Baxter, Rosanne C. – Counsel for Amicus Curiae

39.   Bazer, Morgan – *Amicus Curiae*

40.   BCC – *Amicus Curiae*

41.   Bertschi, Craig E. – Counsel for Amicus Curiae

42.   Beth Chayim Chadashim (BCC) - *Amicus Curiae*

43.   Binning, Sarah R. – Counsel for Amicus Curiae

44.   BlackRock, Inc. (BLK) - Beneficial owner of Amicus Curiae Yelp Inc.

45.   Boies, Schiller & Flexner, LLP – Counsel for Amicus Curiae

<u>Adams v. The School Board of St. Johns County, Florida</u>
Appeal No. 18-13592-EE

46.    Borelli, Tara L. – Counsel for Appellee

47.    Boston Area Rape Crisis Center – *Amicus Curiae*

48.    Bourgeois, Roger – *Amicus Curiae*

49.    Bruce, Diana K. – *Amicus Curiae*

50.    Buckeye Region Anti-Violence Organization, a Program of Equitas
       Health – *Amicus Curiae*

51.    Berlow, Clifford W. – Counsel for Amicus Curiae

52.    California – *Amicus Curiae*

53.    California Women Lawyers – *Amicus Curiae*

54.    California Women's Law Center – *Amicus Curiae*

55.    Campbell, James A. – Counsel for Amicus Curiae

56.    Canan, Patrick – Board Member of Appellant

57.    Carney, Karen – *Amicus Curiae*

58.    Carpenter, Christopher S., Ph.D. - *Amicus Curiae*

59.    Carter, Heidi – *Amicus Curiae*

60.    Casa de Esperanza: National Latina Network for Healthy Families and
       Communities – *Amicus Curiae*

61.    Castillo, Paul David – Counsel for Appellee

62.    Center for Constitutional Rights – *Amicus Curiae*

63.    Center for Religious Expression – Counsel for Amicus Curiae

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

64.    Center for Reproductive Rights – *Amicus Curiae*

65.    Central Conference of American Rabbis – *Amicus Curiae*

66.    Champion Women – *Amicus Curiae*

67.    Chandy, Sunu P. (National Women's Law Center) - Counsel for Amici Curiae

68.    Chang, Tommy – *Amicus Curiae*

69.    Chapman, Peyton – *Amicus Curiae*

70.    Chaudhry, Neena (National Women's Law Center) - Counsel for Amici Curiae

71.    Coalition of Black Trade Unionists – *Amicus Curiae*

72.    Coleman, Arthur - Counsel for Amicus Curiae

73.    Colter, Howard – *Amicus Curiae*

74.    Connecticut – *Amicus Curiae*

75.    Conron, Kerith J., M.P.H., Sc.D. - *Amicus Curiae*

76.    Copsey, Alan D. (Washington State Office of the Attorney General)  - Counsel for Amicus Curiae

77.    Corrigan, Hon, Timothy J. – United States District Judge

78.    Credo Mobile, Inc. – *Amicus Curiae*

79.    Cyra, Sherri – *Amicus Curiae*

<u>Adams v. The School Board of St. Johns County, Florida</u>
Appeal No. 18-13592-EE

80.    Dasgupta, Anisha S. (New York State Office of the Attorney General) - Counsel for Amicus Curiae

81.    Davis, Bryan – *Amicus Curiae*

82.    Davis, Steven D. – Counsel for Amici School Administrators

83.    Day One – *Amicus Curiae*

84.    DC Coalition Against Domestic Violence – *Amicus Curiae*

85.    Delaware – *Amicus Curiae*

86.    DeSelm, Lizbeth – *Amicus Curiae*

87.    Deutsche Bank AG. – *Amicus Curiae*

88.    DiBenedetto, Arthur – *Amicus Curiae*

89.    Disability Rights Education and Defense Fund (DREDF) – *Amicus Curiae*

90.    District of Columbia – *Amicus Curiae*

91.    Doolittle, Kirsten L. – Counsel for Appellee

92.    Doran, Mary – *Amicus Curiae*

93.    Doss, Eric – *Amicus Curiae*

94.    DREDF – *Amicus Curiae*

95.    Dyer, Karen Caudill – Counsel for *Amicus Curiae*

96.    Dwyer, John C. – Counsel for *Amicus Curiae*

97.    Eaton, Mary - Counsel for Amicus Curiae

98.     eBay Inc. – *Amicus Curiae*

99.     Education Counsel, LLC - Counsel for Amicus Curiae

100.    Empire Justice Center – *Amicus Curiae*

101.    Endocrine Society – *Amicus Curiae*

102.    Eppink Samuel T., Ph.D. (expected 2019) - *Amicus Curiae*

103.    Equal Rights Advocates – *Amicus Curiae*

104.    Equality California – *Amicus Curiae*

105.    Ewing, Gregory – *Amicus Curiae*

106.    Family Values @ Work – *Amicus Curiae*

107.    Ferguson, Robert W. (Attorney General for the State of Washington) - Counsel for Amici Curiae

108.    Florida School Boards Insurance Trust – Insurance Carrier for Appellant

109.    Flores, Andrew R., Ph.D. - *Amicus Curiae*

110.    Flynn, Diana K. – Counsel for Appellee

111.    FORGE, Inc. – *Amicus Curiae*

112.    Forson, James (Tim) – Superintendent of the St. Johns County School District

113.    Fountain, Lisa Barclay – Counsel for Appellant

114.    Gartrell, Nanette, M.D. - *Amicus Curiae*

<u>Adams v. The School Board of St. Johns County, Florida</u>
Appeal No. 18-13592-EE

115.  Gates, Gary J., Ph.D. - *Amicus Curiae*

116.  Gender Based Violence Organizations – *Amicus Curiae*

117.  Gender Diversity – *Amicus Curiae*

118.  Gender Justice – *Amicus Curiae*

119.  Gender Spectrum – *Amicus Curiae*

120.  General Assembly Space, Inc. – *Amicus Curiae*

121.  Generales, Markos C. – (Akin Gump Strauss Hauer & Feld LLP) Counsel for Amicus Curiae

122.  Girls for Gender Equity – *Amicus Curiae*

123.  Girls, Inc. – *Amicus Curiae*

124.  GitHub, Inc. – *Amicus Curiae*

125.  Glassdoor, Inc. – *Amicus Curiae*

126.  GlaxoSmithKline LLC – *Amicus Curiae*

127.  GlaxoSmithKline PLC: Parent company for Amicus Curiae GlaxoSmithKline LLC

128.  GLMA – Health Professionals Advancing LGBT Equality - *Amicus Curiae*

129.  GLSEN – *Amicus Curiae*

130.  Goldberg, Suzanne – Counsel for Amicus Curiae

131.  Gonzales, Gilbert, Ph.D., M.H.A. - *Amicus Curiae*

<u>Adams v. The School Board of St. Johns County, Florida</u>
Appeal No. 18-13592-EE

132.  Gonzalez-Pagan, Omar – Counsel for Appellee

133.  Google LLC – *Amicus Curiae*

134.  Goss Graves, Fatima (National Women's Law Center) - Counsel for Amicus Curiae

135.  Greer, Eldridge – *Amicus Curiae*

136.  Grossman, Miriam – *Amicus Curiae*

137.  Grijalva, Adelita – *Amicus Curiae*

138.  Gurtner, Jill – *Amicus Curiae*

139.  Haney, Matthew – *Amicus Curiae*

140.  Hargis, Kellie M. – *Amicus Curiae*

141.  Harmon, Terry J. – Counsel for Appellant

142.  Harrington, Emily – Counsel for Amicus Curiae

143.  Hawaii – *Amicus Curiae*

144.  Haynes, Patricia - Counsel for Amicus Curiae

145.  Herman, Jody L., Ph.D. - *Amicus Curiae*

146.  Heyer, Walt – *Amicus Curiae*

147.  Hohs, Sherie – *Amicus Curiae*

148.  Holland & Knight, LLP – Counsel for Amicus Curiae

149.  Holloway, Ian W., Ph.D., M.S.W., M.P.H. - *Amicus Curiae*

150.  Hughes, Paul W. (Mayer Brown) - Counsel for Amicus Curiae

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

151.   IBM Corporation – *Amicus Curiae*

152.   Ifill, Sherrilyn A. - Counsel for Amicus Curiae

153.   Illinois – *Amicus Curiae*

154.   Illinois Accountability Initiative – *Amicus Curiae*

155.   In Our Own Voice: National Black Women's Reproductive Justice
       Agenda – *Amicus Curiae*

156.   Indiegogo, Inc. – *Amicus Curiae*

157.   Iowa – *Amicus Curiae*

158.   Iowa Coalition Against Sexual Assault – *Amicus Curiae*

159.   Jacksonville Area Sexual Minority Youth Network, Inc. – *Amicus
       Curiae*

160.   Jacobs, Edward J. – Counsel for Amicus Curiae

161.   James, Letitia (Attorney General for the State of New York) - Counsel
       for Amicus Curiae

162.   Kaiser Foundation Health Plan, Inc. ("Kaiser Permanente") - *Amicus
       Curiae*

163.   Kaiser Permanente – *Amicus Curiae*

164.   Kaplan, Aryeh L. – Counsel for Appellee

165.   Kasper, Erica Adams – Appellee's Next Friend and Mother

166.   Kellum, Nathan W. – Counsel for Amicus Curiae

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

167.  Kenney, Tim – *Amicus Curiae*

168.  Kimberly, Michael B. (Mayer Brown LLP) - Counsel for Amicus Curiae

169.  Kirkland, Earl – Counsel for Amicus Curiae

170.  Knotel, Inc. - *Amicus Curiae*

171.  Kogan, Terry S. – *Amicus Curiae*

172.  Kostelnik, Kevin C. – Counsel for Appellant, Terminated

173.  Kunin, Ken – *Amicus Curiae*

174.  Kunze, Lisa – Principal of Allen D. Nease High School

175.  Laidlaw, Michael – *Amicus Curiae*

176.  Lambda Legal Defense and Education Fund, Inc. – Counsel for Appellee

177.  Lapointe, Markenzy – Counsel for Appellee

178.  Las Cruces Public Schools – *Amicus Curiae*

179.  LatinoJustice PRLDEF – *Amicus Curiae*

180.  Lawyers Club of San Diego – *Amicus Curiae*

181.  Lee, Jen Hee – Counsel for Amicus Curiae

182.  Legal Aid At Work – *Amicus Curiae*

183.  Legal Momentum – *Amicus Curiae*

184.  Legal Voice – *Amicus Curiae*

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

185. Levi Strauss & Co. - *Amicus Curiae*

186. Linden Research, Inc. d/b/a Linden Lab – *Amicus Curiae*

187. Los Angeles Unified School District – *Amicus Curiae*

188. Louisiana Foundation Against Sexual Assault – *Amicus Curiae*

189. Love, Laura H. – *Amicus Curiae*

190. Lyft, Inc. - *Amicus Curiae*

191. MacKenzie, Dominic C. – Counsel for Amicus Curiae

192. Maine – *Amicus Curiae*

193. Majeski, Jeremy – *Amicus Curiae*

194. Mallory, Christy, J.D. - *Amicus Curiae*

195. Mapbox, Inc. - *Amicus Curiae*

196. Marin Software Incorporated (MRIN) - *Amicus Curiae*

197. Martin, Emily (National Women's Law Center) - Counsel for Amicus Curiae

198. Massachusetts – *Amicus Curiae*

199. Mayer Brown LLP - Counsel for Amici Curiae

200. McCaleb, Gary S. – Counsel for Amicus Curiae

201. McCalla, Craig – *Amicus Curiae*

202. McRae Bertschi & Cole, LLC – Counsel for Amicus Curiae

203. Meece, Gregory R. – *Amicus Curiae*

<u>Adams v. The School Board of St. Johns County, Florida</u>
Appeal No. 18-13592-EE

204. Meerkamper, Shawn – *Amicus Curiae*

205. Melody, Colleen M., (Washington State Office of the Attorney General) – Counsel for Amicus Curiae

206. Mesa, David D. – Counsel for Amicus Curiae

207. Meyer, Ilan, H., Ph.D. – *Amicus Curiae*

208. Michigan – *Amicus Curiae*

209. Michigan Coalition to End Domestic & Sexual Violence – *Amicus Curiae*

210. Microsoft Corporation (MSFT): *Amicus Curiae* and parent company for *Amicus Curiae* GitHub, Inc.

211. Mignon, Bill – Board Member of Appellant

212. Miller, William C. – Counsel for Appellee

213. Minnesota – *Amicus Curiae*

214. Minter, Shannon – Counsel for Amicus Curiae

215. Morse, James C., Sr. – *Amicus Curiae*

216. Munson, Ziad W. – *Amicus Curiae*

217. Murray, Kerrel – Counsel for Amicus Curiae

218. NAACP Legal Defense & Educational Fund, Inc. – *Amicus Curiae*

219. Nardecchia, Natalie – Counsel for Appellee, Terminated

220. National Alliance to End Sexual Violence – *Amicus Curiae*

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

221.  National Asian Pacific American Women's Forum – *Amicus Curiae*

222.  National Association of School Psychologists – *Amicus Curiae*

223.  National Association of Social Workers – *Amicus Curiae*

224.  National Association of Women Lawyers – *Amicus Curiae*

225.  National Center for Law and Economic Justice – *Amicus Curiae*

226.  National Center for Transgender Equality – *Amicus Curiae*

227.  National Coalition Against Domestic Violence – *Amicus Curiae*

228.  National Council of Jewish Women – *Amicus Curiae*

229.  National Crittenton – *Amicus Curiae*

230.  National LGBTQ Task Force – *Amicus Curiae*

231.  National Organization for Women Foundation – *Amicus Curiae*

232.  National PTA and The American School Counselor Association – *Amicus Curiae*

233.  National Resource Center on Domestic Violence – *Amicus Curiae*

234.  National Women's Law Center, et al. – *Amicus Curiae*

235.  Nebraska Coalition to End Domestic and Sexual Violence – *Amicus Curiae*

236.  Nelson, Janai S. – Counsel for Amicus Curiae

237.  Nevada Coalition to End Domestic and Sexual Violence – *Amicus Curiae*

Adams v. The School Board of St. Johns County, Florida

Appeal No. 18-13592-EE

238. New Hampshire Coalition Against Domestic and Sexual Violence – *Amicus Curiae*

239. New Jersey – *Amicus Curiae*

240. New Mexico – *Amicus Curiae*

241. New Mexico Coalition of Sexual Assault Programs, Inc. – *Amicus Curiae*

242. New York – *Amicus Curiae*

243. New York State Coalition Against Sexual Assault – *Amicus Curiae*

244. NIO Inc. (NIO): Parent company for *Amicus Curiae* NIO USA, Inc.

245. NIO NextEV Ltd.: Parent company for *Amicus Curiae* NIO USA, Inc.

246. NIO USA, Inc. – *Amicus Curiae*

247. Northern Marianas Coalition Against Domestic & Sexual Violence – *Amicus Curiae*

248. Oasis Legal Services – *Amicus Curiae*

249. Oath Inc. – Parent company for *Amicus Curiae* Tumblr, Inc

250. O'Melveny & Myers LLP – Counsel for Amicus Curiae

251. O'Reilly, John – *Amicus Curiae*

252. OGC Law, LLC. – Counsel for Amicus Curiae

253. Ohio Alliance to End Sexual Violence – *Amicus Curiae*

254. Oregon – *Amicus Curiae*

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

255.  Oregon Coalition Against Domestic & Sexual Violence – *Amicus Curiae*

256.  Orr, Asaf – Counsel for Amicus Curiae

257.  Palacios, Patricia – Counsel for Amicus Curiae

258.  Palazzo, Denise – *Amicus Curiae*

259.  Parent-Child Center – *Amicus Curiae*

260.  Patreon, Inc. – *Amicus Curiae*

261.  Pediatric Endocrine Society – *Amicus Curiae*

262.  Pennsylvania – *Amicus Curiae*

263.  PFLAG, Inc. – *Amicus Curiae*

264.  Pierce, Jerome – Counsel for Amicus Curiae

265.  Pillsbury Winthrop Shaw Pittman LLP – Counsel for Appellee

266.  Pincus, Andrew J. (Mayer Brown LLP) – Counsel for Amicus Curiae

267.  Planned Parenthood of South, East and North Florida – *Amicus Curiae*

268.  Planned Parenthood of Southwest and Central Florida – *Amicus Curiae*

269.  Pollock, Lindsey – *Amicus Curiae*

270.  Portnoi, Dimitri – Counsel for Amicus Curiae

271.  Postmates Inc. – *Amicus Curiae*

272.  Powell, Wesley R. – Counsel for Record of Amicus Curiae

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

273.  Purcell, Noah G. (Solicitor General for the State of Washington) – Counsel for Amicus Curiae

274.  Rakuten, Inc.: Beneficial owner of *Amicus Curiae* Lyft, Inc.

275.  Ranck-Buhr, Wendy – *Amicus Curiae*

276.  Rao, Devi M. – Counsel for Amicus Curiae, Terminated

277.  Rape/Domestic Abuse Program – *Amicus Curiae*

278.  RC Barden and Associates – Counsel for Appellant, Terminated

279.  Recruit Holdings Co., Ltd. (TYO 6098): Parent company for *Amicus Curiae* Glassdoor Inc.

280.  Replacements, Ltd. – *Amicus Curiae*

281.  Retzlaff, Pamela – *Amicus Curiae*

282.  Reynolds, Andrew, Ph.D. – *Amicus Curiae*

283.  RGF OHR USA, Inc.: Parent company for Amicus Curiae Glassdoor Inc.

284.  Rhode Island – *Amicus Curiae*

285.  Rivaux, Shani – Counsel for Appellee

286.  Robertson, Cynthia C. – Counsel for Appellee

287.  Rose, Nicholas M. (Baker & Hostetler LLP) – Counsel for Amicus Curiae

288.  Rothfield, Charles – Counsel for Amicus Curiae

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

289.  Samuels, Jocelyn, J.D. – *Amicus Curiae*

290.  San Diego Cooperative Charter Schools – *Amicus Curiae*

291.  Santa, Rachel – *Amicus Curiae*

292.  SASA Crisis Center – *Amicus Curiae*

293.  Sears, R. Bradley, J.D. – *Amicus Curiae*

294.  Schaffer, Brian – *Amicus Curiae*

295.  Scholars Who Study The Transgender Population – *Amicus Curiae*

296.  Schommer, Monica – *Amicus Curiae*

297.  School Administrators from 29 States and the District of Columbia – *Amicus Curiae*

298.  School District of South Orange and Maplewood – *Amicus Curiae*

299.  Segal, Richard M. – Counsel for Appellee

300.  Shah, Paru – *Amicus Curiae*

301.  Shirk, Sarah – *Amicus Curiae*

302.  Shutterstock, Inc. (SSTK) – *Amicus Curiae*

303.  SisterReach – *Amicus Curiae*

304.  Slanker, Jeffrey D. – Counsel for Appellant

305.  Slavin, Alexander – Counsel for Amicus Curiae

306.  Slough, Beverly – Board Member of Appellant

307.  Smith, Nathaniel R. – Counsel for Appellee

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

308. Sniffen, Robert J. – Counsel for Appellant

309. Sniffen & Spellman, P.A. – Counsel for Appellant

310. Spellman, Michael P. – Counsel for Appellant

311. Spital, Samuel (counsel for LDF) – Counsel for Amicus Curiae

312. Spotify AB – Parent company for *Amicus Curiae* Spotify USA Inc.

313. Spotify Technology S.A. – Parent company for *Amicus Curiae* Spotify USA Inc

314. Spotify USA Inc. – *Amicus Curiae*

315. Spryszak, Delois Cooke – *Amicus Curiae*

316. SSAIS.org – *Amicus Curiae*

317. Steptoe & Johnson LLP – Counsel for Amicus Curiae

318. Stop Sexual Assault in Schools (SSAIS.org) – *Amicus Curiae*

319. Stork, Victoria Lynn – (Baker & Hostetler LLP) – Counsel for Amicus Curiae

320. SurvJustice – *Amicus Curiae*

321. Sutherland, Emily – *Amicus Curiae*

322. Taymore, Cyndy – *Amicus Curiae*

323. Teufel, Gregory H. – Counsel for Amicus Curiae

324. The American Academy of Pediatrics – *Amicus Curiae*

325. The Impact Fund – *Amicus Curiae*

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

326. The Law Office of Kirsten Doolittle, P.A. – Counsel for Appellee

327. The School Board of St. Johns County, Florida – Appellant

328. The Southwest Women's Law Center – *Amicus Curiae*

329. The Women's Law Center of Maryland – *Amicus Curiae*

330. Toomey, Joel – Magistrate Judge

331. Trans Youth Equality Foundation – Amicus Curiae

332. Tumblr, Inc. – *Amicus Curiae*

333. Twitter Inc. (TWTR) – *Amicus Curiae*

334. Tyler & Bursch, LLP. – Counsel for Amicus Curiae

335. Tyler, Robert H. – Counsel for Amicus Curiae

336. Tysse, James E. – (Akin Gump Strauss Hauer & Feld LLP) – Counsel
for Amicus Curiae

337. Underwood, Barbara D. (Solicitor General for the State of New York)
– Counsel for Amici Curiae

338. Union for Reform Judaism – *Amicus Curiae*

339. UniteWomen.org – *Amicus Curiae*

340. Upchurch, Bailey & Upchurch, P.A. – General Counsel to Appellant

341. Upchurch, Frank D. – General Counsel to Appellant

342. Valbrun-Pope, Michaelle – *Amicus Curiae*

343. Van Meter, Quentin – *Amicus Curiae*

344.  Van Mol, Andre – *Amicus Curiae*

345.  Vannasdall, David – *Amicus Curiae*

346.  Vaughn, Craig – *Amicus Curiae*

347.  Verizon Communications Inc. (VZ) – Parent company for *Amicus Curiae* Tumblr, Inc.

348.  Vermont – *Amicus Curiae*

349.  Vermont Network Against Domestic & Sexual Violence – *Amicus Curiae*

350.  Virginia – *Amicus Curiae*

351.  Virginia Sexual & Domestic Violence Action Alliance – *Amicus Curiae*

352.  Vitale, Julie – *Amicus Curiae*

353.  Voices of Hope – *Amicus Curiae*

354.  Wallace, Matthew M. – Counsel for Amicus Curiae, Terminated

355.  Washington – *Amicus Curiae*

356.  Washoe County School District – *Amicus Curiae*

357.  Wasick, Joanna (Baker & Hostetler LLP) – Counsel for Amicus Curiae

358.  Weber, Thomas – *Amicus Curiae*

359.  Weisel, Jessica M. – (Akin Gump Strauss Hauer & Feld LLP) Counsel for Amicus Curiae

360. Williams Institute at UCLA School of Law – *Amicus Curiae*

361. Willkie Farr & Gallagher LLP – Counsel for Amicus Curiae

362. Wilson, Bianca, D.M., Ph.D. – *Amicus Curiae*

363. Wisconsin Coalition Against Sexual Assault – *Amicus Curiae*

364. Women of Reform Judaism, and Men of Reform Judaism – *Amicus Curiae*

365. Women's Bar Association of the District of Columbia – *Amicus Curiae*

366. Women's Bar Association of the State of New York – *Amicus Curiae*

367. Women's Center for Advancement – *Amicus Curiae*

368. Women's Law Project – *Amicus Curiae*

369. Women's Law Project and Young Women United – *Amicus Curiae*

370. Women Lawyers On Guard Inc. ("WLG") – *Amicus Curiae*

371. Women's Legal Defense and Education Fund – *Amicus Curiae*

372. Women's Liberation Front – *Amicus Curiae*

373. Wong, Kyle – Counsel for Amicus Curiae

374. Working Assets, Inc. – Parent company for *Amicus Curiae* CREDO Mobile, Inc.

375. Wyoming Coalition Against Domestic Violence and Sexual Assault – *Amicus Curiae*

376. Xerox Corporation (XRX) – *Amicus Curiae*

377.   Yelp Inc. (YELP) – *Amicus Curiae*

378.   Young Women United – *Amicus Curiae*

The undersigned certifies that included in this CIP is a list of the publicly traded companies and corporations that have indicated an interest in the outcome of the case or appeal through their appearance as an *Amicus Curiae*. Upon information and belief, the undersigned is not required to enter this information into the web-based CIP.

Aside from those appearing as *Amicus Curiae*, the undersigned is unaware of any publicly traded companies or corporations that have an interest in the outcome of the case or appeal. The undersigned will enter this information into the web-based CIP contemporaneous with the filing of this Certificate of Interested Persons and Corporate Disclosure Statement.

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

## **RULE 35 CERTIFICATION**

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance, namely: the constitutionality of sex-separated bathrooms based on a conception of sex founded in the biological and physiological differences between boys and girls that the United States Supreme Court has recognized are real and enduring; and the legality of a policy separating bathrooms based on biological sex under Title IX of the Education Amendments of 1972, whose implementing regulations permit sex-separated bathrooms.

I further express a belief, based on a reasoned and studied professional judgment, that the majority decision is contrary to the following decisions of the United States Supreme Court or the precedents of this Circuit and that consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court: Cochise Consultancy, Inc. v. U.S. ex rel. Hunt, 139 S. Ct. 1507 (2019); New Prime Inc. v. Oliveira, 139 S. Ct. 532 (2019); EEOC v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028 (2015); Nguyen v. Immigration & Naturalization Serv., 533 U.S. 53 (2001); Davis ex rel. D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629 (1999); United States v. Virginia, 518 U.S. 515 (1996); Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981); Michael M. v. Super. Ct. of Sonoma Cty., 450 U.S. 464 (1981) (plurality opinion); Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

(1979); Geduldig v. Aiello, 417 U.S. 484 (1974); Frontiero v. Richardson, 411 U.S.

677 (1973) (plurality opinion);  Jefferson v. Sewon Am., Inc., 891 F.3d 911 (11th

Cir. 2018); Sumpter v. Sec'y of Labor, 763 F.3d 1292 (11th Cir. 2014); Koch Foods,

Inc. v. Sec'y of Labor, 712 F.3d 476 (11th Cir. 2013); Pugliese v. Pukka Dev., Inc.,

550 F.3d 1299 (11th Cir. 2008); Fortner v. Thomas, 983 F.2d 1024 (11th Cir. 1993).

Respectfully submitted this 28th day of August, 2020.

/s/ Terry J. Harmon
Terry J. Harmon FBN 0029001
/s/ Jeffrey D. Slanker
Jeffrey D. Slanker FBN 0100391
Robert J. Sniffen FBN 000795
Michael P. Spellman FBN 937975

SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, FL 32301
Telephone: (850) 205-1996
Fax: (850) 205-3004

*Counsel for The School Board of St. Johns County, Florida*

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................................C - 1

RULE 35 CERTIFICATION ......................................................................i

TABLE OF CONTENTS....................................................................... iii

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF THE ISSUES................................................................1

COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE ...................2

STATEMENT OF THE FACTS NECESSARY TO THE ARGUMENT OF THE ISSUES..............................................................................................2

REASONS FOR GRANTING THE PETITION ........................................4

      I.    En Banc Review of the Equal Protection Issue is Required to Maintain Uniformity of the Decisions of this Court and the Supreme Court ......................................................4

      II.    En Banc Review of the Title IX Issue is Required to Maintain Uniformity of this Court's Decisions and of the Decisions of the Supreme Court .................................9

      III.    The Issues in this Case are Exceptionally Important...............13

CONCLUSION......................................................................................15

CERTIFICATE OF COMPLIANCE.......................................................16

CERTIFICATE OF SERVICE ...............................................................17

OPINION SOUGHT TO BE REHEARD ...............................................18

## TABLE OF AUTHORITIES

## DECISIONAL AUTHORITY

Access Now, Inc. v. Sw. Airlines Co.,
   385 F.3d 1324 (11th Cir. 2004) ............................................................................12

Bostock v. Clayton Cty.,
   140 S. Ct. 1731 (2020) ......................................................... 1, 9, 10, 11

Bray v. Alexandria Women's Health Clinic,
   506 U.S. 263 (1993) ............................................................................6

Cochise Consultancy, Inc. v. U.S. ex rel. Hunt,
   139 S. Ct. 1507 (2019) ......................................................................11

Davis ex rel. D. v. Monroe Cty. Bd. of Educ.,
   526 U.S. 629 (1999) ..........................................................................12

EEOC v. Abercrombie & Fitch Stores, Inc.,
   135 S. Ct. 2028 (2015) ......................................................................11

Florida State Univ. v. Sondel,
   685 So. 2d 923 (Fla. 1st DCA 1996) ................................................14

Fortner v. Thomas,
   983 F.2d 1024 (11th Cir. 1993) ..........................................................7

Frontiero v. Richardson,
   411 U.S. 677 (1973) ............................................................................8

Geduldig v. Aiello,
   417 U.S. 484 (1974) ........................................................................6, 8

Glenn v. Brumby,
   663 F.3d 1312 (11th Cir. 2011) ................................................. 10, 11

Goodson v. Wal-Mart Stores,
   No. 4:06-CV-00243, 2006 WL 8443378 (N.D. Fla. Oct. 19, 2006) ....................15

iv

*Jefferson v. Sewon Am., Inc.,*
   891 F.3d 911 (11th Cir. 2018)................................................................12

*Koch Foods, Inc. v. Sec'y of Labor,*
   712 F.3d 476 (11th Cir. 2013)..............................................................10

*Michael M. v. Super. Ct. of Sonoma Cty.,*
   450 U.S. 464 (1981) ..............................................................................5

*New Prime Inc. v. Oliveira,*
   139 S. Ct. 532 (2019) ...........................................................................10

*Nguyen v. Immigration & Naturalization Serv.,*
   533 U.S. 53 (2001) ..............................................................................5, 8

*Pennhurst State Sch. & Hosp. v. Halderman,*
   451 U.S. 1 (1981) .................................................................................12

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979)................................................................................7

*Pugliese v. Pukka Dev., Inc.,*
   550 F.3d 1299 (11th Cir. 2008)............................................................12

*Ramirez v. Sec'y, U.S. Dep't of Transp.,*
   686 F.3d 1239 (11th Cir. 2012)............................................................13

*Sumpter v. Sec'y of Labor,*
   763 F.3d 1292 (11th Cir. 2014)............................................................10

*United States v. Virginia,*
   518 U.S. 515 (1996) .............................................................................7, 8

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ...............................................................................7

**STATUTES**

20 U.S.C. § 1681 ......................................................................................9

v

20 U.S.C. § 1686 ........................................................................................9

§ 760.08, Fla. Stat. (2019) ......................................................................14

**REGULATIONS**

34 C.F.R. § 106.33 ....................................................................................9

## STATEMENT OF THE ISSUES

The majority opinion in this case must be reviewed *en banc*. The first issue for review is whether the majority correctly ruled that the School Board's long-standing policy separating student bathrooms on the basis of biological sex violated the Equal Protection Clause. The Supreme Court has long held that a sex-based classification does not violate the Equal Protection Clause when it is based on the real differences between men and women. The majority opinion rejected this line of Supreme Court precedent and determined that the School Board's policy could not survive Constitutional Scrutiny.

The second issue for review is whether the majority correctly determined that the School Board's policy is actionable sex discrimination under Title IX. This Court and the Supreme Court have long recognized that words in a statute must be interpreted consistent with their ordinary common meaning at the time the statute was enacted. There is no question that the ordinary common meaning of the term "sex" when Title IX was enacted did not encompass transgender status. The majority analogized this case to Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020) but failed to appreciate that the School Board's policy does not discriminate based on transgender status. The majority then refused to evaluate the applicability of Title IX's implementing regulations that permit sex-separated bathrooms or the implications

of the clear statement rule that requires statutes passed pursuant to Congress' spending power, like Title IX, to be interpreted narrowly.

Despite the exceptional importance of these issues, the majority issued an opinion in a vacuum and failed to appreciate its import. The logic of the reasoning in the majority opinion will compel lower courts to find that sex classifications grounded in the biological distinctions between men and women are *per se* unlawful. The majority's logic extends to such distinctions in school locker rooms, sports, and showering and living facilities, and outside the school setting in places of employment, government facilities, and public accommodation. This is not an everyday case but rather an exceptionally important one requiring the full Court's attention.

## COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

This is an appeal of the district court's decision that the School Board's policy requiring its students to use bathrooms matching their biological sex violates the Equal Protection Clause and Title IX. A divided panel of this Court affirmed the district court's decision.

## STATEMENT OF THE FACTS NECESSARY TO THE ARGUMENT OF THE ISSUES

Adams was formerly a student at Nease High School, a public high school operated by the School Board located in the St. Johns County School District. Op. at 6. Adams is a biological female that identifies as a male. Op. 1-2, 47; Doc. 160 at

2

Tr. 83, 96, 195; Doc. 166-2. The School Board prohibited Adams from using the boys' bathrooms at Nease. Op. at 6. The School Board's decision in this regard was consistent with its longstanding and unwritten policy that students must use the bathrooms matching their biological sex (i.e. the anatomical differences between the sexes). Op. at 6-7; Docs. 161 at Tr. 248-249; 162 at Tr. 45-46, 99-100. The policy is based on the privacy rights individual students have to use the bathroom away from the other sex. Doc. 162 at Tr. 67-68.

Consistent with a Best Practices document designed to offer school staff guidelines related to LGBTQ students, including transgender and gender-fluid students, Adams was permitted to continue using the bathrooms matching his biological sex or a gender-neutral bathroom. Op at 7-8; Docs. 152-6; 161 at Tr. 242-43, 246-47; 162 at Tr. 70-71, 110. The Best Practices document provides that "[t]ransgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex." Op. at 8.

It was the School Board's unwritten policy that excluded Adams from the boys' bathroom as opposed to the Best Practices document. Docs. 160 at Tr. 255; 161 at Tr. 185. Generally, the School Board requires students to use the bathroom matching the sex identified on their enrollment paperwork with that marker being a proxy for biological sex. Doc. 161 at Tr. 205, 234. Nonetheless, that a student might conceivably enroll in the district with a sex marker on their enrollment paperwork

not matching their biological sex does not alter the policy, as such situations would be addressed as they arise. Doc. 162 at Tr. 52-55.

There are approximately 40,000 students in the St. Johns County School District. Op at 50. At the time of the trial, School Board officials were only aware that sixteen of those students were transgender. Id.

Adams brought suit against the School Board alleging discrimination on the basis of sex because he was not permitted to use the boys' bathrooms. After a trial, the district court found for Adams, and this appeal followed.

## REASONS FOR GRANTING THE PETITION

This case is tailor-made for the plenary review by the entirety of the Circuit. The majority misinterpreted the School Board's policy and reached a decision out of line with precedent. The implications are weighty and go far beyond this case.

### I.  *En Banc* Review of the Equal Protection Issue is Required to Maintain Uniformity of the Decisions of this Court and the Supreme Court

The majority's reasoning is inconsistent with Supreme Court precedent interpreting the propriety of sex-based classifications. The majority opinion is an exercise in means-end analysis and distorts the School Board's policy to reach a result that binding precedent forecloses. The majority incorrectly re-casts the policy as one targeting transgender students for differential treatment. The policy requires students to use the bathrooms of their biological sex to advance the important

governmental interest of insuring the privacy of students to use the bathroom away from the opposite sex.

As an initial matter, the majority reasons that the manner in which the policy is enforced renders it arbitrary and unconstitutional. Op. at 15. The majority erroneously reasons that the policy is arbitrary simply because some transgender students might enroll with a designation of sex inconsistent with their biological sex. Op. at 16-18. That hypothetical situation does not change the nature of the policy which requires all students, not just transgender students, to use the bathroom matching their biological sex. In that regard, the policy perfectly classifies nearly every student in the District, as at the time of the trial, the School Board was aware of only sixteen transgender students out of approximately 40,000. While the majority was able to craft this hypothetical "loop-hole" not rooted in the actual record, the policy is not required to be perfect to survive intermediate scrutiny. The majority's demand of perfection is directly in conflict with Supreme Court precedent regarding the government's burden in establishing a policy that withstands intermediate scrutiny. Nguyen v. Immigration & Naturalization Serv., 533 U.S. 53, 70 (2001) (Intermediate scrutiny does not "require[] that the [policy] under consideration must be capable of achieving its ultimate objective in every instance."); see also Michael M. v. Super. Ct. of Sonoma Cty., 450 U.S. 464, 473 (1981) (plurality opinion) ("The

5

relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been . . . .").

Next, the majority contends that the policy triggers intermediate scrutiny not because it classifies students based on biological sex but rather because it purportedly targets transgender students for different treatment. Op. at 12. It also asserts that the policy is not substantially related to an important governmental interest because bodily privacy concerns were not implicated by Adams using the boys' bathroom and because the policy was based on impermissible stereotypes about the sexes. Op. at 21, 24, 25-28. The majority misconstrues the policy and rules contrary to Supreme Court precedent in finding it unconstitutional.

The policy that excluded Adams from the boys' bathrooms is the policy that students must use the bathroom matching their biological sex.[1] The policy does not target transgender students. As Chief Judge Pryor points out, because the policy affects transgender and non-transgender students in the same way, there is a lack of identity between the classes meaning the policy does not classify based on transgender status. See Op. at 55-56 (citing Geduldig v. Aiello, 417 U.S. 484 (1974) and Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 271 (1993)). Further, there is no evidence the policy was motivated by a discriminatory purpose towards

---

[1] The policy at issue is not the Best Practices document the majority contends targets transgender students. Op. at 12. The Best Practices document represents the School Board's efforts to accommodate LGBTQ students.

6

Adams or transgender individuals sufficient to establish a constitutional claim based on any adverse impact Adams might have suffered by operation of a facially neutral policy. Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 274 (1979); see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977) ("Proof of. . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

The majority also refused to accept that schoolchildren have a privacy interest in using the bathroom away from the other biological sex, even while acknowledging that insuring privacy in bathrooms, in some sense, is an important governmental interest. The majority argues that the anatomical differences between Adams and biological boys is irrelevant to bathroom privacy. This is contrary to Supreme Court precedent. United States v. Virginia, 518 U.S. 515, 550 n.19 (1996). This Court even recognizes that individuals have a "special sense of privacy" in avoiding bodily exposure and it is heightened "in the presence of people of the other sex." Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir. 1993).

The policy is also not based on an unconstitutional stereotype. The policy does not make a presumption about how a male should act or identify. The policy has nothing to do with gender identity. It is not an unconstitutional stereotype to believe that "one's gender identity and expression should align with one's birth sex." Contra Op. at 25-26. The majority's opinion is therefore contrary to decades of Supreme

Court precedent that grounds its sex discrimination jurisprudence in the biological and physiological differences between the sexes. See, e.g., Nguyen, 533 U.S. at 73 ("The difference between men and women in relation to the birth process is a real one. . . ."); Geduldig, 417 U.S. at 496 n.20 ("[I]t is true that only women can become pregnant . . . ."); Virginia, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: [T]he two sexes are not fungible . . . ." (internal quotation marks omitted)); Frontiero v. Richardson, 411 U.S. 677, 686 (1973) (plurality opinion) (since sex . . . is an immutable characteristic determined solely by the accident of birth . . .).

The majority has held that it is a stereotype to recognize that the sexes are different and reduces the differences between men and women into a nullity, contrary to Supreme Court precedent. See Nguyen, 533 U.S. at 73 ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real."). Protecting bodily privacy in the bathroom from those of the opposite sex is an important governmental interest and utilizing a policy that classifies bathroom usage based on biological sex is substantially related to advancing that important governmental interest. The majority's twisting of the School Board's policy and distortion of the intermediate scrutiny analysis requires *en banc* review.

8

## II.   *En Banc* Review of the Title IX Issue is Required to Maintain Uniformity of this Court's Decisions and of the Decisions of the Supreme Court

The majority's holding that the School Board's policy, and its application to Adams, amounts to actionable sex discrimination under Title IX also conflicts with precedent. Title IX does prohibit sex discrimination in educational programs and activities. 20 U.S.C. § 1681(a). However, Title IX permits schools to maintain separate living facilities for the sexes. Id. at § 1686. Title IX's implementing regulations also give schools discretion to "provide separate toilet, locker room, and shower facilities on the basis of sex..." 34 C.F.R. § 106.33.

The majority concluded that the School Board's policy violated Title IX, because it discriminated against Adams based on Adams' transgender status. Op. at 31. The majority equated this case to the Supreme Court's interpretation of Title VII in Bostock, *supra*. Op. at 32-34. The majority then disclaimed any application of the safe harbor provision to exempt the School Board's sex-based policy, because the safe harbor does not "declare" whether "sex" as applied to Adams is "sex identified at birth" or gender identity. Op. at 40-41. Finally, the majority refused to analyze the implications of the fact that Title IX is spending clause legislation asserting that the School Board waived this argument by not presenting it to the district court. See Op. at 45, n. 10. Each of these underpinnings of the majority opinion requires rehearing *en banc*.

9

The disposition of this issue is determined by the appropriate meaning of "sex" in Title IX and whether the regulatory safe harbor in Title IX exempts the policy. Statutory language must be accorded its ordinary meaning at the time of the enactment of the statute. New Prime Inc. v. Oliveira, 139 S. Ct. 532, 539 (2019); Koch Foods, Inc. v. Sec'y of Labor, 712 F.3d 476, 480 (11th Cir. 2013); Sumpter v. Sec'y of Labor, 763 F.3d 1292, 1296 (11th Cir. 2014). In determining common usage, courts are also guided by dictionary definitions. Koch Foods Inc., 712 F.3d at 480. As Chief Judge Pryor explained in his dissent, there can be no question that the ordinary meaning of the term "sex" when Title IX was enacted in 1972 did not include the concept of transgender status. See Op. at 67-68.

Bostock, which held that terminating a transgender individual due to their transgender status is sex discrimination under Title VII, does not dictate the result the majority reached. Bostock was built on the assumption that "sex" in Title VII only referred to the "biological distinctions" between men and women and declined to decide whether its holding should be extended to policies requiring sex-separated bathrooms. Bostock also concerns Title VII which does not have any regulatory exemption permitting separating bathrooms on the basis of sex. Unlike Bostock, and Glenn v. Brumby, 663 F.3d 1312 (11th Cir. 2011), Adams was not discriminated against based on transgender status, because the policy does not target transgender

students; rather, this case involves the application of a policy that classifies "on the basis of sex" pursuant to a regulatory safe harbor that permits such classification.

In this vein, the majority dodged the application of the regulatory safe harbor, holding that it does not apply to the School Board's policy, because the regulation does not declare how sex should be interpreted or dictate how schools should approach transgender student bathroom use. Nonetheless, the ordinary meaning of the term "sex" does not change from the text of the statute to the text of the safe harbor regulation just because Adams identifies as transgender. The majority's opinion is in conflict with the fundamental canon of statutory construction that words in statutes generally have fixed meanings. See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt, 139 S. Ct. 1507, 1512 (2019). Rather than interpreting the safe harbor regulation, the majority read the term "sex" in the regulation to contain an exception for transgender students. This was inappropriate and in conflict with precedent holding that the duty of courts is to interpret the text of the statute as opposed to applying a meaning based on the silence of those tasked to enact and enforce it. EEOC v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2033 (2015) ("We construe [a statute's] silence as exactly that: silence.").

In this vein, the majority failed to address that, unlike Title VII at issue in Bostock and Glenn, Title IX was passed pursuant to the spending clause. Thus, any violation of Title IX, which is essentially a condition on the receipt of federal funds,

11

must be unambiguously stated by Congress to trigger liability. Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981); Davis ex rel. D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 649-50 (1999). The School Board was not on notice it could be held liable for doing what the safe harbor regulation permits, and the majority's failure to evaluate the statute for spending clause implications conflicts with precedent.

The majority contends this argument was waived because the School Board did not argue it below. However, the School Board argued below that the ordinary common meaning of the term "sex" in Title IX meant biological sex, and the safe harbor regulation contemplated the School Board's policy. This was sufficient to preserve the argument for appeal. While new issues may not be raised on appeal, new arguments relating to preserved issues may. Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1304, n. 3 (11th Cir. 2008) (holding that permutations of statutory argument not raised below could be presented on appeal because the issue was preserved). And, as Chief Judge Pryor points out in his dissent, a party can never waive the proper interpretation of a statute. See Op. at 71 (citing Jefferson v. Sewon Am., Inc., 891 F.3d 911, 923 (11th Cir. 2018)).[2]

---

[2] This Court can also consider an argument first raised on appeal if it involves a pure question of law and refusal to consider it would result in a miscarriage of justice, or where it presents significant questions of general impact or of great public concern. Access Now, Inc. v. Sw. Airlines Co., 385 U.S. 1324, 1332 (11th Cir. 2004). On the

The majority's failure to address the ordinary common meaning of the term "sex" in Title IX and its implementing regulations, to evaluate the regulation's safe harbor, and to interpret the statute consistent with precedent concerning spending clause legislation, merits rehearing *en banc* as those failures run head-long into applicable precedent as described herein. These issues are too important to pass on.

## III.    The Issues in this Case are Exceptionally Important

This case is not just about one student. The logic and reasoning of the opinion will have much wider ramifications across this Circuit and will create a Hobson's choice for entities in this Circuit addressing complicated issues involving policies based on the real differences between the sexes.

First, the majority's conception of intermediate scrutiny to prohibit biological sex-based classifications as a means to achieve the important governmental interest of insuring bodily privacy in intimate facilities will go well-beyond this case. The majority's rationale will invalidate innumerable governmental policies in schools, facilities, and workplaces separating bathrooms, locker rooms, living facilities, and showers on the basis of sex.

---

first point, "where the party seeking consideration of an argument not raised in the district court 'has raised no new factual questions' and the record 'supports its legal argument,' [this Court has] held that 'refusal to consider that argument could result in a miscarriage of justice.'" Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1250 (11th Cir. 2012). The application of the School Board's spending clause argument is a pure question of law and deserves consideration by this Circuit. As will be more fully explained herein, this is also an issue of great public concern.

Equally concerning is the impact of the Court's analysis of the terms of Title IX. The majority's reasoning will be weaponized by those seeking to abolish any recognition that biology is relevant in the application of Title IX in the programs and activities operated by educational institutions receiving federal funds. Essentially, the opinion sends a wrecking ball through Title IX. The reasoning will logically extend to the propriety of the sex-separation of locker rooms, living facilities, showers, and sports teams at schools. This ruling and reasoning applies to all schools subject to Title IX by accepting federal funds, making the majority's failure to address the School Board's spending clause arguments all the more troubling.

The majority's reasoning on the statutory claim will not just affect schools. Lower courts will be hard-pressed to find any material distinction between this case and claims of transgender individuals asserting discrimination in employment for employer restrictions on bathroom, locker room, and shower use. In Florida, the implications of the majority opinion even extends to places of public accommodation. Florida's Civil Rights Act provides:

> All persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation without discrimination or segregation on the ground of … sex…

§ 760.08, Fla. Stat. (2019). Florida courts routinely apply Federal law to interpret state civil rights statutes if those statutes contain similar language to federal law. Florida State Univ. v. Sondel, 685 So. 2d 923, 925 n. 1 (Fla. 1st DCA 1996). One

14

court has already applied federal law to evaluate a public accommodation claim under the Florida law due to its similarity to Title VII. <u>Goodson v. Wal-Mart Stores</u>, No. 4:06-CV-00243, 2006 WL 8443378, at *2, n. 1 (N.D. Fla. Oct. 19, 2006).

A full panel of the Court is necessary to consider these broader issues.

## <u>CONCLUSION</u>

For these reasons, the Court should grant this petition, and rehear the case *en banc*.

Respectfully submitted this 28th day of August, 2020.

/s/ Terry J. Harmon
Terry J. Harmon FBN 0029001
/s/ Jeffrey D. Slanker
Jeffrey D. Slanker FBN 0100391
Robert J. Sniffen FBN 000795
Michael P. Spellman FBN 937975

SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, FL 32301
Telephone: (850) 205-1996
Fax: (850) 205-3004

*Counsel for The School Board of St. Johns County, Florida*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I CERTIFY that this Petition for Rehearing En Banc complies with the type-volume limit of Fed. R. App. P. 35(b)(2) and the word limit of Fed. R. App. P. 35(b)(2) because, excluding the parts of the document exempted by 11th Cir. R. 35-1, this Petition for Rehearing En Banc contains 3552 words and is fifteen pages or less.

I FURTHER CERTIFY that this Petition for Rehearing En Banc complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this Petition for Rehearing En Banc has been prepared in a proportionally spaced typeface using Microsoft Word Version 2016 in 14-point Times New Roman.

/s/ Terry J. Harmon

**TERRY J. HARMON**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify one true and accurate copy of the foregoing document has been furnished by electronic means to all counsel of record as well as by U.S. Certified Mail, Postage Prepaid and Return Receipt Requested.

One original version and fifteen copies of this Petition for Rehearing En Banc with white covers have been delivered via Federal Express to:

David J. Smith, Clerk
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St. N.W.
Atlanta, GA 30303

/s/ Terry J. Harmon
**TERRY J. HARMON**

17

## <u>COPY OF OPINION SOUGHT TO BE REHEARD</u>

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13592

_____

D.C. Docket No. 3:17-cv-00739-TJC-JBT

DREW ADAMS,
a minor, by and through his next friend and mother, Erica Adams Kasper,

Plaintiff - Appellee,

versus

SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 7, 2020)

Before WILLIAM PRYOR, Chief Judge, MARTIN and JILL PRYOR, Circuit
Judges.

MARTIN, Circuit Judge:

Drew Adams is a young man and recent graduate of Nease High School in

Florida's St. Johns County School District. Mr. Adams is transgender, meaning

when he was born, doctors assessed his sex and wrote "female" on his birth certificate, but today Mr. Adams knows "with every fiber of [his] being" that he is a boy. While Mr. Adams attended Nease High School, school officials considered him a boy in all respects but one: he was forbidden to use the boys' restroom. Instead, Mr. Adams had the option of using the multi-stall girls' restrooms, which he found profoundly "insult[ing]." Or he could use a single-stall gender-neutral bathroom, which he found "isolati[ng]," "depress[ing]," "humiliating," and burdensome. After unsuccessful negotiations with the St. Johns County School District over his bathroom use, Mr. Adams brought suit against the St. Johns County School Board (the "School Board") through his next friend and mother, Ms. Erica Adams Kasper. He asserted violations of his rights under Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and the Fourteenth Amendment to the U.S. Constitution. After a bench trial, the District Court granted him relief on both claims.

This case calls upon us to decide whether the St. Johns County School District's policy barring Mr. Adams from the boys' restroom squares with the Constitution's guarantee of equal protection and Title IX's prohibition of sex discrimination. We conclude it does not. We affirm the District Court's decision on both questions.

2

## I.

The District Court developed a thorough factual record after a three-day bench trial of Mr. Adams's claims.  See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty., 318 F. Supp. 3d 1293, 1298–1310 (M.D. Fla. 2018).  We recite those facts here, as necessary.

Drew Adams was born in 2000.  At birth, doctors examined Mr. Adams and recorded his sex as female.  That female designation has vexed Mr. Adams throughout his young life.  As Mr. Adams entered puberty, he suffered significant anxiety and depression about his developing body, and he sought the help of a therapist and a psychiatrist.  In the eighth grade, after introspection and with the help of therapy, Mr. Adams came to realize he was transgender.  He revealed to his parents that he was a boy, not a girl.  Together, Mr. Adams and his family met with mental health professionals, who confirmed Adams was transgender.  In time, Mr. Adams's psychiatrist diagnosed him with gender dysphoria, a condition of "debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex."  Mr. Adams's "gender identity"—his consistent, internal sense of gender—is male, but the sex assigned to him at birth was female.

To treat and alleviate Mr. Adams's gender dysphoria, the psychiatrist recommended Adams socially transition to living as a boy.  This included cutting

his long hair short, dressing in more masculine clothing, wearing a chest binder to flatten breast tissue, adopting the personal pronouns "he" and "him," and using the men's restroom in public. Mr. Adams embraced these changes. Socially transitioning to using the men's restroom, Mr. Adams explained at trial, is "a statement to everyone around me that I am a boy. It's confirming my identity and confirming who I am, that I'm a boy. And it means a lot to me to be able to express who I am with such a simple action because . . . I'm just like every other boy."

The psychiatrist also supported Mr. Adams's request for medical treatment for his gender dysphoria. Mr. Adams began a birth control regimen to end his menstrual cycle and met with social workers and endocrinologists to obtain a prescription for testosterone to masculinize his body. About a year after his diagnosis with gender dysphoria, Mr. Adams underwent a bilateral mastectomy to remove his breast tissue. At the time of trial, Mr. Adams contemplated further surgeries to alter his internal reproductive organs and external genitalia, but he could not take those steps before reaching the age of 18.

Alongside his social and medical transition, Mr. Adams amended his legal documents to reflect his male sex. Following Florida agencies' established procedures for gender change, Mr. Adams updated the sex marker on his learner's driving permit (which became his driver's license) and his original birth certificate.

4

Both now read "male" or "M."  At the time of trial, Mr. Adams had not yet

changed the sex listed on his U.S. passport but testified he could "very easily go

get that changed" by presenting a letter from his physician stating he was being

clinically treated for gender transition.[1]

The transition process, according to Mr. Adams, took "the better part of a

year."  At trial, he described steps in his medical and social transition as a

"rigorous process" through which "medical providers, me, and my parents [agreed]

that this was the right course of action."  Mr. Adams said transitioning led to "the

happiest moments of my life," "finally figuring out who I was," and being "able to

live with myself again."[2]  Mr. Adams's course of treatment—gender transition—

also reflects the "accepted standard of care for transgender persons suffering from

gender dysphoria."  Modern medical consensus establishes that "forc[ing]

---

[1] See Change of Sex Marker, U.S. DEP'T OF STATE,
https://travel.state.gov/content/travel/en/passports/need-passport/change-of-sex-marker.html (last visited August 7, 2020).

[2] The dissenting opinion's central flaw is that it does not meaningfully reckon with what it means for Mr. Adams to be a transgender boy.  The dissent describes Mr. Adams as "a female."  See Dissenting Op. at 47 (calling Mr. Adams "a female who identifies as a male"). The dissent fails to acknowledge Mr. Adams's gender transition, his gender dysphoria and clinical treatment, or the unique significance of his restroom use to his wellbeing.  The dissent also ignores the finding of the District Court that, in light of Mr. Adams's social, medical, and legal gender transition, he is "like any other boy."  Adams, 318 F. Supp. 3d at 1296–97 (resolving the parties' dispute "over whether Drew Adams is a boy").

Because the dissent does not consider Mr. Adams's transgender status analytically relevant, it expresses the view that allowing Mr. Adams to use the boys' restroom erodes restroom divisions for all. This argument cannot stand together with the fact, found by the District Court, that Mr. Adams is "like any other boy."

transgender people to live in accordance with the sex assigned to them at birth" is ineffective and "cause[s] significant harm." In particular, the Pediatric Endocrine Society maintains that "not allowing [transgender] students to use the restroom matching their gender identity promotes further discrimination and segregation of a group that already faces discrimination and safety concerns."

Mr. Adams entered Nease High School in ninth grade, after he began transitioning and presenting as a boy. Mr. Adams's mother informed the school that Adams was transgender, currently transitioning, and should be considered a boy student, but did not discuss Adams's bathroom use with the school. For his first six weeks as a ninth grader, Mr. Adams used the boys' restroom. One day, however, the school pulled Mr. Adams from class and told him he could no longer use the boys' restroom because students had complained. These complaints came from two unidentified girl students who saw Mr. Adams entering the boys' restroom. There were no complaints from boy students who shared bathroom facilities with Adams. Regardless, school officials gave Mr. Adams two choices: use a single-stall, gender-neutral bathroom in the school office, or use the girls' facilities.

In issuing this warning to Mr. Adams, Nease High administrators were acting to enforce the St. Johns County School District's (the "School District") unwritten bathroom policy. For "as long as anybody can remember," the School

District has maintained a policy that, for restroom use, "boys go to boys' rooms, [and] girls go to girls' rooms." The School District defines "boy" and "girl" based on "biological sex," separating "biological boys" from "biological girls." It administers this policy based on the sex indicated on a student's enrollment documents. Because Mr. Adams enrolled in St. Johns County schools in the fourth grade as "female," the School District's policy considered him a "biological girl" who could not use the boys' restroom, regardless of Mr. Adams's updated legal documents or verified course of medical treatment. Students who fail to abide by the School District's bathroom policy can be disciplined for violating the student code of conduct.

School administrators were not wholly unprepared for Mr. Adams's plea to use the boys' restroom as a transgender boy. In 2012, the School District began to consider how to best accommodate its lesbian, gay, bisexual, transgender, and queer (collectively, "LGBTQ") students. Through research and consultation, the School District developed guidelines it considered to be "best practices" for faculty and staff encountering emerging LGBTQ issues raised by students. The School District implemented this LGBTQ best-practices policy in September 2015, at the same time Mr. Adams was directed to avoid the boys' bathroom.

Among other provisions, the best-practices policy instructed educators to use LGBTQ students' preferred names and pronouns; prohibit discriminatory bullying

7

or harassment; protect students' private information; allow students to be "open about their sexual orientation or transgender identity"; and permit students to "wear clothing in accordance with their consistently asserted gender identity." For bathroom use, the best-practices policy clarified: "Transgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex."[3] The policy also stated the School District's belief that no law required schools to "allow a transgender student access to the restroom corresponding to their consistently asserted transgender identity."

Through researching the LGBTQ best-practices policy, the School District learned that other school districts—in Florida and in other states—permitted transgender students to use the restroom according to their gender identity. But the School District declined to adopt such a policy, in part because it feared any student might be able to gain access to any bathroom facility by identifying or pretending to identify as "gender-fluid."[4] The School District, however, had never

---

[3] Through the LGBTQ best-practices policy, the School District also set policy for transgender students' use of school locker rooms. That policy provided: "Schools will provide a transgender student with available accommodations that best meet[] the needs and privacy concerns of all students. Transgender students will not be forced to use the locker room corresponding to their biological sex."

Mr. Adams did not bring a claim for access to the boys' locker rooms at Nease High School. This opinion therefore does not address whether the Fourteenth Amendment requires schools to allow transgender students access to locker rooms consistent with their gender identity.

[4] "Gender-fluid" describes a person who "typically reject[s] notions of static categories of gender and embrace[s] a fluidity of gender identity." In other words, a person identifying as gender-fluid "may feel they are a girl some days and a boy on others, or a combination, or

encountered or even heard of any gender-fluid students or pretenders seeking access to all bathroom facilities.  The School Board also believed allowing transgender students to use single-stall restrooms appropriately reconciled accommodations for transgender students with the privacy rights of non-transgender students.

Mr. Adams disagreed.  He felt "alienated and humiliated" every time he "walk[ed] past the boys' restroom on his way to a gender-neutral bathroom, knowing every other boy is permitted to use it but him."  Mr. Adams believed the bathroom policy sent "a message to other students who [saw Adams] use a 'special bathroom' that he is different."  Throughout his freshman and sophomore years, he and his mother protested the School District's birth-sex-based bathroom policy, writing letters, meeting with school officials, and filing a complaint with the U.S. Department of Education's Office of Civil Rights.

Unsuccessful, Mr. Adams—through his mother, Ms. Kasper—sued the School Board in federal court in June 2017.  He alleged the School Board violated

---

possibly feel that neither term describes them accurately."  As the District Court observed, no "scientific or medical definition" of "gender-fluid" exists in the record, and other courts have accepted expert testimony that gender-fluid, unlike gender dysphoria, "is not a clinical term." See Doe ex rel. Doe v. Boyertown Area Sch. Dist., 276 F. Supp. 3d 324, 365 (E.D. Pa. 2017), aff'd, 890 F.3d 1124 (3d Cir. 2018), cert. denied, 138 S. Ct. 2636 (2019).  The School District offered no evidence of gender-fluid students or students pretending to be gender-fluid in St. Johns County schools.  See id. at 376 n.44 (observing a school district had "no evidence that any student" who requested special restroom access had "other gender identities" beyond boy or girl, such as "gender-fluid").

his right to equal protection under the Fourteenth Amendment and his rights under Title IX by barring him from the boys' bathrooms at school. He asked for injunctive, declarative, and monetary relief. Mr. Adams then moved for a preliminary injunction to enjoin the School Board from enforcing its bathroom policy. The Honorable Timothy J. Corrigan denied his motion for a preliminary injunction on August 10, 2017, but set the case for a bench trial in December 2017, on an expedited schedule. Before trial, Judge Corrigan toured Nease High School with both sides' counsel to view the bathroom facilities.

After a three-day trial, Judge Corrigan issued findings of fact and conclusions of law, holding that Mr. Adams was entitled to declaratory, injunctive, and monetary relief on his constitutional and Title IX claims. The School Board timely appealed.

## II.

After a bench trial, we review de novo the District Court's conclusions of law. Tartell v. S. Fla. Sinus & Allergy Ctr., Inc., 790 F.3d 1253, 1257 (11th Cir. 2015). We accept the District Court's findings of fact, absent clear error. See id. "We will not find clear error unless our review of the record leaves us with the definite and firm conviction that a mistake has been committed." U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc., 894 F.3d 1313, 1322 (11th Cir. 2018) (quotation marks omitted).

10

## III.

We turn first to Mr. Adams's constitutional claim.

The Fourteenth Amendment promises "the equal protection of the laws." U.S. Const. amend. XIV, § 1. When state actors draw distinctions using sex or gender, this constitutional mandate "call[s] for a heightened standard of review." See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S. Ct. 3249, 3254 (1985). Because sex or gender "generally provide[] no sensible ground for differential treatment," id., the Equal Protection Clause tolerates only "exceedingly persuasive" classifications based on sex or gender, United States v. Virginia ("VMI"), 518 U.S. 515, 534, 555, 116 S. Ct. 2264, 2276, 2286 (1996). "A gender classification fails unless it is substantially related to a sufficiently important governmental interest." Cleburne, 473 U.S. at 441, 105 S. Ct. at 3255. "Ever since the Supreme Court began to apply heightened scrutiny to sex-based classifications, its consistent purpose has been to eliminate discrimination on the basis of gender stereotypes." Glenn v. Brumby, 663 F.3d 1312, 1319 (11th Cir. 2011).

### A.

Mr. Adams and the School Board are in agreement that our Court is required to review the School District's bathroom policy with heightened scrutiny. Although this standard of review is not in dispute, we first review why heightened scrutiny is warranted in order to chart a course for our analysis.

11

The School Board concedes its policy broadly "discriminates on the basis of sex" by requiring "biological females to use girls' bathrooms and biological males to use boys' bathrooms." But Mr. Adams describes the discrimination more narrowly. He believes the bathroom policy discriminates against him because, by being transgender, he defies gender norms and stereotypes. He explains that by defining "boy" and "girl" based on "biological sex," or sex assigned at birth, the School Board divides restrooms based on a characteristic that "punishes transgender students and favors non-transgender students." He further points out that the policy forces transgender students (and only transgender students) to choose between using a single-stall restroom in isolation from their peers or using a restroom that does not match their gender identity and causes them humiliation and insult. Mr. Adams says this choice is no choice at all, so the bathroom policy has the effect of excluding him from all communal restrooms.

It is Mr. Adams who properly tees up the constitutional issue in this case. The School Board's bathroom policy singles out transgender students for differential treatment because they are transgender: "Transgender students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex." The policy emphasized the School Board's position that no law required it to "allow a transgender student access to the restroom corresponding to their consistently asserted []gender

12

identity." In this way, the policy places a special burden on transgender students because their gender identity does not match their sex assigned at birth. And, as this Court announced in Glenn, "discrimination against a transgender individual because of [his or] her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender."[5] 663 F.3d at 1317; cf. Bostock v. Clayton County, 590 U.S. ___, 140 S. Ct. 1731, 1741 (2020) (confirming that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex"). We therefore apply heightened scrutiny to the School Board bathroom policy. See Glenn, 663 F.3d at 1320.

## B.

Next, we recognize an important government interest behind the School Board's bathroom policy. Out of concern for students' privacy, the School Board adopted a policy prohibiting Mr. Adams and other transgender students from using the restrooms matching their gender identity. We believe the School Board's goal is a worthy one. Protecting the bodily privacy of young students is undoubtedly an important government interest. See Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1052 (7th Cir. 2017) (holding a

---

[5] In its analysis of the equal protection claim, the dissenting opinion barely mentions this Court's decision in Glenn. See Dissenting Op. at 57. This is remarkable, because Glenn established the equal protection rights of transgender people in this circuit.

school district had "a legitimate interest in ensuring bathroom privacy rights are protected"); cf. New Jersey v. T.L.O., 469 U.S. 325, 338–39, 105 S. Ct. 733, 740–41 (1985) (observing, in the Fourth Amendment context, that a "search of a child's person" at school "is undoubtedly a severe violation of subjective expectations of privacy"); Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir. 2005) (noting that "[s]tudents of course have a significant privacy interest in their unclothed bodies" against strip searches at school).

C.

Beyond this, we assume the government may promote its interest in protecting privacy by maintaining separate bathrooms for boys and girls or men and women. Mr. Adams, for his part, does not question the ubiquitous societal practice of separate bathrooms for men and women. Instead, Mr. Adams argues the School Board's bathroom policy singles him out for differential treatment on the basis of his gender nonconformity and without furthering student privacy whatsoever. The record before us has persuaded us to his view.

The School Board has demonstrated no substantial relationship between excluding Mr. Adams from the communal boys' restrooms and protecting student privacy. We see three constitutional infirmities with the School District's bathroom policy. First, the policy is administered arbitrarily. The policy relies upon a student's enrollment documents to determine sex assigned at birth. This

14

targets some transgender students for bathroom restrictions but not others. Second, the School Board's privacy concerns about Mr. Adams's use of the boys' bathroom are merely "hypothesized," with no support in the factual record. See VMI, 518 U.S. at 533, 116 S. Ct. at 2275. Third, the School District's bathroom policy subjects Mr. Adams to unfavorable treatment simply because he defies gender stereotypes as a transgender person.

### 1.

The record demonstrates that the School District's bathroom policy is administered arbitrarily. This poses a constitutional problem. To pass muster under the Fourteenth Amendment, a governmental gender classification must "be reasonable, not arbitrary." Reed v. Reed, 404 U.S. 71, 76, 92 S. Ct. 251, 254 (1971) (quotation marks omitted).

By way of example, the Supreme Court struck down an arbitrary gender-based policy in Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451 (1976). See id. at 204, 97 S. Ct. at 460. Craig addressed an Oklahoma statute that outlawed the sale of 3.2% beer to young men under the age of 21 and to young women under the age of 18, purportedly as a means to promote traffic safety. Id. at 191–92, 199, 97 S. Ct. at 454, 458. Considering the constitutionality of the statute, the Court first cast doubt on the statistical evidence that young men drink and drive more frequently

than young women.[6]  See id. at 200, 97 S. Ct. at 458.  The Court concluded that the

statistical evidence did not demonstrate that gender was a "legitimate accurate

proxy for the regulation of drinking and driving."  Id. at 202, 204, 97 S. Ct. at 459,

460.  Then, even setting aside the problematic correlation of gender and drinking

behavior, the Court observed that the statute as written did not even prevent young

men from driving under the influence.  This was because the law "prohibits only

the selling of 3.2% beer to young males and not their drinking the beverage once

acquired (even after purchase by their 18-20-year-old female companions)."  Id. at

204, 97 S. Ct. at 460.  Thus, the Court decided that the statute violated the

Fourteenth Amendment because its terms did not achieve its statutory objective.

Id.  Concurring separately, Justice Stewart observed that the statute's terms

"amount[ed] to total irrationality."  Id. at 215, 97 S. Ct. at 466.

　　The School District's bathroom policy suffers from this type of defect.  We

set aside for now that the policy treats transgender students differently than non-

transgender students.  The policy still runs afoul of the Fourteenth Amendment

---

[6] The Craig Court cautioned that "proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause."  429 U.S. at 204, 97 S. Ct. at 460.  The dissent throws this caution to the wind.  It would condone the School District's bathroom policy because transgender students in the School District are few and the policy is "99.96 percent accurate in separating bathrooms."  Dissenting Op. at 50, 59.  The dissent considers this result "near-perfect."  Id. at 50.  But this case has come before our Court because Mr. Adams considers the bathroom policy to be nowhere near perfect.  Once again, the dissent does not grapple with Mr. Adams's status as a transgender boy.

because it does not even succeed in treating all transgender students alike. Just as the statute in <u>Craig</u> did not prevent young men from driving after drinking 3.2% beer, the bathroom policy does not succeed in excluding every transgender student from the restroom matching his or her gender identity. This arbitrary result demonstrates the unconstitutionality of the bathroom policy.

As the District Court found, the School District determines a student's sex assigned at birth for purposes of restroom use by looking to the forms the student presented at the time he enrolled in the District. Even if a student later provides the District with a birth certificate or driver's license indicating a different sex, the original enrollment documents control. The enrollment forms, however, say nothing about a student's assigned sex at birth or transgender status. They ask only whether a student is male or female. At trial, the School District admitted that if a transgender student enrolled with documents matching his gender identity, he would be permitted to use the restroom matching his gender identity. At present, the School Board acknowledges that this loophole in the policy means some of the District's transgender students may be using school restrooms that match their gender identity. <u>See</u> Oral Arg. Recording at 12:05–12:43 (Dec. 5, 2019). But a transgender student like Mr. Adams, who transitions after enrolling in the School District, would not be able to use the restroom matching his gender identity. In

17

this way, the bathroom policy does not even apply to all transgender students equally.

Thus, the School District's criteria for determining a student's bathroom use do not achieve the School Board's stated goal of restricting transgender students to the restroom of their assigned sex at birth. The designation of a student's sex on his school enrollment documents is not a "legitimate, accurate proxy" for his sex assigned at birth. See Craig, 429 U.S. at 204, 97 S. Ct. at 460. It is arbitrary that some transgender students—like Mr. Adams—are restricted by the bathroom policy, while others are beyond its reach. Again, the Fourteenth Amendment requires a substantial, accurate relationship between a gender-based policy and its stated purpose. See Cleburne, 473 U.S. at 441, 105 S. Ct. at 3255; Craig, 429 U.S. at 198, 97 S. Ct. at 457. Because the bathroom policy does not do what it was designed to do, the School Board cannot show the requisite substantial relationship. See Frontiero v. Richardson, 411 U.S. 677, 690–91, 93 S. Ct. 1764, 1772 (1973) (plurality opinion) (rejecting a gender-based policy as arbitrary because the government did not show that the policy promoted "administrative convenience" by actually saving any money or time (quotation marks omitted)).

## 2.

And there are broader constitutional concerns. The School Board's concerns about transgender students endangering restroom privacy are not borne out by the

record.  To satisfy the Fourteenth Amendment, the government's justification for a gender classification "must be genuine, not hypothesized."  VMI, 518 U.S. at 533, 116 S. Ct. at 2275.  While a rational basis standard of review "permits a court to hypothesize interests that might support [governmental gender] distinctions, . . . heightened scrutiny limits the realm of justification to demonstrable reality."  Tuan Anh Nguyen v. INS, 533 U.S. 53, 77, 121 S. Ct. 2053, 2068 (2001) (O'Connor, J., dissenting).

We must examine the trial record to see whether the government showed a non-hypothesized justification for its gender classification.  For instance, in Glenn, an employer claimed he fired a transgender woman because "other women might object to [her] restroom use."  663 F.3d at 1321.  But the record showed that the office building had "only single-occupancy restrooms," and the employer testified he believed lawsuits over restroom use were "unlikely."  Id.  Because the record showed that concerns about restroom use were unfounded, our Court held there was not sufficient evidence that the employer "was actually motivated" by restroom-related concerns.  Id.  As a result, the Glenn opinion said the employer's defense was a "hypothetical justification" that was "wholly irrelevant to the heightened scrutiny analysis."  Id.

Here, the School Board's concerns about privacy in the boys' bathrooms are as hypothetical as those raised in Glenn.  After extensive evidence was presented at

trial, the District Court found that Mr. Adams's presence in the boys' bathroom does not jeopardize the privacy of his peers in any concrete sense.  When Mr. Adams uses the restroom, he "enters a stall, closes the door, relieves himself, comes out of the stall, washes his hands, and leaves."  The School Board received no reports of privacy breaches during the six weeks Mr. Adams actually used the boys' restroom at Nease.  Indeed, the School Board could not produce any "complaints of untoward behavior involving a transgender student" in the restroom.  Nor could the School Board point to any incidents across the country in which allowing transgender students to use the restroom according to their gender identity compromised other students' privacy.  The District Court found that "any student engaging in voyeurism in the bathroom would be engaging in misconduct which is [already] subject to discipline through the School District's code of conduct," such that the bathroom policy was not necessary to protect any new privacy concerns.  The court also accepted expert evidence that transgender students like Mr. Adams "typically seek privacy and discr[eet]ness in restroom use and try to avoid exposing any parts of their genitalia that would reveal sex characteristics inconsistent with their gender identity."  In fact, the School Board conceded at oral argument it was "fair" that some transgender students in the School District may already be using the bathroom consistent with their gender identity, without anyone's knowledge.  Oral Arg. Recording at 12:05–12:43.  From

20

the sum of these facts, we cannot say the School Board has met its burden to show a genuine, non-hypothetical privacy justification for excluding Mr. Adams from the boys' bathroom.  See Whitaker, 858 F.3d at 1052–53.

Accepting, as it must, the District Court's finding that Mr. Adams has not harassed or peeped at other boys while using the boys' restroom, the School Board argues Mr. Adams's mere presence in the boys' room constitutes a privacy violation.  It asserts that "when Adams enters a boys' bathroom and there is a biological boy using the urinal, that biological boy's privacy rights have been violated."  Again, this record simply does not support this assertion.  Absent such evidence, we "decline to recognize such an expansive [formulation of] privacy . . . that would be violated by the presence of students who do not share the same birth sex."  See Doe ex rel. Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 531 (3d Cir. 2018) (holding that transgender students' access to bathrooms matching gender identity did not violate non-transgender students' constitutional privacy rights), cert. denied, 139 S. Ct. 2636 (2019); see also Parents for Privacy v. Barr, 949 F.3d 1210, 1222 (9th Cir. 2020) (holding that there is no Fourteenth Amendment privacy right not to share school restrooms with transgender students who were assigned a different sex at birth); Whitaker, 858 F.3d at 1052 (holding a school could not show the "mere presence of a transgender student in the bathroom" infringed on other students' privacy rights, without facts supporting

21

tangible breaches of privacy).  Simply put, the School Board singled out Mr. Adams's use of the restroom as problematic, without showing that Adams did, in fact, flout or compromise the privacy of other boys when he was in the boys' restroom.

The School Board next argues its bathroom policy survives heightened scrutiny because excluding transgender students from the restroom matching their gender identity keeps private the "different physiological characteristics between the two sexes."  The Board likens the bathroom policy to the government policies upheld in Michael M. v. Superior Court of Sonoma County, 450 U.S. 464, 101 S. Ct. 1200 (1981), and Tuan Anh Nguyen v. INS, 533 U.S. 53, 121 S. Ct. 2053.  We reject these comparisons as inapt.

Michael M. held that a statutory rape law criminalizing sex with underage girls, but not boys, passed constitutional muster because its goal was to "prevent illegitimate teenage pregnancies."  450 U.S. at 470, 101 S. Ct. at 1205 (plurality opinion).  The idea was that "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse," so the law bore a substantial relationship to the government's important interest in reducing teenage pregnancies.  Id. at 471–72, 101 S. Ct. at 1205.  Nguyen likewise addressed pregnancy and childbirth.  The Nguyen Court upheld a statute allowing unmarried U.S. citizen mothers who gave birth abroad to establish citizenship for

22

the child automatically, while unmarried citizen fathers of foreign-born children had to offer proof of paternity.  See 533 U.S. at 60, 73, 121 S. Ct. at 2059, 2066. Because "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood," the law withstood heightened scrutiny.  Id. at 63, 121 S. Ct. at 2060.

The use of the restrooms by boys and girls in closed, locked bathroom stalls is legally distinct from the reproductive differences between sexes, as related to pregnancy and childbirth.  The District Court here expressly found that the School District's bathroom policy did not turn on "something innately different" between how boys and girls use the bathroom.  The District Court also made the finding that no anatomical differences between the sexes were required to be on display in the school restrooms.  And, "if the School District's concern is that a child will be in the bathroom with another child who does not look anatomically the same," other possible anatomical differences between students, such as the differences between pre-pubescent and post-pubescent students, might be just as concerning from a privacy standpoint.  See Whitaker, 858 F.3d at 1052–53.  But the School District's bathroom policy did not account for these factors.  According to the facts found at trial, Mr. Adams's anatomical differences from his non-transgender male peers are irrelevant to his use of the boys' restroom.

23

And again here, the School Board's invocation of privacy for anatomical differences is internally inconsistent. The School Board ignores that, in many ways, Mr. Adams has changed the physiological manifestation of his gender. Like many transgender boys and men, Mr. Adams surgically eliminated his breast tissue and embarked on hormonal treatment that would "alter the appearance of the genitals, suppress menstruation, and produce secondary sex characteristics such as increased muscle mass, increased body hair on the face, chest, and abdomen, and a deepening of the voice." Were Mr. Adams to use the school's restroom for girls, as the School Board maintains he could, his masculine physiology would present many of the same anatomical differences the School Board fears if non-transgender boys used the girls' restroom. The District Court observed the School Board's position that Mr. Adams was free to use the girls' bathroom "seem[ed] disingenuous" for these reasons. And of course, because the School Board identifies a student's gender based on the paperwork he submitted when he first enrolled in the school district, Mr. Adams would have been considered a boy under the policy if he had happened to enroll with his updated legal documents. On this record, the School Board failed to raise genuine, non-hypothetical justifications for excluding Mr. Adams from the boys' restroom.

3.

The School Board's bathroom policy also treats transgender students like Mr. Adams differently because they fail to conform to gender stereotypes. To survive heightened scrutiny, a sex classification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." VMI, 518 U.S. at 533, 116 S. Ct. at 2275. And "sex-based stereotypes are also insufficient to sustain a classification." Whitaker, 858 F.3d at 1051; see J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 138–40, 114 S. Ct. 1419, 1426–27 (1994) (holding the Equal Protection Clause prohibits peremptory challenges to jurors based on gender stereotypes); Glenn, 663 F.3d at 1320 & n.9 ("[G]overnmental reliance on gender-based stereotypes is dispositive in . . . equal protection analysis. . . .").

Gender stereotypes "presume that men and women's appearance and behavior will be determined by their sex." Glenn, 663 F.3d at 1320. Mr. Adams is considered transgender "precisely because of the perception that his . . . behavior transgresses gender stereotypes." See id. at 1316. Because Mr. Adams was assigned a female sex at birth but identifies consistently and persistently as a boy and presents as masculine, he defies the stereotype that one's gender identity and expression should align with one's birth sex. See id. (noting that transgender persons' "appearance, behavior, or other personal characteristics differ from

25

traditional norms" (quoting Taylor Flynn, <u>Transforming the Debate: Why We Need to Include Transgender Rights in the Struggles for Sex and Sexual Orientation Equality</u>, 101 Colum. L. Rev. 392, 392 (2001))).

The School Board's bathroom policy sought to enforce this gender stereotype. The School District administered the policy using students' enrollment documents as a proxy for their sex at birth. The School Board says this was the best way to protect all students' privacy in school restrooms. But this policy presumes every person deemed "male" at birth would act and identify as a "boy" and every person deemed "female" would act and identify as a "girl." Based on these stereotypes, the School Board labeled Mr. Adams as a "girl" for purposes of his bathroom use, based solely on his sex assigned at birth. This label gives no regard to the fact that that Mr. Adams lives and presents as a boy and has been declared a boy by his family, the State of Florida, the federal government, and his medical providers. As far as the record shows, Mr. Adams was the only student in the School District with a "male" birth certificate and driver's license who was not allowed to use the boys' restroom. Nevertheless, the School Board's bathroom policy relegated Mr. Adams to single-stall, gender-neutral bathrooms and exposed him to school discipline for using the restroom matching his gender identity. These hardships were imposed on Mr. Adams because he is transgender and did not act or present as female, the sex he was assigned at birth.

26

The gender stereotypes the School Board imposed on Mr. Adams track the stereotypes this Court ruled unconstitutional in <u>Glenn</u>. Vandiver Elizabeth Glenn, a transgender woman, was fired because her employer perceived her as "a man dressed as a woman and made up as a woman." 663 F.3d at 1314, 1320–21 (quotation marks omitted). Ms. Glenn's employer was "unsettl[ed] to think of [Glenn] dressed in women's clothing with male sexual organs inside that clothing." <u>Id.</u> at 1314 (quotation marks omitted). This Court held the employer's discomfort with Ms. Glenn's femininity combined with her private anatomy were proof of unconstitutional gender stereotyping. <u>See id.</u> at 1320–21. Based on the employer's comments, this Court concluded Ms. Glenn was fired because she was transgender and thereby defied gender stereotypes. <u>See id.</u>

As in <u>Glenn</u>, the School District's bathroom policy labels Mr. Adams as a "girl" solely because of the gender assigned to him at birth based on his sexual organs. The policy advances gender stereotypes by deeming Mr. Adams "truly" female, even though he produced legal and medical documentation showing he was male. <u>See Grimm v. Gloucester Cty. Sch. Bd.</u>, 400 F. Supp. 3d 444, 457 (E.D. Va. 2019) ("In determining the physical characteristics that define male and female and the characteristics that are disregarded, the [School] Board has crafted a policy that is based on stereotypes about gender." (citing, <u>inter alia</u>, <u>Glenn</u>, 663 F.3d at 1316)), <u>appeal docketed</u>, No. 19-1952 (4th Cir. Sept. 3, 2019). And like <u>Glenn</u>, the

bathroom policy singles out Mr. Adams for different treatment because he is transgender. It excludes him from the restroom matching his gender identity and gives him little choice but to use the restroom in isolation from his peers. See Whitaker, 858 F.3d at 1045 (affirming a preliminary injunction because a school district caused irreparable harm to a student "when it dismissed him to a separate [gender-neutral] bathroom" and "stigmatized [him], indicating that he was 'different' because he was a transgender boy"). Of course the School Board here treated Mr. Adams with more respect than the employer in Glenn. School officials used Adams's male pronouns, permitted him to wear boys' clothes to school, and did not interfere with his decision to identify openly as transgender. Nevertheless, the Constitution does not tolerate any form of gender stereotyping on the basis of one's birth sex and sexual organs. See Glenn, 663 F.3d at 1316–17.

The School Board repeats its concern that allowing Mr. Adams to use the boys' restroom could allow "a non-transgender student to pose as a gender-fluid student to access the bathroom." But again, the Board offers no evidence that any students claiming to be gender-fluid have asked for access to all bathroom facilities. We remain unpersuaded that this concern is anything more than hypothetical.

The School Board also believes allowing Mr. Adams access to the boys' restroom threatens the time-honored convention of separate bathrooms for men and

women, because any person could "claim discrimination" and use a different bathroom for "no reason at all." Neither are we convinced by this argument. Mr. Adams succeeds on his constitutional claim because, first, there is a dearth of evidence in this record that transgender students are a threat to other students' privacy. Second, the record demonstrates that the School Board subjected Mr. Adams to gender stereotyping. We emphasize that the constitutionality of gender-separated bathrooms is not before us. Although the dissenting opinion seems anxious to weigh in on this broader issue, no one has argued here that separating men and women's restrooms treats men and women unequally, lacks any factual basis, or perpetuates "invidious, archaic, and overbroad stereotypes" about gender. See J.E.B., 511 U.S. at 130–31, 115 S. Ct. at 1422.

4.

Because this record reveals no substantial relationship between privacy in St. Johns County School District restrooms and excluding Mr. Adams from the boys' restroom, the School District's bathroom policy violates the Equal Protection Clause. In so holding, we join the Seventh Circuit, the only other circuit to encounter this issue, along with the majority of district courts who have taken up this topic. See Whitaker, 858 F.3d at 1054 (holding a transgender boy demonstrated likelihood of success on the merits of his equal protection claim to use the boys' restroom); see also A.H. ex rel. Handling v. Minersville Area Sch.

Dist., 408 F. Supp. 3d 536, 578 (M.D. Pa. 2019) (granting summary judgment to

transgender girl on equal protection claim for access to girls' restroom because

school district failed to demonstrate an exceedingly persuasive justification);

Grimm, 400 F. Supp. 3d at 461 (same, for transgender boy); Evancho v. Pine-

Richland Sch. Dist., 237 F. Supp. 3d 267, 293 (W.D. Pa. 2017) (holding

transgender students showed likelihood of success on equal protection claim to

access restrooms matching gender identity); Bd. of Educ. of the Highland Local

Sch. Dist. v. U.S. Dep't of Educ., 208 F. Supp. 3d 850, 877 (S.D. Ohio 2016)

(same, with transgender girl).

 Although this issue is not before us here, we are aware that the Third and

Ninth Circuits have rejected claims from non-transgender students that their school

violated their fundamental right to privacy by separating boys' and girls'

bathrooms based on gender identity. See Parents for Privacy, 949 F.3d at 1221–26

(affirming dismissal of non-transgender students' constitutional privacy claim);

Doe, 897 F.3d at 530–31 (holding that non-transgender students could not establish

likelihood of success on constitutional privacy claim).  And we subscribe to the

thinking of the Third Circuit when it said that requiring "transgender student[s] to

use single-user facilities" under an assigned-sex-at-birth-based bathroom policy

"would very publicly brand all transgender students with a scarlet 'T,' and they

should not have to endure that as the price of attending their public school." Doe, 897 F.3d at 530.

This record does not demonstrate that the School Board has met its "demanding" constitutional burden by showing a substantial relationship between excluding transgender students from communal restrooms and student privacy. See VMI, 518 U.S. at 533, 116 S. Ct. at 2275. We therefore affirm the District Court's grant of relief to Mr. Adams under the Fourteenth Amendment.

## IV.

Mr. Adams also prevails on his Title IX claim. Title IX mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

There is only one dispute about Mr. Adams's Title IX claim: whether excluding Mr. Adams from the boys' bathroom amounts to sex discrimination in violation of the statute.[7] We conclude that this policy of exclusion constitutes discrimination. First, Title IX protects students from discrimination based on their transgender status. And second, the School District treated Mr. Adams differently because he was transgender, and this different treatment caused him harm. Finally,

---

[7] The parties agree that the St. Johns County School District receives federal financial assistance and is thus bound by Title IX. They agree as well that the use of the school restrooms is an "education program or activity" within the meaning of Title IX.

nothing in Title IX's regulations or any administrative guidance on Title IX

excuses the School Board's discriminatory policy.

A.

Our analysis of Mr. Adams's Title IX claim benefits from the Supreme

Court's recent decision in <u>Bostock v. Clayton County</u>, 590 U.S. ___, 140 S. Ct.

1731 (2020).  <u>Bostock</u> announced that Title VII's prohibition on sex discrimination

also forbids discrimination based on transgender status.  <u>Id.</u> at 1737.  The Court

instructed that "it is impossible to discriminate against a person for being . . .

transgender without discriminating against that individual based on sex."  <u>Id.</u> at

1741.

<u>Bostock</u> has great import for Mr. Adams's Title IX claim.  Although Title

VII and Title IX are separate substantive provisions of the Civil Rights Act of

1964, both titles prohibit discrimination against individuals on the basis of sex.  42

U.S.C. § 2000e-2(a)(1) (Title VII); 20 U.S.C. § 1681(a) (Title IX).  Both titles also

employ a "but-for causation standard," which <u>Bostock</u> found critical to its

expansive interpretation of sex discrimination.  <u>See</u> <u>Bostock</u>, 140 S. Ct. at 1739

(citing <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 350, 133 S. Ct. 2517,

2527 (2013)); <u>Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media</u>, 589

U.S. ___, 140 S. Ct. 1009, 1014 (2020) (explaining that but-for causation is the

"default" rule for federal antidiscrimination laws).  Given these similarities, it

32

comes as no surprise that the Supreme Court has "looked to its Title VII interpretations of discrimination in illuminating Title IX" and its anti-discrimination provisions.  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 616 n.1, 119 S. Ct. 2176, 2195 n.1 (1999) (Thomas, J., dissenting); see, e.g., Franklin v. Gwinnett Cty. Pub. Schs., 503 U.S. 60, 75, 112 S. Ct. 1028, 1037 (1992) (applying, in the context of a Title IX claim, Title VII's conception of sexual harassment as sex discrimination).

The School Board argues that Title IX does not proscribe discrimination against transgender people, because the statute was only "intended to address discrimination plaguing biological women."  Appellant's Br. at 39.  However, Bostock teaches that, even if Congress never contemplated that Title VII could forbid discrimination against transgender people, the "starkly broad terms" of the statute require nothing less.  140 S. Ct. at 1753.  This reasoning applies with the same force to Title IX's equally broad prohibition on sex discrimination.

Still, the School Board argues that Title IX's ban on sex discrimination is somehow different from Title VII's because "schools are a wildly different environment than the workplace" and education "is the province of local governmental officials."  Appellant's Br. at 43–44.  We are not persuaded. Congress saw fit to outlaw sex discrimination in federally funded schools, just as it

33

did in covered workplaces. And, as we have explained, the Supreme Court's interpretation of discrimination based on sex applies in both settings.

With Bostock's guidance, we conclude that Title IX, like Title VII, prohibits discrimination against a person because he is transgender, because this constitutes discrimination based on sex.

## B.

Of course, Mr. Adams still bears the burden of showing that the School District discriminated against him by barring him from the boys' restroom because he is transgender. With the benefit of the District Court's careful factfinding, we are satisfied that Mr. Adams succeeds on his claim of sex discrimination under Title IX, and we affirm the District Court's judgment in his favor.

Again, Title IX provides that no person shall, "on the basis of sex . . . be subjected to discrimination" at school. 20 U.S.C. § 1681(a). Discrimination "refers to distinctions or differences in treatment that injure protected individuals." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59, 126 S. Ct. 2405, 2410 (2006); see also Jackson v. Birmingham Bd. of Ed., 544 U.S. 167, 174, 125 S. Ct. 1497, 1504 (2005) (describing sex discrimination under Title IX as "differential" and "less favorable" treatment (quotation marks omitted)). Title IX's implementing regulations explain that a school cannot "[s]ubject any person to separate or different rules of behavior, sanctions, or other treatment" on the basis

34

of sex.  34 C.F.R. § 106.31(b)(4).  Neither can a school "[p]rovide different aid, benefits, or services or provide aid, benefits or services in a different manner" because of sex.  Id. § 106.31(b)(2).

As with his equal protection claim, Mr. Adams's claim of sex discrimination is stated narrowly.  He argues the School District excluded him from the boys' restroom because he is transgender.  He says this policy constitutes discrimination on the basis of sex in violation of Title IX.  Although one would never know it from reading the dissenting opinion, Mr. Adams does not argue that providing separate restrooms for boys and girls violates Title IX.  Nor do we think he could. The statute's implementing regulations specifically authorize "separate toilet, locker room, and shower facilities on the basis of sex," as long as all facilities are "comparable."  34 C.F.R. § 106.33.

The School Board argues Mr. Adams did not suffer any discrimination.  The Board reads Bostock to hold that "a woman who identifies as a man—a transgender man—is a woman."  Appellant's Suppl. Br. at 3.  This being the Board's view, it argues that Mr. Adams was treated just the same as all girl students at Nease High School.  But the School Board, like the dissenting opinion, misapprehends Bostock.  Bostock explained that if an employer fires a transgender female employee but retains a non-transgender female employee, this differential treatment is discrimination because of sex.  140 S. Ct. at 1741–42.  In the same

way, Mr. Adams can show discrimination by comparing the School Board's treatment of him, as a transgender boy, to its treatment of non-transgender boys.

The Board's treatment of Mr. Adams is like that deemed discriminatory in Bostock. If Mr. Adams were a non-transgender boy, the School Board would permit him to use the boys' restroom. The School Board allowed all non-transgender boys to use the boys' restroom. It allowed all non-transgender students with male driver's licenses and birth certificates to use the boys' restroom. But because Mr. Adams is a transgender boy, the School Board singled him out for different treatment. By the very terms of the bathroom policy, the Board refused to allow Adams, "a transgender student[,] access to the restroom corresponding to [his] consistently asserted transgender identity."

Mr. Adams was also treated differently than non-transgender students generally. If Mr. Adams entered the restroom matching the sex on his legal documents and his gender identity, he faced school discipline. But non-transgender students did not face discipline for restroom use corresponding to their gender identity and their legal documents. Through the bathroom policy, the School District ousted Mr. Adams from communal restrooms and gave him no choice but to use the single-stall facilities. In these respects, the Board subjected Mr. Adams, "as a transgender student, to different rules, sanctions, and treatment

than non-transgender students, in violation of Title IX."  Whitaker, 858 F.3d at 1049–50; see 34 C.F.R. § 106.31(b)(4).

The record leaves no doubt that Mr. Adams suffered harm from this differential treatment.  Mr. Adams introduced expert testimony that many transgender people experience the "debilitating distress and anxiety" of gender dysphoria, which is alleviated by using restrooms consistent with their gender identity, among other measures.  318 F. Supp. 3d. at 1299 (quotation marks omitted).  Experts also testified that "forc[ing] transgender people to live in accordance with the sex assigned to them at birth . . . cause[s] significant harm." Id. at 1300.  Mr. Adams described that he personally suffered "anxiety and depression" from "walk[ing] past the boys' restroom on his way to a gender-neutral bathroom, knowing every other boy is permitted to use it but him."  Id. at 1308.  The bathroom policy caused him to feel sorely "alienated" and "different" from other students because he is transgender.  Id.  Mr. Adams testified that, because of the policy, "I know that the school sees me as less of a person, less of a boy, certainly, than my peers."  R. Doc. 160-1 at 204.

Mr. Adams also suffered harm because he was separated from his peers in single-stall restroom facilities.  Mr. Adams explained it felt like a "walk of shame" when he had to walk past the communal restrooms for a single-stall, gender-neutral restroom.  It heightened the stigma he felt for being transgender.  Mr. Adams had

little choice in this matter. The evidence at trial established that using the girls' restroom at school hindered Mr. Adams's clinical treatment for gender dysphoria. Because of the bathroom policy, Mr. Adams had to use single-stall restrooms at school.[8] This marked him as different from his peers because he is transgender.

On the basis of this evidence, the District Court found that Mr. Adams "suffered emotional damage, stigmatization and shame from not being permitted to use the boys' restroom at school." Adams, 318 F. Supp. 3d at 1327. These consequences are well-recognized as injurious. See Whitaker, 858 F.3d at 1045–47 (affirming a finding of irreparable harm because excluding a transgender student from the boys' restroom "stigmatized" the student and caused him "significant psychological distress" including "depression and anxiety" (quotation marks omitted)); Dodds v. U.S. Dep't of Educ., 845 F.3d 217, 221–22 (6th Cir. 2016) (per curiam) (affirming a finding of irreparable harm because excluding a young transgender student "from the girls' restrooms has already had substantial and immediate adverse effects on [her] daily life[,] . . . health[,] and well-being"); see also Obergefell v. Hodges, 576 U.S. ___, 135 S. Ct. 2584, 2602 (2015)

---

[8] The evidence at trial also showed that the School District expected this outcome. The School District official who developed the bathroom policy testified that she would prefer a transgender student to use the gender-neutral single-stall facilities instead of the restroom of his sex assigned at birth. This employee also acknowledged that a transgender student like Mr. Adams could face "safety, security, and privacy concerns" while using the restroom of his sex assigned at birth.

(recognizing that "laws excluding same-sex couples from the marriage right impose stigma and injury").

Every court of appeals to consider bathroom policies like the School District's agrees that such policies violate Title IX. The Seventh Circuit has held that "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." Whitaker, 858 F.3d at 1049. The Sixth Circuit, affirming a preliminary injunction order, stated that, under Title IX, "transgender students are entitled to access restrooms for their identified gender rather than their biological gender at birth." Dodds, 845 F.3d at 221. We agree with our sister circuits.

## C.

The School Board believes 34 C.F.R. § 106.33 of the Title IX implementing regulations forecloses Mr. Adams's discrimination claim. Section 106.33 reads:

> A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

The School Board argues that the use of the term "sex" in this regulation clearly means "biological sex," or sex assigned at birth. Thus, it asserts that dividing restrooms by sex assigned at birth—requiring transgender boys to use the girls' restroom and transgender girls to use the boys' restroom—cannot be

39

discriminatory under Title IX. The Board considers Mr. Adams a "biological female," and it seeks to exclude him from the boys' restroom on this basis.

But Mr. Adams's discrimination claim does not contradict the implementing regulations for two reasons. First, Mr. Adams is not challenging § 106.33's provision of separate restrooms for girls and boys. He is simply seeking access to the boys' restroom as a transgender boy. And second, the regulation does not mandate how to determine a transgender student's "sex." Thus, we perceive no conflict between the text of § 106.33 and Mr. Adams's successful claim of discrimination.

Title IX says nothing about Mr. Adams's "sex." To start, Title IX and its accompanying regulations contain no definition of the term "sex." "Also absent from the statute is the term 'biological.'" Whitaker, 858 F.3d at 1047. It seems fair to say that § 106.33 tells us that restrooms may be divided by male and female. But the plain language of the regulation sheds no light on whether Mr. Adams's "sex" is female as assigned at his birth or whether his "sex" is male as it reads on his driver's license and his birth certificate. While the School Board maintains that Mr. Adams's sex is female, the State of Florida recognizes his sex as male. The federal government is also prepared to recognize Mr. Adams's sex as male, if he seeks an updated passport. As the Supreme Court observed in Bostock, transgender individuals have "one sex identified at birth and another today." 140

40

S. Ct. at 1746. Title IX and its regulations do not declare which sex should determine a transgender student's restroom use. Thus, the language of § 106.33 does not insulate the School Board from Mr. Adams's discrimination claim based on his transgender status.

The School Board argues that Bostock endorses its reading of the term "sex" as strictly "biological sex." According to the Board, Bostock laid out "a conception of sex founded in biology and not gender identity." Appellant's Suppl. Br. at 4.

Bostock lends no support to the Board's interpretation of "sex." The Bostock Court expressly declined to decide whether Title VII's reference to "sex" means only "reproductive biology" or incorporates "some norms concerning gender identity." See 140 S. Ct. at 1739 (quotation marks omitted). The Court felt it unnecessary to answer this open interpretive question in order to hold discrimination against transgender people unlawful. Id. Thus, its analysis proceeded "on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female." Id.

The District Court in this case studied the statute and the case law and held that "the meaning of 'sex' in Title IX includes 'gender identity.'" Adams, 318 F.

41

Supp. 3d at 1325.  If we thought it necessary, we would affirm this holding.[9]  But

Bostock counsels otherwise.  Our dissenting colleague accuses us of shirking our

duty because we do not delve into the meaning of "sex" in Title IX.  To the

contrary, we follow the lead of the Supreme Court in Bostock, which found it

unnecessary to perform that analysis as to Title VII.  We need not interpret the

term "sex" to recognize that Mr. Adams suffered discrimination at school because

he was transgender.  See Bostock, 140 S. Ct. at 1746.  And nothing in Bostock or

the language of § 106.33 justifies the School Board's discrimination against Mr.

Adams.  Specifically, § 106.33 does not dictate how schools should approach

transgender students' restroom use or define a transgender student's "sex."  Indeed,

no court of appeals has accepted the School Board's arguments that § 106.33

requires transgender students to use the restroom of their sex assigned at birth.  See

Parents for Privacy, 949 F.3d at 1227 (rejecting a strict "biological sex" reading of

§ 106.33 as it applies to transgender students); Whitaker, 858 F.3d at 1047

(observing that the term "biological" does not appear in Title IX); G.G. ex rel.

---

[9] Our dissenting colleague believes that the term "sex" cannot encompass any conception
of gender identity.  See Dissenting Op. at 67–68.  Important to the dissent's position is that, at
the time Title IX was passed, "a common belief among psychiatrists was that trans[gender]
people were severely mentally disturbed."  Id. at 68 (alteration adopted and quotation marks
omitted).  The Supreme Court has recently reminded us, however, that we must "apply[]
protective laws to groups that were politically unpopular at the time of the law's passage."
Bostock, 140 S. Ct. at 1751.  To hinge our statutory analysis on the historical prejudice and
misunderstanding the dissent describes "would tilt the scales of justice in favor of the strong or
popular."  Id.

<u>Grimm v. Gloucester County School Board</u>, 822 F.3d 709, 720–21 (4th Cir. 2016) (observing that § 106.33 does not explain how to determine an individual's maleness or femaleness for purposes of restroom use), <u>vacated and remanded</u>, 580 U.S. ___, 137 S. Ct. 1239 (2017).

The School Board then argues that the Department of Education ("DOE") and the Department of Justice ("DOJ") endorse its reading of "sex" as "biological sex." In 2016, the DOE's Office for Civil Rights and the DOJ's Civil Rights Division jointly issued a "Dear Colleague" letter instructing that discrimination based on sex encompassed "discrimination based on a student's gender identity, including discrimination based on a student's transgender status." Then, in 2017, the DOE and DOJ withdrew this guidance in a second "Dear Colleague" letter. The withdrawal letter reasoned that the 2016 guidance did not "contain extensive legal analysis or explain how the position is consistent with the express language of Title IX, nor did [it] undergo any formal public process."

The School Board believes the withdrawal of the 2016 guidance signifies the DOE's new position that sex discrimination does not include discrimination because of gender identity. We are unpersuaded. The 2017 letter contained no substantive interpretation of the meaning of "sex discrimination" in Title IX. It merely withdrew the 2016 guidance for lack of sufficient legal explanation and formal process. Since the 2017 letter contains no substantive interpretation of Title

IX or its regulations, we owe it no deference.  Cf. Kisor v. Wilkie, 588 U.S. ___,

139 S. Ct. 2400, 2414 (2019) (explaining that deference is not warranted to an

agency's interpretation of its own regulation when that "interpretation does not

reflect [the] agency's authoritative, expertise-based, fair, or considered judgment"

(alteration adopted) (quotation marks omitted)); Chevron, USA, Inc. v. Nat'l Res.

Def. Council, Inc., 467 U.S. 837, 842–44, 104 S. Ct. 2778, 2781–82 (1984)

(describing deference to an agency's interpretation of the statute which it

administers).

Even if we were to accept the School Board's argument that sex is "founded

in biology" or refers "only to biological distinctions between male and female," see

Bostock, 140 S. Ct. at 1739, this interpretation does not establish that Mr. Adams is

biologically female and belongs in the girls' restroom.  As the District Court found,

Mr. Adams—like some other transgender people—has confirmed his male sex not

just legally and socially, but medically.  See 318 F. Supp. 3d at 1300–01.  We will

not rehash the details of Mr. Adams's medical transition.  But suffice it to say that

the School Board's preferred definition of "biological sex" reduces Mr. Adams "to

nothing more than the sum of [his] external genitalia at birth," to the exclusion of

all other characteristics.  See Appellee's Suppl. Br. at 11.  This understanding of

"sex"—or, for that matter, "biological sex"—is as narrow as it is unworkable.

*     *     *

44

<u>Bostock</u> confirmed that workplace discrimination against transgender people is contrary to law. Neither should this discrimination be tolerated in schools. The School Board's bathroom policy, as applied to Mr. Adams, singled him out for different treatment because of his transgender status. It caused him psychological and dignitary harm. We affirm the District Court's ruling that maintaining this policy violated Title IX.[10]

## V.

A public school may not punish its students for gender nonconformity. Neither may a public school harm transgender students by establishing arbitrary, separate rules for their restroom use. The evidence at trial confirms that Mr. Adams suffered both these indignities. The record developed in the District Court shows that the School Board failed to honor Mr. Adams's rights under the Fourteenth Amendment and Title IX. The judgment of the District Court is therefore **AFFIRMED.**

---

[10] The School Board presents one last argument. The Board points out that Title IX was enacted through Congress's spending power, which permits recovery of damages only where recipients of federal funding have notice of their liability. See <u>Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.</u>, 526 U.S. 629, 640, 119 S. Ct. 1661, 1669–70 (1999). The Board says it had no notice that Title IX forbids discrimination against transgender students. Without such notice, the Board contends, it cannot be said to have harbored discriminatory intent against Mr. Adams and it cannot be held liable.

We need not pass upon the Board's arguments, because the Board never raised the Spending Clause issue in the District Court. "Arguments raised for the first time on appeal are not properly before this Court." <u>Hurley v. Moore</u>, 233 F.3d 1295, 1297 (11th Cir. 2000) (per curiam).

WILLIAM PRYOR, Chief Judge, dissenting:

Not long ago, a suit challenging the lawfulness of separating bathrooms on the basis of sex would have been unthinkable. This practice has long been the common-sense example of an acceptable classification on the basis of sex. And for good reason: it protects well-established privacy interests in using the bathroom away from the opposite sex. Although the Supreme Court recently considered the relationship between transgender status and sex in the context of claims of employment discrimination under Title VII, it declined to consider the permissibility of sex-separated bathrooms. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1753 (2020); *see also id.* at 1739 (assuming that "sex" refers "only to biological distinctions between male and female"). After all, context matters. As the late Justice Thurgood Marshall once put it, "A sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part).

Against this backdrop, the St. John's County School Board has long enforced a policy that separates the bathrooms in its elementary and secondary schools by sex. And yet the majority rules this policy illegal—indeed *unconstitutional*—in an opinion that distorts the policy, misunderstands the legal claims asserted, and rewrites well-established precedent. By failing to address

46

head-on the lawfulness of sex-separated bathrooms in schools, the majority recasts the school policy as classifying students on the basis of transgender status. And based on this recasting, it reaches the remarkable conclusion that schoolchildren have no sex-specific privacy interests when using the bathroom. The majority opinion purports to allow only plaintiff Drew Adams, a female who identifies as a male, to use the boys' bathroom, but the logic of this decision would require all schoolchildren to use sex-neutral bathrooms. I dissent.

   A. *The Bathroom Policy Does Not Violate the Equal Protection Clause.*

   Because the Equal Protection Clause "does not make sex a proscribed classification," a policy that classifies on the basis of sex is constitutional if it survives the two requirements of intermediate scrutiny. *United States v. Virginia*, 518 U.S. 515, 533 (1996). The government first must prove that the "classification serves important governmental objectives." *Id.* (internal quotation marks omitted). For an objective to be "important," it cannot stem from "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* The objective must also be "genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* In addition to proving that its policy serves important objectives, the government must prove that "the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks omitted).

Under this well-established standard, this appeal is not complicated. Although the school policy classifies on the basis of sex, it serves the important objectives of protecting the interests of children in using the bathroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex. The policy also fits tightly with both interests in privacy. By requiring students to use the bathroom away from the opposite sex, the policy directly protects the first interest and eliminates one of the most likely opportunities for a violation of the second interest. In short, it easily satisfies intermediate scrutiny, and even if questions remained, the Supreme Court has long required that we defer to the judgment of public-school officials in this context.

The schools' first objective—to protect students' interest in using the bathroom away from the opposite sex—is important. As then-Professor Ruth Bader Ginsburg explained, "Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21. Indeed, "[a]cross societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822

48

F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated*, 137 S. Ct. 1239 (2017). Separating bathrooms based on sex "dates back as far as written history will take us." W. Burlette Carter, *Sexism in the "Bathroom Debates*,*"* 37 Yale L. & Pol'y Rev. 227, 287–88 (2018); *see also id.* at 258–61 (documenting sex-separated bathrooms in feudal Japan and in ancient Egypt, Greece, and Rome).

Unsurprisingly, the Supreme Court and our sister circuits have long acknowledged a privacy interest in using the bathroom away from the opposite sex. Even as it ordered the Virginia Military Institute to enroll women, the Supreme Court acknowledged that "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *Virginia*, 518 U.S. at 550 n.19 (citing Brief for Petitioner at 27–29 (arguing that integrating the institute would not require the sexes to be together "when sleeping, dressing and using the bathroom")). Our sister circuits have likewise accepted that "the law tolerates same-sex restrooms . . . to accommodate privacy needs." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010); *accord Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993); *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982); *see also, e.g.*, *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) ("[S]egregation of inmates by sex is unquestionably

constitutional."). This privacy interest has long been "appropriately harmonized" with the principle of equality. Ginsburg, *Equal Rights Amendment*, *supra*.

The schools' policy is also "substantially related to the achievement" of its objective to protect this privacy interest. *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Indeed, the policy is a mirror image of its objective—it protects students from using the bathroom with the opposite sex by separating bathrooms on the basis of sex. The policy "is not a means to some greater end, but an end in itself." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572 (1991) (plurality opinion). Intermediate scrutiny is satisfied when a policy directly achieves the objective itself. *See id.*

This conclusion does not turn on Adams's sex. The district court found that the St. John's County School District educates about 40,000 children, and of all those students, the Board is aware of only 16 transgender students. Even if the district court were correct that gender identity, not biology, determines a person's sex—that is, the school policy should have assigned these 16 students to the bathroom that aligned with their gender identity—the policy would still be 99.96 percent accurate in separating bathrooms by sex. This near-perfect result is certainly enough to satisfy intermediate scrutiny, which does not "require[] that the [policy] under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen v. Immigration & Naturalization Serv.*, 533 U.S. 53, 70

(2001); *see also Michael M. v. Super. Ct. of Sonoma Cty.*, 450 U.S. 464, 473 (1981) (plurality opinion) ("The relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been . . . .").

Nor does it matter that Adams brings an as-applied challenge to the bathroom policy. "[C]lassifying a lawsuit as facial or as-applied . . . does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). And, to reiterate, intermediate scrutiny does not "require[] that the [policy] under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Demanding that the policy satisfy its privacy interests as to each plaintiff who brings an as-applied challenge would disregard intermediate scrutiny by demanding a perfect fit between the sex-based classification and the government interest at issue.

The school policy also substantially advances its objective to protect children from exposing their unclothed bodies to the opposite sex. Courts have long understood that the "special sense of privacy" that individuals hold in avoiding bodily exposure is heightened "in the presence of people of the other sex." *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (internal quotation marks omitted); *accord, e.g.*, *Cookish v. Powell*, 945 F.2d 441, 446 (1st Cir. 1991); *Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016); *Doe v. Luzerne Cty.*, 660 F.3d

169, 177 (3d Cir. 2011); *Strickler v. Waters*, 641 F.2d 1375, 1387 (4th Cir. 1993);

*Moore v. Carwell*, 168 F.3d 234, 236–37 (5th Cir. 1999); *Brannum v. Overton Cty.*

*Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *Canedy v. Boardman*, 16 F.3d 183,

185 (7th Cir. 1994); *Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141

(9th Cir. 2011) (en banc); *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995).

And separating bathrooms by sex eliminates one of the most common

opportunities for exposure to the opposite sex. The district court acknowledged the

undisputed testimony that students at Adams's school change clothing outside

bathroom stalls and that bathrooms are ordinarily unsupervised. By separating

bathrooms by sex, the policy eliminates the risk of bodily exposure where it is

most likely to occur, which satisfies intermediate scrutiny. *See Nguyen*, 533 U.S. at

70 (holding that a policy that "seeks to foster the opportunity" for a government

objective "has a close and substantial bearing on" that objective).

Even if any doubt remained about whether the bathroom policy survives

scrutiny, we must resolve that doubt in favor of the Board because the policy

governs student conduct in public schools. The Supreme Court has long held that

the constitutional rights of students, including "Fourteenth Amendment rights, are

different in public schools than elsewhere." *Vernonia Sch. Dist. 47J v. Acton*, 515

U.S. 646, 656 (1995). Schools have a "custodial and tutelary" power over minor

students, "permitting a degree of supervision and control that could not be

exercised over free adults." *Id.* at 655. For that reason, the Supreme Court has long deferred to the decisions of school districts in a variety of constitutional contexts, including when determining whether a suspicionless drug search was reasonable under the Fourth Amendment, *id.* at 665, whether the censorship of certain speech was acceptable under the First Amendment, *Morse v. Frederick*, 551 U.S. 393, 403–06, 409–410 (2007) (collecting decisions), and whether corporal punishment was cruel and unusual under the Eighth Amendment, *Ingraham v. Wright*, 430 U.S. 651, 681–82 (1977).

The bathroom policy falls squarely within the Board's authority to "prescribe and control conduct" in its schools. *Id.* at 682 (internal quotation marks omitted). "[I]n a public school environment . . . the State is responsible for maintaining discipline, health, and safety." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 830 (2002); *see also* Fla. Stat. § 1001.42(8)(a) (making school boards responsible for the "control of students at school, and for proper attention to health, safety, and other matters relating to the welfare of students"). This responsibility is so weighty that school districts can be liable for sexual assault and harassment between students. *See Miami-Dade Cty. Sch. Bd. v. A.N.*, 905 So. 2d 203, 203–04, 206 (Fla. Dist. Ct. App. 2005) (upholding a jury verdict against a school for failing to protect a student who was sexually assaulted in a bathroom by another student); *see also Williams v. Bd. of*

*Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1299 (11th Cir. 2007). And

bathrooms, one of the few areas in a school that are unsupervised, plainly pose

risks to student "discipline, health, and safety." *Earls*, 536 U.S. at 830; *see also*

*A.N.*, 905 So. 2d at 203–04, 206. The Board's assessment of the privacy risks its

students face and the effectiveness of its policy in mitigating those risks deserves

deference.

The majority opinion elides this entire analysis by misunderstanding both

the classification and privacy interests at issue. It contends that the policy triggers

heightened scrutiny not because it separates bathrooms by sex but because it

purportedly imposes "differential treatment" on transgender students. Majority Op.

at 12. In doing so, the majority misstates the school policy, conflates sex-based

classifications with transgender-based classifications, and contravenes Supreme

Court precedent. Compounding its errors, the majority then ignores fundamental

understandings of why bathrooms are separated on the basis of sex by rejecting

long-standing privacy rationales for sex-separated bathrooms. This conclusion

leads it to fault the objective underlying the school policy as both hypothetical and

based on impermissible stereotypes. After misconstruing both the classification

and the privacy interests at issue—the only two ingredients of intermediate

scrutiny—the majority opinion then concludes that the schools' classification does

not substantially advance a valid objective. I take each of these errors in turn.

54

The majority's conclusion that the school policy classifies on the basis of sex because it "singles out transgender students" is both central to its analysis and wrong. *Id.* The majority opinion reaches this incorrect conclusion by pointing to a provision of the school policy that does not have that effect. The majority opinion says the school policy targets transgender students because of the following provision: "*Transgender* students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex." *Id.* But this provision only offers the option of using gender-neutral bathrooms as an *alternative* to the bathroom that matches a child's sex. It is an *accommodation* for transgender students, not a special *burden*. What Adams actually challenges is the requirement that students cannot use the bathrooms of the opposite sex, which long predates the provision that accommodates transgender students. It is this policy that "prohibit[s] . . . transgender students from using the restrooms matching their gender identity." *Id.* at 14. Because this policy divides bathrooms by sex, not transgender status, it does not facially classify on the basis of transgender status.

The decision of the Supreme Court in *Geduldig v. Aiello*, 417 U.S. 484 (1974), is instructive. There, the Court held that a state insurance policy that excluded coverage for pregnancies did not classify on the basis of sex. *Id.* at 495–97. It explained that the classification at issue created two groups—pregnant and nonpregnant people. *Id.* at 496 n.20. Although "the first group is exclusively

female," the Court explained, "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.*; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) (reaffirming this reasoning). This analysis applies with equal force here. The bathroom policy creates two groups—students who can use the boys' bathroom and students who can use the girls' bathroom. Both groups contain transgender students and non-transgender students, so a "lack of identity" exists between the policy and transgender status. *Geduldig*, 417 U.S. at 496 n.20.

At most, the policy has a disparate impact on transgender students, which is not enough to create a sex-based classification. Facially neutral policies trigger intermediate scrutiny only if "invidious gender-based discrimination" motivated them. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Adams cannot argue that a discriminatory purpose against transgender students motivated the policy. Although the district court found that the Board acted with discriminatory intent because it failed to update its policies when it became "aware of the need to treat transgender students the same as other students," the Supreme Court has repeatedly held that "[d]iscriminatory purpose . . . implies more than . . . awareness of consequences." *E.g.*, *Bray*, 506 U.S. at 760

(internal quotation marks omitted); *Feeney*, 442 U.S. at 279 (internal quotation marks omitted). It instead requires the Board to act "at least in part 'because of,' not merely 'in spite of,' . . . adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. The district court found that the "School Board did not have transgender students in mind when it originally established separate multi-stall restrooms for boys and girls," which precludes a finding of discriminatory intent.

The decision of the Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731, is not to the contrary. To be sure, *Bostock* clarified that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex" in the context of employment discrimination under Title VII. *Id.* at 1747; *see also Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011) (holding that discrimination based on gender nonconformity constitutes sex discrimination regardless of whether the victim is transgender or not). But this appeal concerns the converse question: whether discrimination on the basis of sex necessarily entails discrimination based on transgender status. Of course, a policy can classify on the basis of sex without also classifying on the basis of transgender status. *See, e.g.*, *Nguyen*, 533 U.S. at 60. Indeed, *Bostock* expressly disclaimed reaching any conclusion on the permissibility of sex-separated bathrooms and locker rooms. *See* 140 S. Ct. at 1753.

The majority's misunderstanding of the classification at issue infects its constitutional inquiry. Intermediate scrutiny turns on the relationship between the classification at issue and the government's objectives—that is, whether a sex-based classification is substantially related to the government's objectives. *See Nguyen*, 533 U.S. at 60. So the relevant question is whether excluding students of one sex from the bathroom of the other sex substantially advances the schools' privacy objectives. The question is not, as the majority frames it, whether excluding transgender students from the bathroom of their choice furthers important privacy objectives. The majority's misunderstanding of the classification as based on transgender status gerrymanders its analysis to the second question.

Consider the majority's assertion that the bathroom policy cannot satisfy intermediate scrutiny because it is arbitrary. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 201–04 (1976) (holding that a statute failed intermediate scrutiny when the relationship between the sex-based classification and government interest was "unduly tenuous"). The district court found that the school district determines each child's sex by looking to the enrollment forms that the student provides when the student enrolls, which includes the student's birth certificate. The majority explains that a transgender student who changed the sex on his birth certificate before enrolling could use the bathroom matching his gender identity and not his sex. *See generally* Fla. Admin. Code Ann. r. 64V-1.003(2)(c), (4)(b) (allowing amendments

to birth certificates with medical documentation). According to the majority, this process for determining sex fails to achieve the "stated goal of restricting transgender students to the restroom of their assigned sex at birth" because the enrollment documents are not "legitimate, accurate prox[ies]" for determining a transgender student's "sex assigned at birth." Majority Op. at 18 (quoting *Craig*, 429 U.S. at 204).

This argument fails when we remember that the goal of the policy is to restrict *all* students, not only transgender students, from the bathroom of the opposite sex. Birth certificates are an almost perfect proxy for determining a student's sex. Even if all transgender students in the school district used bathrooms that did not align with their sex, the policy would still be 99.96 percent accurate in separating bathrooms by sex, which satisfies intermediate scrutiny. *See Nguyen*, 533 U.S. at 70. To close the supposed loophole that the majority identifies, schools in the district would need to target transgender students. Of course, intermediate scrutiny does not require that approach. *See id.* at 63 ("The Constitution . . . does not require that Congress elect one particular mechanism . . . even if that mechanism arguably might be the most scientifically advanced method.").

In addition to misunderstanding the classification at issue, the majority erroneously redefines the privacy interests at stake. Although the majority concedes that protecting bathroom privacy, in some abstract sense, is an important

objective, it rejects both of the privacy interests that the school policy protects. For the first interest, the majority asserts that the Board incorrectly decided that its students had any privacy interest in using the bathroom away from "students who do not share the same birth sex." Majority Op. at 21 (internal quotation marks omitted). And although the majority appears to acknowledge that students have a privacy interest in not exposing their bodies, it does not accept that this interest can be sex-specific—that the interest is heightened when exposure is to the opposite sex. Instead, it asserts not only that Adams's "anatomical differences" from boys are "irrelevant" to bathroom privacy, *id.* at 24, but also that thinking otherwise is an unconstitutional stereotype, *id.* at 25–28.

The majority's understanding of each interest contravenes precedent. Its decision to limit students' privacy interest to bodily exposure ignores that children also have a distinct privacy interest in using the bathroom away from the opposite sex. *See, e.g.*, *Virginia*, 518 U.S. at 550 n.19; *Chaney*, 612 F.3d at 913; *Faulkner*, 10 F.3d at 232; *Cumbey*, 684 F.2d at 714; *see also Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) (concluding that urination is "an excretory function traditionally shielded by great privacy"). Similarly, the majority's failure to acknowledge that the privacy interest in avoiding bodily exposure is heightened when children of the opposite sex are present ignores longstanding precedent, not to mention common sense. *See, e.g.*, *Fortner*, 983 F.2d at 1030; *Harris*, 818 F.3d at

60

59; *Luzerne Cty.*, 660 F.3d at 177; *Overton Cty.*, 516 F.3d at 494; *Canedy*, 16 F.3d at 185.

Finally, the majority's alternative contention that the privacy interests at issue are invalid because they rest on impermissible sex stereotypes is incorrect. According to the majority, the school policy "presumed every person deemed 'male' at birth would act and identify as a 'boy' and every person deemed 'female' would act and identify as a 'girl.'" Majority Op. at 26. The majority also faults the policy for indulging in the purportedly unconstitutional stereotype that "one's gender identity and expression should align with one's birth sex." *Id.* Neither of these arguments has merit.

The majority never explains how the school policy "presume[d] every person deemed 'male' at birth would act and identify as a 'boy' and every person deemed 'female' would act and identify as a 'girl.'" Nor can it. The policy does not turn on how students "act and identify." It assigns bathrooms by sex, which is not a stereotype. *See Nguyen*, 533 U.S. at 73 ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real."); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) ("Use of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes.").

61

The majority's other contention—that believing "one's gender identity and expression should align with one's birth sex" is an unconstitutional stereotype—fares no better. The Supreme Court has long grounded its sex-discrimination jurisprudence in reproductive biology. *See, e.g.*, *Nguyen*, 533 U.S. at 73 ("The difference between men and women in relation to the birth process is a real one . . . ."); *Geduldig*, 417 U.S. at 496 n.20 ("[I]t is true that only women can become pregnant . . . ."); *see also Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: [T]he two sexes are not fungible . . . ." (internal quotation marks omitted)). Indeed, the Court's justification for giving heightened scrutiny to sex-based classifications makes sense only with reference to physiology.

In one of its foundational sex-discrimination decisions, the Court justified heightened scrutiny this way: "since sex . . . is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate the basic concept of our system that legal burdens should bear some relationship to individual responsibility." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (internal quotation marks omitted). In other words, the Court endorsed heightened scrutiny because laws "distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the

relative capabilities of men and women." *Cleburne*, 473 U.S. at 441. To say that it is an unconstitutional stereotype to believe that "one's gender identity and expression should align with one's birth sex," the majority must not only rewrite the Supreme Court's physiological rationale for heightened scrutiny of sex-based classifications, but also hold that many of the Court's sex-discrimination decisions turned on an impermissible stereotype. *See Nguyen*, 533 U.S. at 73; *Virginia*, 518 U.S. at 533; *Geduldig*, 417 U.S. at 496 n.20; *Frontiero*, 411 U.S. at 686. We, of course, cannot take either of those actions.

The majority's narrow construction of bathroom privacy skews the intermediate-scrutiny analysis in favor of Adams. Policies that separate bathrooms on the basis of sex arise from the understanding that privacy interests are sometimes sex specific. By failing to acknowledge any sex-specific privacy interest, the majority demands the impossible: a justification for sex-separated bathrooms that does not involve sex. To be sure, the majority suggests that a different trial record—one that contained evidence that Adams or other transgender students "harass[ed] or peep[ed] at" other students in the bathroom—might support the bathroom policy. Majority Op. at 21. But that evidence would not justify a sex-based classification. If voyeurism is equally problematic whether it occurs between children of the same or opposite sex, then separating bathrooms by sex would not advance any interest in combatting voyeurism. Only single-stall bathrooms could

63

address that concern. Further, under intermediate scrutiny, an invidious stereotype about members of a suspect class cannot justify a discriminatory policy "even when some statistical support can be conjured up for the generalization." *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 139 n.11 (1994). So evidence that children of a particular sex—or transgender students under the majority's perspective—are likely to "harass or peep at" members of the opposite sex could not justify sex-separated bathrooms.

Only after it replaces both of the inquiries relevant to intermediate scrutiny—the "discriminatory means employed" by the policy and the privacy interests at issue, *Virginia*, 518 U.S. at 533 (internal quotation marks omitted)—does the majority conclude that the school policy does not substantially advance its objective to protect privacy. The end result is an opinion on sex discrimination that looks nothing like an intermediate-scrutiny inquiry into whether a sex-based classification satisfies the Equal Protection Clause.

The majority's redefinition of intermediate scrutiny will have consequences far beyond the confines of this appeal. The logic of its opinion would invalidate all government policies that separate bathrooms—or locker rooms and showers, for that matter—by sex. To be sure, the majority "assume[s]" that the government can promote privacy interests by separating bathrooms by sex, and it insists that the lawfulness of sex-separated locker rooms is not before it. Majority Op. at 8 n.3, 14.

64

But anyone can take advantage of the majority's demolition of sex-specific bathroom privacy.

That the majority purports to invalidate the school policy only as it applies to Adams changes nothing. *See Bucklew*, 139 S. Ct. at 1127. The majority does not offer a meaningful way to distinguish this appeal from one that challenges sex-separated bathrooms and locker rooms. It only insists that the issue is not before it. But do not be fooled: future plaintiffs can still leverage the majority's narrow view of privacy. Ultimately, if the privacy interest at stake is untethered from using the bathroom away from the opposite sex or from biological differences between the sexes, then no justification exists for separating bathrooms—or any related facility—by sex.

When shorn of the majority's misunderstandings of the school policy and the legal standards that govern sex-based classifications, this appeal is straightforward. The school policy protects longstanding privacy interests inherent in using the bathroom, and it does so in an ancient and unremarkable way—by separating bathrooms on the basis of sex. That policy is not unconstitutional.

## B. The Bathroom Policy Does Not Violate Title IX.

Title IX mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20

U.S.C. § 1681(a). But an important qualification tempers this mandate: "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.* § 1686. The implementing regulations clarify that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Whether the Board violated Title IX turns on the answer to one question: what does "sex" mean in Title IX? Regardless of whether separating bathrooms by sex would otherwise constitute discrimination "on the basis of sex," 20 U.S.C. § 1681(a), the bathroom policy does not violate Title IX if it falls within the safe harbor for "separate toilet . . . facilities on the basis of sex." 34 C.F.R § 106.33. And if the school policy is valid under Title IX, then Title IX also permits the schools to require all students, including Adams, to follow that policy. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied." (quoting 1 James Kent, *Commentaries on American Law* *464)).

Contrary to the majority's and Adams's arguments otherwise, the Supreme Court did not resolve this question in *Bostock*. Far from it. Not only did the Court

66

"proceed on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female," it disclaimed deciding whether Title VII allows for sex-separated bathrooms. *Bostock*, 140 S. Ct. at 1739, 1753. And any guidance *Bostock* might otherwise provide about whether Title VII allows for sex-separated bathrooms does not extend to Title IX, which permits schools to act on the basis of sex through sex-separated bathrooms. *See* 20 U.S.C. § 1686; 34 C.F.R. § 106.33.

Turning to the provisions at issue, this question is not close. As used in Title IX and its implementing regulations, "sex" unambiguously is a classification on the basis of reproductive function. We must, of course, give words in statutes the ordinary meaning they conveyed when Congress enacted them. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019); Scalia & Garner, *Reading Law* §§ 6–7, at 69–71, 78–79. And "sex" has never meant gender identity. *See, e.g., Sex*, *The American Heritage Dictionary of the English Language* (1979) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, *The Random House College Dictionary* (1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); *see also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) ("This chapter employs constructs and terms as they are widely used by clinicians from various disciplines with specialization in this area. In this chapter, *sex* and *sexual* refer to the

67

biological indicators of male and female (understood in the context of reproductive

capacity) . . . .").

That "sex" did not mean gender identity is unsurprising. When Congress

enacted Title IX in 1972, psychiatric literature conflated sexual orientation with

gender identity. *See* Jack Drescher, *Transsexualism, Gender Identity Disorder and*

*the DSM*, 14 J. Gay & Lesbian Mental Health 109, 111 (2010). And as with

homosexuality, a common belief among psychiatrists was that "trans people [were]

severely mentally disturbed." *See id.* at 114, 116–17. Indeed, the American

Psychiatric Association first classified "Gender Identity Disorders" as

psychosexual disorders in which a person's internal sense of gender did not align

with his or her anatomy. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical*

*Manual of Mental Disorders* 261 (3d ed. 1980). Consistent with this view,

"[m]ainstream medical thinking" when Title IX became law was firmly opposed to

sex-reassignment surgery. Drescher, *supra*, at 111–12. Even among its proponents,

"[s]ex reassignment was . . . considered not a cure, but a palliative treatment."

Dallas Denny, *A Selective Bibliography of Transsexualism*, 6 J. Gay & Lesbian

Psychotherapy 35, 38 (2002). It is untenable to construe transgender status, which

even the medical community saw as a departure from the norm, as altering the

norm itself among the general public.

In deciding otherwise, the majority erroneously concludes that the safe harbor for bathrooms does not apply because Title IX and its regulations do not "declare" whether "sex" as applied to Adams is the "sex identified at birth"—female—or the sex listed on Adams's amended birth certificate and driver's license—male. Majority Op. at 40–41 (quoting *Bostock*, 140 S. Ct. at 1746). But the ordinary meaning of "sex" in the safe-harbor provision does not change when a plaintiff is transgender. *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). And as explained above, the ordinary meaning of "sex" when Congress enacted Title IX turned on reproductive function. That Congress did not define "sex" does not change this conclusion. *See United States v. Sepulveda*, 115 F.3d 882, 886 n.9 (11th Cir. 1997) ("[A] statute is not ambiguous merely because it contains a term without a statutory definition."). And under the unambiguous meaning of "sex" in the safe-harbor provision, the Board did not violate Title IX when it prohibited Adams from using the boys' bathroom.

Instead of grappling with the meaning of "sex," the majority abdicates its duty to interpret the law. According to the majority, it is unnecessary to delve into the meaning of "sex" in Title IX because the safe harbor "does not dictate how schools should approach transgender students' restroom use." Majority Op. at 42.

But courts regularly apply general standards of law to particular facts, and the Board asks this Court to apply the safe-harbor provision to the facts in this appeal. By declaring it not "necessary" to interpret the safe-harbor provision, the majority abandons statutory interpretation in favor of legislating a transgender exception to the safe-harbor provision. This approach offends basic principles of statutory interpretation. *See* Scalia & Garner, *Reading Law* § 8, at 93 ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it. The judge should not presume that every statute answers every question . . . . Nor should the judge elaborate unprovided-for exceptions to a text . . . ."); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) ("We construe [a statute's] silence as exactly that: silence.").

Indeed, the majority turns Title IX on its head by requiring a clear statement from Congress that the safe harbor protects the Board. Because Congress enacted Title IX under its Spending Clause power, U.S. Const. art. I, § 8, cl. 1, the Board's violation must be unambiguous to trigger liability. Although the Spending Clause allows Congress to "attach conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987), "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In other words, "if Congress intends to impose

a condition on the grant of federal moneys, it must do so unambiguously." *Id.* This requirement unquestionably applies when courts interpret Title IX. *See Davis ex rel. D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999). It also applies when the appellant fails to press the issue in the district court. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018) ("[P]arties cannot waive the application of the correct law."). So even if the majority were correct that "sex" was ambiguous, Title IX still would not prohibit the Board's actions. Instead, the Board would lose the protection of the bathroom safe harbor only if the meaning of "sex" unambiguously did *not* turn on reproductive function.

For its part, the district court ruled that the Board violated Title IX for different but equally flawed reasons. It first ruled that the meaning of "sex" in Title IX was ambiguous because the statute did not define the term and dictionary definitions of "sex" were not "so universally clear" at the time. It then held that our decision in *Glenn v. Brumby*, 663 F.3d 1312, and the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality opinion), supported its conclusion that "sex" in Title IX "includes 'gender identity' for purposes of its application to transgender students."

A statutory term is not ambiguous solely because a statute does not define it or because an isolated dictionary suggests a divergent meaning. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional

71

possibilities but of statutory context . . . .”). Further, the only purportedly competing definition the district court found—that “sex” means “the character of being either male or female,” *Sex*, *American College Dictionary* (1970)—supports a biological meaning of sex. That dictionary defined “female” and “male” in physiological, reproductive terms. *See Female*, *id.* (“a human being of the sex which conceives and brings forth young; a woman or girl”); *Male*, *id.* (“belonging to the sex which begets young, or any division or group corresponding to it”). The district court had no reason to conclude that the term was ambiguous.

The decision to resolve the purported ambiguity as applied to transgender students with *Price Waterhouse* and *Glenn* fares no better. Like the majority, the district court erred by assuming that “sex” could have different meanings as applied to transgender and non-transgender persons. *See Cochise Consultancy*, 139 S. Ct. at 1512. Further, neither *Price Waterhouse* nor *Glenn* redefined the meaning of “sex.” They held only that when an employer acts against a member of one sex for failing to conform to stereotypes associated with that sex—for example, dressing like the opposite sex—that employer has acted because of sex. *See Price Waterhouse*, 490 U.S. at 250 (holding that an employer discriminated on the basis of sex when he “act[ed] on the basis of a belief that a woman cannot be aggressive, or that she must not be”); *Glenn*, 663 F.3d at 1318–19 (“All persons, whether transgender or not, are protected from discrimination on the basis of gender

stereotype. . . . Because these protections are afforded to everyone, they cannot be denied to a transgender individual."). Whether or not the Board based its policy on sex stereotypes does not matter for this claim because that question would determine only whether the Board acted "on the basis of sex." 20 U.S.C. § 1681(a). Title IX and its regulations expressly allow the Board to do so to provide separate bathrooms. *See id.* § 1686; 34 C.F.R. § 106.33.

Like the majority, the district court also failed to grapple with the fact that Congress enacted Title IX under its Spending Clause power. As explained above, the district court could impose liability only if it concluded that the meaning of "sex" in Title IX unambiguously did not turn on reproductive function. In other words, even if the district court were correct that "sex" was ambiguous and that the best interpretation of "sex" when Congress enacted Title IX was gender identity— and, to reiterate, it was not on either count—Title IX still would not prohibit a school from separating bathrooms on the basis of sex.

*        *        *

The majority transforms an appeal that it should have resolved with straightforward applications of intermediate scrutiny and statutory interpretation into something unrecognizable. Almost no aspect of its analysis emerges unscathed. The majority misunderstands the policy at issue, ignores decades of precedent, dismisses any sex-specific interest in bathroom privacy, and flouts

foundational principles of statutory interpretation. In the process, it issues a

holding with radical consequences for sex-separated bathrooms. But for all of its

errors, the majority opinion cannot obscure what should have been the bottom line

of this appeal: there is nothing unlawful, under either the Constitution or federal

law, about a policy that separates bathrooms for schoolchildren on the basis of sex.

    I dissent.