APPEAL NO. 18-13592-EE

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

DREW ADAMS,
Plaintiff-Appellee,

v.

THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA
Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Middle District of Florida, Jacksonville Division
District Court No. 3:17-cv-00739-TJC-JBT

_____

## PETITION FOR PANEL REHEARING AND REHEARING EN BANC OF APPELLANT THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA

_____

Terry J. Harmon FBN 0029001
Jeffrey D. Slanker FBN 0100391
Robert J. Sniffen FBN 000795
Michael P. Spellman FBN 937975

SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Fax: (850) 205-3004
Counsel for Appellant

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Local Rules 26.1-1 through 26.1-3 and 28-1(b), Appellant certifies that the name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action — including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to *any* party in the case is limited to the following:

1. AAPL – *Amicus Curiae*

2. AAUW – *Amicus Curiae*

3. A Better Balance - *Amicus Curiae*

4. Aberli, Thomas A. – *Amicus Curiae*

5. Achievement First Public Charter Schools – *Amicus Curiae*

6. Adams, Drew – Appellee

7. Adams, Scott – Appellee's Father

8. Adecco Group AG - Parent company for Amicus Curiae General Assembly Space, Inc.

9. Adecco, Inc. - Parent company for Amicus Curiae General Assembly Space, Inc.

10. ADL – *Amicus Curiae*

11.   Advocates for Youth – *Amicus Curiae*

12.   Airbnb, Inc. – *Amicus Curiae*

13.   Akin Gump Strauss Hauer & Feld LLP - Counsel for Amici Curiae

14.   Alger, Maureen P. – Counsel for Amicus Curiae

15.   Allen, Tommy – Board Member of Appellant

16.   Alliance Defending Freedom – Counsel for Amicus Curiae

17.   Alphabet, Inc. (GOOG) - Parent company for Amicus Curiae Google LLC

18.   Altman, Jennifer G. – Counsel for Appellee

19.   Amend, Andrew – (New York State Office of the Attorney General) - Counsel for Amicus Curiae

20.   American Academy of Child and Adolescent Psychiatry (AACAP) – *Amicus Curiae*

21.   American Academy of Nursing – *Amicus Curiae*

22.   American Academy of Pediatrics – *Amicus Curiae*

23.   American Association of University Women (AAUW) - *Amicus Curiae*

24.   American College of Physicians – *Amicus Curiae*

25.   American Medical Association – *Amicus Curiae*

26.   American Medical Women's Association – *Amicus Curiae*

27.  American Nurses Association – *Amicus Curiae*

28.  American School Counselor Association – *Amicus Curiae*

29.  Apple Inc. – *Amicus Curiae*

30.  Asana, Inc. – *Amicus Curiae*

31.  Association of Medical School Pediatric Department Chairs – *Amicus Curiae*

32.  Atlanta Women for Equality – *Amicus Curiae*

33.  Baker & Hostetler LLP - Counsel for Amicus Curiae

34.  Banks, Emily – *Amicus Curiae*

35.  Barden, Robert Chris – Counsel for Appellant, Terminated

36.  Barrera, Kelly – Board Member of Appellant

37.  Barth, Morgan – *Amicus Curiae*

38.  Baxter, Rosanne C. – Counsel for Amicus Curiae

39.  Bazer, Morgan – *Amicus Curiae*

40.  BCC – *Amicus Curiae*

41.  Berlow, Clifford W. – Counsel for Amicus Curiae

42.  Bertschi, Craig E. – Counsel for Amicus Curiae

43.  Beth Chayim Chadashim (BCC) - *Amicus Curiae*

44.  Binning, Sarah R. – Counsel for Amicus Curiae

45.  BlackRock, Inc. (BLK) - Beneficial owner of Amicus Curiae Yelp Inc.

46.    Boies, Schiller & Flexner, LLP – Counsel for Amicus Curiae

47.    Borelli, Tara L. – Counsel for Appellee

48.    Boston Area Rape Crisis Center – *Amicus Curiae*

49.    Bourgeois, Roger – *Amicus Curiae*

50.    Brown, Meredith Taylor – Counsel for Amicus Curiae, Terminated

51.    Bruce, Diana K. – *Amicus Curiae*

52.    Buckeye Region Anti-Violence Organization, a Program of Equitas
       Health – *Amicus Curiae*

53.    California – *Amicus Curiae*

54.    California Women Lawyers – *Amicus Curiae*

55.    California Women's Law Center – *Amicus Curiae*

56.    Campbell, James A. – Counsel for Amicus Curiae

57.    Canan, Patrick – Board Member of Appellant

58.    Carney, Karen – *Amicus Curiae*

59.    Carpenter, Christopher S., Ph.D. - *Amicus Curiae*

60.    Carter, Heidi – *Amicus Curiae*

61.    Casa de Esperanza: National Latina Network for Healthy Families and
       Communities – *Amicus Curiae*

62.    Castillo, Paul David – Counsel for Appellee

63.    Center for Constitutional Rights – *Amicus Curiae*

64. Center for Religious Expression – Counsel for Amicus Curiae

65. Center for Reproductive Rights – *Amicus Curiae*

66. Central Conference of American Rabbis – *Amicus Curiae*

67. Champion Women – *Amicus Curiae*

68. Chandy, Sunu P. (National Women's Law Center) - Counsel for Amici Curiae

69. Chang, Tommy – *Amicus Curiae*

70. Chapman, Peyton – *Amicus Curiae*

71. Chaudhry, Neena (National Women's Law Center) - Counsel for *Amici Curiae*

72. Coalition of Black Trade Unionists – *Amicus Curiae*

73. Coleman, Arthur - Counsel for Amicus Curiae

74. Colter, Howard – *Amicus Curiae*

75. Connecticut – *Amicus Curiae*

76. Conron, Kerith J., M.P.H., Sc.D. - *Amicus Curiae*

77. Copsey, Alan D. (Washington State Office of the Attorney General) - Counsel for *Amicus Curiae*

78. Corrigan, Hon, Timothy J. – United States District Judge

79. Credo Mobile, Inc. – *Amicus Curiae*

80. Cyra, Sherri – *Amicus Curiae*

81. Dasgupta, Anisha S. (New York State Office of the Attorney General) - Counsel for *Amicus Curiae*

82. Davis, Bryan – *Amicus Curiae*

83. Davis, Steven D. – Counsel for Amici School Administrators

84. Day One – *Amicus Curiae*

85. DC Coalition Against Domestic Violence – *Amicus Curiae*

86. Delaware – *Amicus Curiae*

87. DeSelm, Lizbeth – *Amicus Curiae*

88. Deutsche Bank AG. – *Amicus Curiae*

89. DiBenedetto, Arthur – *Amicus Curiae*

90. Disability Rights Education and Defense Fund (DREDF) – *Amicus Curiae*

91. District of Columbia – *Amicus Curiae*

92. Doolittle, Kirsten L. – Counsel for Appellee

93. Doran, Mary – *Amicus Curiae*

94. Doss, Eric – *Amicus Curiae*

95. DREDF – *Amicus Curiae*

96. Dyer, Karen Caudill – Counsel for *Amicus Curiae*

97. Dwyer, John C. – Counsel for *Amicus Curiae*

98. Eaton, Mary - Counsel for Amicus Curiae

99.    eBay Inc. – *Amicus Curiae*

100.   Education Counsel, LLC - Counsel for *Amicus Curiae*

101.   Empire Justice Center – *Amicus Curiae*

102.   Endocrine Society – *Amicus Curiae*

103.   Eppink Samuel T., Ph.D. (expected 2019) - *Amicus Curiae*

104.   Equal Rights Advocates – *Amicus Curiae*

105.   Equality California – *Amicus Curiae*

106.   Ewing, Gregory – *Amicus Curiae*

107.   Family Values @ Work – *Amicus Curiae*

108.   Ferguson, Robert W. (Attorney General for the State of Washington) - Counsel for Amici Curiae

109.   Florida School Boards Insurance Trust – Insurance Carrier for Appellant

110.   Flores, Andrew R., Ph.D. - *Amicus Curiae*

111.   Flynn, Diana K. – Counsel for Appellee

112.   FORGE, Inc. – *Amicus Curiae*

113.   Forson, James (Tim) – Superintendent of the St. Johns County School District

114.   Fountain, Lisa Barclay – Counsel for Appellant

115.   Gartrell, Nanette, M.D. - *Amicus Curiae*

116.  Gates, Gary J., Ph.D. - *Amicus Curiae*

117.  Gender Based Violence Organizations – *Amicus Curiae*

118.  Gender Diversity – *Amicus Curiae*

119.  Gender Justice – *Amicus Curiae*

120.  Gender Spectrum – *Amicus Curiae*

121.  General Assembly Space, Inc. – *Amicus Curiae*

122.  Generales, Markos C. – (Akin Gump Strauss Hauer & Feld LLP)
      Counsel for Amicus Curiae

123.  Girls for Gender Equity – *Amicus Curiae*

124.  Girls, Inc. – *Amicus Curiae*

125.  GitHub, Inc. – *Amicus Curiae*

126.  Glassdoor, Inc. – *Amicus Curiae*

127.  GlaxoSmithKline LLC – *Amicus Curiae*

128.  GlaxoSmithKline PLC: Parent company for *Amicus Curiae*
      GlaxoSmithKline LLC

129.  GLMA – Health Professionals Advancing LGBT Equality - *Amicus
      Curiae*

130.  GLSEN – *Amicus Curiae*

131.  Goldberg, Suzanne – Counsel for *Amicus Curiae*

132.  Gonzales, Gilbert, Ph.D., M.H.A. - *Amicus Curiae*

133.  Gonzalez-Pagan, Omar – Counsel for Appellee

134.  Google LLC – *Amicus Curiae*

135.  Goss Graves, Fatima (National Women's Law Center) - Counsel for *Amicus Curiae*

136.  Greer, Eldridge – *Amicus Curiae*

137.  Grossman, Miriam – *Amicus Curiae*

138.  Grijalva, Adelita – *Amicus Curiae*

139.  Gurtner, Jill – *Amicus Curiae*

140.  Haney, Matthew – *Amicus Curiae*

141.  Hargis, Kellie M. – *Amicus Curiae*

142.  Harmon, Terry J. – Counsel for Appellant

143.  Harrington, Emily – Counsel for *Amicus Curiae*

144.  Hawaii – *Amicus Curiae*

145.  Haynes, Patricia - Counsel for *Amicus Curiae*

146.  Herman, Jody L., Ph.D. - *Amicus Curiae*

147.  Heyer, Walt – *Amicus Curiae*

148.  Hohs, Sherie – *Amicus Curiae*

149.  Holland & Knight, LLP – Counsel for *Amicus Curiae*

150.  Holloway, Ian W., Ph.D., M.S.W., M.P.H. - *Amicus Curiae*

151.  Hughes, Paul W. (Mayer Brown) - Counsel for *Amicus Curiae*

152. IBM Corporation – *Amicus Curiae*

153. Ifill, Sherrilyn A. - Counsel for *Amicus Curiae*

154. Illinois – *Amicus Curiae*

155. Illinois Accountability Initiative – *Amicus Curiae*

156. In Our Own Voice: National Black Women's Reproductive Justice Agenda – *Amicus Curiae*

157. Indiegogo, Inc. – *Amicus Curiae*

158. Iowa – *Amicus Curiae*

159. Iowa Coalition Against Sexual Assault – *Amicus Curiae*

160. Jacksonville Area Sexual Minority Youth Network, Inc. – *Amicus Curiae*

161. Jacobs, Edward J. – Counsel for Amicus Curiae

162. James, Letitia (Attorney General for the State of New York) - Counsel for Amicus Curiae

163. Kaiser Foundation Health Plan, Inc. ("Kaiser Permanente") - *Amicus Curiae*

164. Kaiser Permanente – *Amicus Curiae*

165. Kaplan, Aryeh L. – Counsel for Appellee

166. Kasper, Erica Adams – Appellee's Next Friend and Mother

167. Kellum, Nathan W. – Counsel for *Amicus Curiae*

168.  Kenney, Tim – *Amicus Curiae*

169.  Kimberly, Michael B. (Mayer Brown LLP) - Counsel for Amicus Curiae

170.  Kirkland, Earl – Counsel for *Amicus Curiae*

171.  Knotel, Inc. - *Amicus Curiae*

172.  Kogan, Terry S. – *Amicus Curiae*

173.  Kostelnik, Kevin C. – Counsel for Appellant, Terminated

174.  Kunin, Ken – *Amicus Curiae*

175.  Kunze, Lisa – Principal of Allen D. Nease High School

176.  Laidlaw, Michael – *Amicus Curiae*

177.  Lambda Legal Defense and Education Fund, Inc. – Counsel for Appellee

178.  Lapointe, Markenzy – Counsel for Appellee

179.  Las Cruces Public Schools – *Amicus Curiae*

180.  LatinoJustice PRLDEF – *Amicus Curiae*

181.  Lawyers Club of San Diego – *Amicus Curiae*

182.  Lee, Jen Hee – Counsel for Amicus Curiae

183.  Legal Aid At Work – *Amicus Curiae*

184.  Legal Momentum – *Amicus Curiae*

185.  Legal Voice – *Amicus Curiae*

186. Levi Strauss & Co. - *Amicus Curiae*

187. Linden Research, Inc. d/b/a Linden Lab – *Amicus Curiae*

188. Los Angeles Unified School District – *Amicus Curiae*

189. Louisiana Foundation Against Sexual Assault – *Amicus Curiae*

190. Love, Laura H. – *Amicus Curiae*

191. Lyft, Inc. - *Amicus Curiae*

192. MacKenzie, Dominic C. – Counsel for Amicus Curiae

193. Maine – *Amicus Curiae*

194. Majeski, Jeremy – *Amicus Curiae*

195. Mallory, Christy, J.D. - *Amicus Curiae*

196. Mapbox, Inc. - *Amicus Curiae*

197. Marin Software Incorporated (MRIN) - *Amicus Curiae*

198. Martin, Emily (National Women's Law Center) - Counsel for Amicus Curiae

199. Massachusetts – *Amicus Curiae*

200. Mayer Brown LLP - Counsel for *Amici Curiae*

201. McCaleb, Gary S. – Counsel for *Amicus Curiae*

202. McCalla, Craig – *Amicus Curiae*

203. McRae Bertschi & Cole, LLC – Counsel for Amicus Curiae

204. Meece, Gregory R. – *Amicus Curiae*

205. Meerkamper, Shawn – *Amicus Curiae*

206. Melody, Colleen M., (Washington State Office of the Attorney General) – Counsel for Amicus Curiae

207. Mesa, David D. – Counsel for Amicus Curiae

208. Meyer, Ilan, H., Ph.D. – *Amicus Curiae*

209. Michigan – *Amicus Curiae*

210. Michigan Coalition to End Domestic & Sexual Violence – *Amicus Curiae*

211. Microsoft Corporation (MSFT): *Amicus Curiae* and parent company for *Amicus Curiae* GitHub, Inc.

212. Mignon, Bill – Board Member of Appellant

213. Miller, William C. – Counsel for Appellee

214. Minnesota – *Amicus Curiae*

215. Minter, Shannon – Counsel for *Amicus Curiae*

216. Morse, James C., Sr. – *Amicus Curiae*

217. Munson, Ziad W. – *Amicus Curiae*

218. Murray, Kerrel – Counsel for Amicus Curiae

219. NAACP Legal Defense & Educational Fund, Inc. – *Amicus Curiae*

220. Nardecchia, Natalie – Counsel for Appellee, Terminated

221. National Alliance to End Sexual Violence – *Amicus Curiae*

222.  National Asian Pacific American Women's Forum – *Amicus Curiae*

223.  National Association of School Psychologists – *Amicus Curiae*

224.  National Association of Social Workers – *Amicus Curiae*

225.  National Association of Women Lawyers – *Amicus Curiae*

226.  National Center for Law and Economic Justice – *Amicus Curiae*

227.  National Center for Transgender Equality – *Amicus Curiae*

228.  National Coalition Against Domestic Violence – *Amicus Curiae*

229.  National Council of Jewish Women – *Amicus Curiae*

230.  National Crittenton – *Amicus Curiae*

231.  National LGBTQ Task Force – *Amicus Curiae*

232.  National Organization for Women Foundation – *Amicus Curiae*

233.  National PTA and The American School Counselor Association – *Amicus Curiae*

234.  National Resource Center on Domestic Violence – *Amicus Curiae*

235.  National Women's Law Center, et al. – *Amicus Curiae*

236.  Nebraska Coalition to End Domestic and Sexual Violence – *Amicus Curiae*

237.  Nelson, Janai S. – Counsel for Amicus Curiae

238.  Nevada Coalition to End Domestic and Sexual Violence – *Amicus Curiae*

239. New Hampshire Coalition Against Domestic and Sexual Violence – *Amicus Curiae*

240. New Jersey – *Amicus Curiae*

241. New Mexico – *Amicus Curiae*

242. New Mexico Coalition of Sexual Assault Programs, Inc. – *Amicus Curiae*

243. New York – *Amicus Curiae*

244. New York State Coalition Against Sexual Assault – *Amicus Curiae*

245. NIO Inc. (NIO): Parent company for *Amicus Curiae* NIO USA, Inc.

246. NIO NextEV Ltd.: Parent company for *Amicus Curiae* NIO USA, Inc.

247. NIO USA, Inc. – *Amicus Curiae*

248. Northern Marianas Coalition Against Domestic & Sexual Violence – *Amicus Curiae*

249. Oasis Legal Services – *Amicus Curiae*

250. Oath Inc. – Parent company for *Amicus Curiae* Tumblr, Inc

251. O'Melveny & Myers LLP – Counsel for Amicus Curiae

252. O'Reilly, John – *Amicus Curiae*

253. OGC Law, LLC. – Counsel for Amicus Curiae

254. Ohio Alliance to End Sexual Violence – *Amicus Curiae*

255. Oregon – *Amicus Curiae*

256.  Oregon Coalition Against Domestic & Sexual Violence – *Amicus Curiae*

257.  Orr, Asaf – Counsel for Amicus Curiae

258.  Palacios, Patricia – Counsel for Amicus Curiae

259.  Palazzo, Denise – *Amicus Curiae*

260.  Parent-Child Center – *Amicus Curiae*

261.  Patreon, Inc. – *Amicus Curiae*

262.  Pediatric Endocrine Society – *Amicus Curiae*

263.  Pennsylvania – *Amicus Curiae*

264.  PFLAG, Inc. – *Amicus Curiae*

265.  Pierce, Jerome – Counsel for Amicus Curiae

266.  Pillsbury Winthrop Shaw Pittman LLP – Counsel for Appellee

267.  Pincus, Andrew J. (Mayer Brown LLP) – Counsel for Amicus Curiae

268.  Planned Parenthood of South, East and North Florida – *Amicus Curiae*

269.  Planned Parenthood of Southwest and Central Florida – *Amicus Curiae*

270.  Pollock, Lindsey – *Amicus Curiae*

271.  Portnoi, Dimitri – Counsel for Amicus Curiae

272.  Postmates Inc. – *Amicus Curiae*

273.  Powell, Wesley R. – Counsel for Record of Amicus Curiae

274. Purcell, Noah G. (Solicitor General for the State of Washington) – Counsel for Amicus Curiae

275. Rakuten, Inc.: Beneficial owner of *Amicus Curiae* Lyft, Inc.

276. Ranck-Buhr, Wendy – *Amicus Curiae*

277. Rao, Devi M. – Counsel for Amicus Curiae, Terminated

278. Rape/Domestic Abuse Program – *Amicus Curiae*

279. RC Barden and Associates – Counsel for Appellant, Terminated

280. Recruit Holdings Co., Ltd. (TYO 6098): Parent company for *Amicus Curiae* Glassdoor Inc.

281. Replacements, Ltd. – *Amicus Curiae*

282. Retzlaff, Pamela – *Amicus Curiae*

283. Reynolds, Andrew, Ph.D. – *Amicus Curiae*

284. RGF OHR USA, Inc.: Parent company for Amicus Curiae Glassdoor Inc.

285. Rhode Island – *Amicus Curiae*

286. Rivaux, Shani – Counsel for Appellee

287. Robertson, Cynthia C. – Counsel for Appellee

288. Rose, Nicholas M. (Baker & Hostetler LLP) – Counsel for Amicus Curiae

289. Rothfield, Charles – Counsel for Amicus Curiae

290. Samuels, Jocelyn, J.D. – *Amicus Curiae*

291. San Diego Cooperative Charter Schools – *Amicus Curiae*

292. Santa, Rachel – *Amicus Curiae*

293. SASA Crisis Center – *Amicus Curiae*

294. Sears, R. Bradley, J.D. – *Amicus Curiae*

295. Schaffer, Brian – *Amicus Curiae*

296. Scholars Who Study The Transgender Population – *Amicus Curiae*

297. Schommer, Monica – *Amicus Curiae*

298. School Administrators from 29 States and the District of Columbia – *Amicus Curiae*

299. School District of South Orange and Maplewood – *Amicus Curiae*

300. Segal, Richard M. – Counsel for Appellee

301. Shah, Paru – *Amicus Curiae*

302. Shirk, Sarah – *Amicus Curiae*

303. Shutterstock, Inc. (SSTK) – *Amicus Curiae*

304. SisterReach – *Amicus Curiae*

305. Slanker, Jeffrey D. – Counsel for Appellant

306. Slavin, Alexander – Counsel for Amicus Curiae

307. Slough, Beverly – Board Member of Appellant

308. Smith, Nathaniel R. – Counsel for Appellee

309.  Sniffen, Robert J. – Counsel for Appellant

310.  Sniffen & Spellman, P.A. – Counsel for Appellant

311.  Spellman, Michael P. – Counsel for Appellant

312.  Spital, Samuel (counsel for LDF) – Counsel for Amicus Curiae

313.  Spotify AB – Parent company for *Amicus Curiae* Spotify USA Inc.

314.  Spotify Technology S.A. – Parent company for *Amicus Curiae* Spotify USA Inc

315.  Spotify USA Inc. – *Amicus Curiae*

316.  Spryszak, Delois Cooke – *Amicus Curiae*

317.  SSAIS.org – *Amicus Curiae*

318.  Steptoe & Johnson LLP – Counsel for Amicus Curiae

319.  Stop Sexual Assault in Schools (SSAIS.org) – *Amicus Curiae*

320.  Stork, Victoria Lynn – (Baker & Hostetler LLP) – Counsel for Amicus Curiae

321.  SurvJustice – *Amicus Curiae*

322.  Sutherland, Emily – *Amicus Curiae*

323.  Taymore, Cyndy – *Amicus Curiae*

324.  Teufel, Gregory H. – Counsel for Amicus Curiae

325.  The American Academy of Pediatrics – *Amicus Curiae*

326.  The Impact Fund – *Amicus Curiae*

327.  The Law Office of Kirsten Doolittle, P.A. – Counsel for Appellee

328.  The School Board of St. Johns County, Florida – Appellant

329.  The Southwest Women's Law Center – *Amicus Curiae*

330.  The Women's Law Center of Maryland – *Amicus Curiae*

331.  Toomey, Joel – Magistrate Judge

332.  Trans Youth Equality Foundation – Amicus Curiae

333.  Tumblr, Inc. – *Amicus Curiae*

334.  Twitter Inc. (TWTR) – *Amicus Curiae*

335.  Tyler & Bursch, LLP. – Counsel for Amicus Curiae

336.  Tyler, Robert H. – Counsel for Amicus Curiae

337.  Tysse, James E. – (Akin Gump Strauss Hauer & Feld LLP) – Counsel
      for Amicus Curiae

338.  Underwood, Barbara D. (Solicitor General for the State of New York)
      – Counsel for Amici Curiae

339.  Union for Reform Judaism – *Amicus Curiae*

340.  UniteWomen.org – *Amicus Curiae*

341.  Upchurch, Bailey & Upchurch, P.A. – General Counsel to Appellant

342.  Upchurch, Frank D. – General Counsel to Appellant

343.  Valbrun-Pope, Michaelle – *Amicus Curiae*

344.  Van Meter, Quentin – *Amicus Curiae*

345.  Van Mol, Andre – *Amicus Curiae*

346.  Vannasdall, David – *Amicus Curiae*

347.  Vaughn, Craig – *Amicus Curiae*

348.  Verizon Communications Inc. (VZ) – Parent company for *Amicus Curiae* Tumblr, Inc.

349.  Vermont – *Amicus Curiae*

350.  Vermont Network Against Domestic & Sexual Violence – *Amicus Curiae*

351.  Virginia – *Amicus Curiae*

352.  Virginia Sexual & Domestic Violence Action Alliance – *Amicus Curiae*

353.  Vitale, Julie – *Amicus Curiae*

354.  Voices of Hope – *Amicus Curiae*

355.  Wallace, Matthew M. – Counsel for Amicus Curiae, Terminated

356.  Washington – *Amicus Curiae*

357.  Washoe County School District – *Amicus Curiae*

358.  Wasick, Joanna (Baker & Hostetler LLP) – Counsel for Amicus Curiae

359.  Weber, Thomas – *Amicus Curiae*

360.  Weisel, Jessica M. – (Akin Gump Strauss Hauer & Feld LLP) Counsel for Amicus Curiae

361.  Williams Institute at UCLA School of Law – *Amicus Curiae*

362.  Willkie Farr & Gallagher LLP – Counsel for Amicus Curiae

363.  Wilson, Bianca, D.M., Ph.D. – *Amicus Curiae*

364.  Wisconsin Coalition Against Sexual Assault – *Amicus Curiae*

365.  Women of Reform Judaism, and Men of Reform Judaism – *Amicus Curiae*

366.  Women's Bar Association of the District of Columbia – *Amicus Curiae*

367.  Women's Bar Association of the State of New York – *Amicus Curiae*

368.  Women's Center for Advancement – *Amicus Curiae*

369.  Women's Law Project – *Amicus Curiae*

370.  Women's Law Project and Young Women United – *Amicus Curiae*

371.  Women Lawyers On Guard Inc. ("WLG") – *Amicus Curiae*

372.  Women's Legal Defense and Education Fund – *Amicus Curiae*

373.  Women's Liberation Front – *Amicus Curiae*

374.  Wong, Kyle – Counsel for Amicus Curiae

375.  Working Assets, Inc. – Parent company for *Amicus Curiae* CREDO Mobile, Inc.

376.  Wyoming Coalition Against Domestic Violence and Sexual Assault – *Amicus Curiae*

377.  Xerox Corporation (XRX) – *Amicus Curiae*

378.    Yelp Inc. (YELP) – *Amicus Curiae*

379.    Young Women United – *Amicus Curiae*

The undersigned certifies that included in this CIP is a list of the publicly traded companies and corporations that have indicated an interest in the outcome of the case or appeal through their appearance as an *Amicus Curiae*. Upon information and belief, the undersigned is not required to enter this information into the web-based CIP.

Aside from those appearing as *Amicus Curiae*, the undersigned is unaware of any publicly traded companies or corporations that have an interest in the outcome of the case or appeal. The undersigned will enter this information into the web-based CIP contemporaneous with the filing of this Certificate of Interested Persons and Corporate Disclosure Statement.

Adams v. The School Board of St. Johns County, Florida
Appeal No. 18-13592-EE

## **RULE 35 CERTIFICATION**

We express a belief, based on a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance, namely: the constitutionality of sex-separated bathrooms based on a conception of sex founded in the biological and physiological differences between boys and girls that the United States Supreme Court has recognized are real and enduring.

We further express a belief, based on a reasoned and studied professional judgment, that the majority decision is contrary to the following decisions of the United States Supreme Court or the precedents of this Circuit and that consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court: United States v. Sineneng-Smith, 140 S. Ct. 1575 (2020); Greenlaw v. United States, 554 U.S. 237 (2008); Nguyen v. Immigr. & Naturalization Serv., 533 U.S. 53 (2001); United States v. Virginia, 518 U.S. 515 (1996); Michael M. v. Super. Ct. of Sonoma Cty., 450 U.S. 464 (1981) (plurality opinion); Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256 (1979); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977); Geduldig v. Aiello, 417 U.S. 484 (1974); Frontiero v. Richardson, 411 U.S. 677 (1973) (plurality opinion); Levy v. U.S. Attorney General, 882 F.3d 1364, 1368–69 (11th Cir. 2018).

Respectfully submitted this 4th day of August 2021.

/s/ Terry J. Harmon
Terry J. Harmon FBN 0029001
/s/ Jeffrey D. Slanker
Jeffrey D. Slanker FBN 0100391
Robert J. Sniffen FBN 000795
Michael P. Spellman FBN 937975

SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, FL 32301
Telephone: (850) 205-1996
Fax: (850) 205-3004

*Counsel for The School Board*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .........................................................................C - 1

RULE 35 CERTIFICATION ...................................................................................i

TABLE OF CONTENTS.........................................................................................iii

TABLE OF AUTHORITIES ..................................................................................iv

STATEMENT OF THE ISSUES.............................................................................1

COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE ...................4

STATEMENT OF THE FACTS NECESSARY TO THE ARGUMENT OF THE ISSUES...........................................................................................................4

REASONS FOR GRANTING THE PETITION......................................................6

       I.     *En Banc* Review of the Equal Protection Issue is Required to Maintain Uniformity of the Decisions of this Court and the Supreme Court ....................................................................6

       II.    *En Banc* Review or Rehearing by the Panel is Required, Because the School Board is Entitled to a Decision on the Issues Before the Court............................................................13

       III.   The Issues in this Case are Exceptionally Important................15

CONCLUSION.....................................................................................................16

CERTIFICATE OF COMPLIANCE....................................................................18

CERTIFICATE OF SERVICE .............................................................................19

OPINION SOUGHT TO BE REHEARD .............................................................20

# TABLE OF AUTHORITIES

## DECISIONAL AUTHORITY

Bostock v. Clayton Cty.
  140 S. Ct. 1731 (2020) .....................................................................15

Craig v. Boren,
  429 U.S. 190 (1976) .......................................................................8, 9

Frontiero v. Richardson,
  411 U.S. 677 (1973) .........................................................................12

Geduldig v. Aiello,
  417 U.S. 484 (1974) .........................................................................12

Grimm v. Gloucester Cty. Sch. Bd.,
  972 F. 3d 586 (4th Cir. 2020) .............................................................2

Greenlaw v. United States,
  554 U.S. 237 (2008) .........................................................................14

Levy v. U.S. Attorney General,
  882 F.3d 1364 (11th Cir. 2018) ........................................................10

Michael M. v. Super. Ct. of Sonoma Cty.,
  450 U.S. 464 (1981) .........................................................................10

Nguyen v. Immigration & Naturalization Serv.,
  533 U.S. 53 (2001) ...............................................................10, 12, 13

Pers. Adm'r of Mass. v. Feeney,
  442 U.S. 256 (1979) .........................................................................12

United States v. Sineneng-Smith,
  140 S. Ct. 1575, 1579 (2020) ...........................................................14

United States v. Virginia,
  518 U.S. 515 (1996) ...................................................................10, 12

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,
  429 U.S. 252 (1977) .........................................................................12

**STATUTES**

20 U.S.C. § 1686 .................................................................................................16

**REGULATIONS**

34 C.F.R. § 106.33 ..............................................................................................16

## STATEMENT OF THE ISSUES

Drew Adams is biologically female but identifies as male. He attended a high school which, like all other schools within its district, followed a simple and unwritten policy maintained by the School Board for as long as anyone could recall: biological boys may use the boys' bathrooms, but not the girls' bathrooms, and vice versa. Any student, including Adams, was also provided access to numerous gender-neutral, single-user bathrooms at their schools. The effect of this policy resulted in Adams being prohibited from using the boys' bathroom. The constitutionality of that policy is at issue here.

After issuing an opinion affirming the district court's decision finding the policy violated Title IX of the Education Amendments Act and the Fourteenth Amendment's Equal Protection Clause, the majority vacated that opinion and issued a new opinion. The new opinion did not reach the Title IX issue and narrowed the grounds for affirming the district court's holding on the Equal Protection Clause claim from three grounds to one. The majority now asserts that the policy or classification at issue, which it now frames as the School Board's practice of relying on self-reported sex and supporting documentation to determine the sex of its students, is unconstitutional because it is arbitrary.

The School Board presumes the Court's members know of this case. That much is obvious from the language in the majority's new opinion that expresses it

was issued in an effort to garner more support amongst this Court's members. Op. at 1-2. *No* member of the Court should support this new opinion, which eludes the major issues in this case and provides no guidance to litigants in this Circuit about the permissible contours of sex classifications in intimate facilities.

The majority opinion confronts, rather than avoids, the constitutional question here and ducks the ultimate question of whether the policy classifying students based on biological sex is permissible. The majority recasts the policy which, in turn, refocuses the opinion away from the actual classification at issue. The majority's recasting was inappropriate, and the majority's implicit ruling that a classification based on biological sex for bathroom use is not substantially related to an important government interest is contrary to Supreme Court precedent. The Supreme Court has recognized that the differences in the sexes are enduring and that constitutionalizing all differences between the sexes risks trivializing those stereotypes that are real. No aspect of the classification at issue in this case was based on a stereotype or was arbitrary and there is no evidence the policy failed to work *perfectly* as intended to achieve its goal of protecting student privacy.

The majority's failure to reach the Title IX issue is troubling and has left the Circuit and the nation in a quandary. It was this Court's rationale in the now-vacated opinion affirming the district court's decision finding the policy violated Title IX that provided at least part of the basis for a similar holding in <u>Grimm v. Gloucester</u>

<u>Cty. Sch. Bd.</u>, 972 F. 3d 586 (4th Cir. 2020) which the Supreme Court recently declined to hear. One need only browse the internet to locate numerous reports of school boards monitoring this case seeking an understanding of how to comply with the law. Also, as a practical matter, whether the School Board prevailed on this claim is relevant to the compensability of Adams' attorneys' fees.

The School Board is, and surely other governmental entities are, left wondering after years of litigation what a proper policy that classifies based on "sex" looks like. The majority and Adams concedes that there is nothing wrong with separating school bathrooms based on sex. Nonetheless, Adams contends "sex" means gender identity, and it appears the majority agrees. But, that is key to the dispute in this case - whether the School Board's definition of sex advances the acknowledged important governmental interest of protecting student privacy in bathrooms even if such a definition may have the *potential* to impact some transgender students. The Court explicitly avoided resolving this question.

Despite posturing that the problem with the policy was its arbitrariness, no policy would survive the majority's reasoning unless it classifies based on gender identity. The majority takes umbrage at the dissent's reliance on dictionary definitions explicating the ordinary meaning of the word "sex" while assuming the only appropriate way to classify the sexes is based on gender identity or how the State of Florida decides to identify gender markers on drivers' licenses or amended

birth certificates. The assumption implicit in the majority's opinion, that only a conception of sex based on gender identity is constitutionally permissible, decides the case without explicitly deciding it.

This case has always been about whether a definition of sex founded in the real and enduring biological differences between boys and girls substantially advances the important privacy interests of students to use the bathroom free from members of the opposite biological sex. Yet, the Court has not answered that question. The School Board requests that the entire panel of this Court do so.

## COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

This is an appeal of the district court's decision that the Board's policy requiring its students to use bathrooms matching their biological sex violates the Equal Protection Clause and Title IX. The panel opinion initially issued in this case affirmed the district court. The current opinion vacated that opinion and was issued in its place.

## STATEMENT OF THE FACTS NECESSARY TO THE ARGUMENT OF THE ISSUES

Adams was a student at a public school operated by the Board. Op. at 2. Adams is a biological female that identifies as a male. Op. at 2; Doc. 160 at Tr. 83, 96, 195; Doc. 166-2. The Board prohibited Adams from using the boys' bathrooms at his school. Op. at 26. The Board's decision in this regard was consistent with its longstanding and unwritten policy that students must use the bathrooms matching

their biological sex. Op. at 7; Docs. 161 at Tr. 248-249; 162 at Tr. 45-46, 99-100. The policy is based on the privacy rights students have to use the bathroom away from the opposite sex. Doc. 162 at Tr. 67-68.

Consistent with a Best Practices document designed to offer staff guidelines related to LGBTQ students, Adams was permitted to continue using the bathroom matching his biological sex or a gender-neutral bathroom. Op at 48-49; Docs. 152-6; 161 at Tr. 242-43, 246-47; 162 at Tr. 70-71, 110. It was the Board's unwritten policy that excluded Adams from the boys' bathroom as opposed to the Best Practices document. Docs. 160 at Tr. 255; 161 at Tr. 185. Since this proceeding's inception, and as acknowledged by the district court and this Court in its vacated opinion, the policy Adams challenges is the Board's policy separating bathrooms on the basis of biological sex. Doc. 1 at ¶56; Doc. 22 at p. 7; Doc. 60 at ¶¶4, 48, 61, 65; Doc. 116 at p. 2, 4; Doc. 137 at ¶¶30-31; Doc. 138-1 at p. 24; Doc. 172 at ¶10; Doc. 173-1 at p. 1; Doc. 174 at pp. 3-4; Doc. 175 at pp. 7-8; Doc. 192 at pp. 14, 18-19, 35-36, 48; Appellant's Civil Appeal Statement at p. 2; Appellant's Initial Brief at p. 1; Appellee's Initial Brief at pp. 9-10; Appellant's Reply Brief at pp. 2, 15; Opinion of the Court (August 7, 2020, *vacated*) at 6-7, 12.

Generally, the Board requires students to use the bathroom matching the sex identified on their enrollment paperwork with that marker being a proxy for biological sex. Doc. 161 at Tr. 205, 234. Nonetheless, that a student *might* enroll in

the district with a sex marker on their enrollment paperwork not matching their biological sex does not alter the policy, *as such situations would be addressed as they arise.* Doc. 162 at Tr. 52-55.

At the time of the trial, 40,000 students attended District schools, and school officials were only aware that sixteen of those students were transgender. Op. at 44-45. This means even if every single student who is transgender enrolled as a member of the opposite sex from their birth certificate, of which there is no evidence, the school district would be 99.96% accurate at identifying the sex of its students.

**REASONS FOR GRANTING THE PETITION**

This Court should address the issues squarely before it and adjudicate the actual policy challenged. If the actual classification is meaningfully confronted, the reasoning in the panel decision simply cannot be squared with precedent. This case is too important to let the opinion stand.

**I.** ***En Banc* Review of the Equal Protection Issue is Required to Maintain Uniformity of the Decisions of this Court and the Supreme Court**

The majority's reasoning is inconsistent with Supreme Court precedent interpreting the propriety of sex-based classifications. If not before, it is evident now that the majority opinion is an exercise in means-end analysis and an effort to achieve a result divorced from the record and law.

The policy requires students to use the bathroom matching their biological sex to advance the important governmental interest of protecting student privacy in

intimate facilities. The question here has always been whether a definition of sex founded in the biological differences between the sexes was substantially related to this important governmental interest.

The majority though has reframed the policy to something it is not and conflated it with one aspect of its enforcement. The majority now asserts that it views the School Board's practice of relying on self-reported sex and supporting documentation to determine the sex of its students as the policy at issue. Op. at 12. That has never been the challenged policy.

The majority now bases the entirety of its holding on its belief that the reframed policy is unconstitutional because it is arbitrary. It contends this arbitrariness is demonstrated by a *hypothetical* in which a transgender student obtains government paperwork designating their sex as one inconsistent with their biological sex and then transfers to a St. Johns County school with enrollment paperwork reflecting their gender identity as their sex and not their biological sex. Op. at 13-14. The majority asserts that because this hypothetical student might then use the bathroom inconsistent with their biological sex, without school officials' knowledge, the policy is unconstitutionally arbitrary. Id.

Never mind there is no evidence this hypothetical has ever occurred, there are at least two problems with this reasoning. It ignores the evidence establishing that if such a situation were to arise, the School Board would address it. If a student

complains about a transgender student using a bathroom that does not align with their biological sex, giving the School Board reason to doubt that the sex denoted in their enrollment papers reflected their biological sex, the School Board would take steps to enforce its policy; that biological boys must use the boys' bathrooms and vice versa, regardless of what is on their enrollment paperwork. Second, the majority's reliance on Craig v. Boren, 429 U.S. 190 (1976) is misplaced.

Craig involved laws in Oklahoma that forbade selling non-intoxicating beer to males, but not females, aged 18-21. Id. at 192. The state's proffered important governmental interest was to improve traffic safety. Id. at 199. To support its assertion that the classification advanced this interest, the state offered statistical evidence suggesting young men were involved in traffic incidents involving alcohol more often than young women. Id. at 200-203. The Supreme Court held that this statistical evidence was not probative though because the statistical significance of the tendency of young men to be involved in alcohol-related traffic incidents, as compared to young women, was quite small. Id. at 202-203. Here, the majority seized on one aspect of the opinion that noted the classification was arbitrary, because it did not prohibit young men from drinking the beer, just from purchasing it. Id. at 204. As Justice Powell noted in his concurring opinion, the policy was so easily circumvented that it was virtually meaningless. Id. at 210-211.

The situation in Craig is unlike the situation here. Here, the policy requires all biological girls to use the girls' bathrooms and all biological boys to use the boys' bathrooms. There is no way to easily circumvent the policy like there was in Craig where any young man could legally drink the beer; he just needed someone else purchase it. The classification in Craig would be more similar to the one here if it also prohibited the beer's consumption. The classification then would be related to the goal. One could imagine scenarios even under such a hypothetical Oklahoma law where a young man could unlawfully purchase *and* drink the low alcohol beer, but that hypothetical scenario would not render such a policy arbitrary in the sense of the Supreme Court's reasoning in Craig.

Surely, there are potential situations in which a student in District schools might use the bathroom that does not match their biological sex, notwithstanding the Board's policy. That is true of both the hypothetical transgender transfer student, but it is also true of cisgender students that might use a bathroom inconsistent with their biological sex for whatever reason, without the knowledge of school officials. Neither hypothetical situation changes the policy's nature which applies to all students, not just transgender students.

More substantively, where the majority deviated from binding precedent in this case was to hold that such hypotheticals *ipso facto* rendered the policy unconstitutionally arbitrary. Of course, classifications triggering intermediate

scrutiny review must serve important governmental interests and the means employed must be substantially related to the achieve that interest. United States v. Virginia, 518 U.S. 515, 524 (1996). But, a policy does not have to perfectly classify to withstand intermediate scrutiny. Nguyen v. Immigration & Naturalization Serv., 533 U.S. 53, 70 (2001) (Intermediate scrutiny does not "require[] that the [policy] under consideration must be capable of achieving its ultimate objective in every instance."); see also Michael M. v. Super. Ct. of Sonoma Cty., 450 U.S. 464, 473 (1981) (plurality opinion) ("The relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been . . . ."); Levy v. U.S. Attorney General, 882 F.3d 1364, 1368–69 (11th Cir. 2018)(upholding statute under intermediate scrutiny despite fact that Congress could have drafted it in a manner that encompassed the plaintiff).

The *actual* policy here, while theoretically imperfect, is substantially related to student bathroom privacy. Indeed, the policy perfectly classifies nearly every student in the District, as at the time of the trial, the Board was aware of only sixteen transgender students out of approximately 40,000. There is no evidence that even those students' sex as denoted in their enrollment materials did not match their biological sex, and we know that was not the case with Adams. More importantly, the policy classifies all students on the basis of biological sex, without regard to gender identity. The policy does this with remarkable accuracy and no precedent

suggests that a policy that achieves its goal over 99% of the time is not substantially related to its objective.

The majority asserts there is no evidence there has ever been an "exposure" or that Adams or any transgender student threatened another student's privacy in the bathrooms. Op. at 22-23. There is no such evidence because the School Board's policy is at least 99.96% effective in assigning students to bathrooms matching their biological sex. The only violation of the policy in the record occurred when Adams, a student correctly identified through the policy as a biological female and someone who used the girls' bathrooms for years, proceeded to use the boys' bathrooms.

Ultimately, the rationale for the majority opinion is dependent on what Judge Pryor referred to as a "linguistic sleight of hand" in his dissent. Op. at 42 (Pryor. J., dissenting). The majority presumes that a classification of sex based on biological differences between men and women for the purposes of bathroom use cannot withstand intermediate scrutiny, and that "sex" means gender identity. Yet, the majority did not even address the practical realities of how such a holding applies to gender fluid students. Adams of course, like other biological females, cannot use the boys' bathrooms, and it is the disparate impact on Adams himself, a transgender boy that cannot use the bathroom consistent with his gender identity, with which the majority takes issue.

The majority does not hold though that the Board's classification of bathroom use based on the enduring physical differences between men and women is improper. Precedent will not let it. The anatomical differences between the sexes is relevant to bathroom privacy. Virginia, 518 U.S. at 550 n.19. And it is not stereotypical to recognize that the sexes are different. See Nguyen, 533 U.S. at 73 ("The difference between men and women in relation to the birth process is a real one..."); Geduldig v. Aiello, 417 U.S. 484, 496 n.20 (1974)("[I]t is true that only women can become pregnant ..."); Virginia, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: [T]he two sexes are not fungible ..." (internal quotation marks omitted)); Frontiero v. Richardson, 411 U.S. 677, 686 (1973) (plurality opinion) (noting that sex is an immutable characteristic determined solely by the accident of birth).

To the extent the majority suggests that any discriminatory impact towards Adams is sufficient to establish a constitutional claim, that assertion is also without merit. There is no evidence the policy was motivated by a discriminatory purpose towards Adams sufficient to establish a constitutional claim based on any adverse impact Adams might have suffered by operation of a facially-neutral policy. Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 274 (1979); see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977) ("Proof of. . .

discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

Essentially, the majority reframed the policy to something it was not to find it was unconstitutionally arbitrary. Implicitly, the majority holds that it is a stereotype to recognize the sexes are different and reduces the differences between men and women into a nullity, contrary to precedent. See Nguyen, 533 U.S. at 73 ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real."). Protecting bodily privacy in bathrooms is an important governmental interest and a policy that classifies bathroom usage based on biological sex is substantially related to that interest. The majority's twisting of the School Board's policy and distortion of the intermediate scrutiny analysis requires *en banc* review.

## II. *En Banc* Review or Rehearing by the Panel is Required, Because the Board is Entitled to a Decision on the Issues Before the Court

For years the Board has defended its policy separating student bathrooms on the basis of biological sex. Nearly a year after requesting *en banc* review of this Court's now-vacated opinion, the Court issued a new opinion avoiding the policy litigated and briefed by the parties and, instead, found fault with a feature of the Board's policy that was neither challenged by Adams nor briefed by the parties. The majority's focus on a feature of the policy (enrollment documents) instead of the policy warrants rehearing.

First, the Board's policy was not "adopted in the context of the School District's reexamination of its policies toward … 'LGBTQ'… students." Op. at 7. The policy existed long before the Board analyzed its Best Practices document regarding LGBTQ students. Doc. 162 at Tr. 45-46; Doc. 184 at Tr. 11-12. Moreover, under the policy, students of one biological sex were *never* permitted to use the bathroom of the opposite biological sex. Doc. 161 at Tr. 149-50. Adams, a biological girl, enrolled in the School District as a girl. Adams was denied access to the boys' bathroom for one reason - he is a biological girl. He was not denied access to the boys' bathroom because he is transgender. All biological girls are denied access to the boys' bathroom under the policy.

Considering the importance of the issues here, and the reality that the newly-adopted opinion analyzed a different policy than the one subject of this appeal, the Board submits that an *en banc* review, or panel rehearing, is necessary and, frankly, that to which it is entitled. See United States v. Sineneng-Smith, 140 S. Ct. 1575, 1579 (2020)("In our adversarial system of adjudication, we follow the principle of party presentation"). "[I]n both civil and criminal cases" courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." Greenlaw v. United States, 554 U.S. 237 (2008). The majority did not abide by this principle, but struck out on its own to reach a decision

divorced from this litigation's reality. This warrants panel rehearing at least, and rehearing by the Court's entirety if the panel does not choose to correct this error.

## III.    The Issues in this Case are Exceptionally Important

The majority refuses to acknowledge that this case is not just about one student. In this vein, the majority claims the case is not about locker rooms or anything else separate from Adams' specific claim. Op. at 23. Yet, the majority's now-vacated interpretation of Adams' Title IX claim exemplifies how precedent expressly purporting to concern only one scenario (Bostock v. Clayton Cty, Georgia, 140 S. Ct. 1731 (2020)) is more broadly interpreted and applied by lower courts.

The majority's reasoning will have ramifications for all governmental entities in this Circuit that must address complicated issues involving policies based on the real differences between the sexes. Implicit in the majority's finding is that a sex-based classification must define sex in terms of gender identity to withstand constitutional scrutiny. As a result, judges in courts throughout the Circuit will be hard-pressed to uphold any policy that makes a distinction based on biological sex. The reality is that future litigants in Alabama, Florida, and Georgia will utilize this Court's opinion to argue that schools and governmental entities are prohibited from adopting *any* policy based on the real differences between the sexes whether that be in the context of the provision of services, school administration, or employment.

Schools throughout the Circuit are monitoring this case to determine how to address these issues. They are now left without any guidance from this Circuit on these issues and have no idea what role Title IX plays in the matter. This is important because Title IX and its implementing regulations permit sex-separated bathrooms and living facilities. 20 U.S.C. § 1686 (providing that schools may maintain separate living facilities for the sexes); 34 C.F.R. § 106.33 (granting schools discretion to "provide separate toilet, locker room, and shower facilities on the basis of sex...").

Considering the gravity and future impact the Court's opinion will have throughout the Circuit, and the probability these issues will return to this Court in the future, *en banc* review is necessary.

## <u>CONCLUSION</u>

The Court should grant this petition and rehear the case or rehear the case *en banc*.

Respectfully submitted this 4th day of August, 2021.

/s/ Terry J. Harmon
Terry J. Harmon FBN 0029001
/s/ Jeffrey D. Slanker
Jeffrey D. Slanker FBN 0100391
Robert J. Sniffen FBN 000795
Michael P. Spellman FBN 937975

SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, FL 32301
Telephone: (850) 205-1996
Fax: (850) 205-3004

*Counsel for The School Board*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I CERTIFY that this Petition for Rehearing and Rehearing En Banc complies with the type-volume limit of Fed. R. App. P. 35(b)(2) and Fed. R. App. P. 40(b) and the word limit of Fed. R. App. P. 35(b)(2) and Fed. R. App. P. 40(b) because, excluding the parts of the document exempted by 11th Cir. R. 35-1, this Petition for Rehearing and Rehearing En Banc has been produced on a computer and contains less than 3,900 words.

I FURTHER CERTIFY that this Petition for Rehearing and for Rehearing En Banc complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this Petition for Rehearing and Rehearing En Banc has been prepared in a proportionally spaced typeface using Microsoft Word Version 2016 in 14-point Times New Roman.

/s/ Terry J. Harmon
**TERRY J. HARMON**

## CERTIFICATE OF SERVICE

I hereby certify one true and accurate copy of the foregoing document has been furnished by electronic means to all counsel of record as well as by Federal Express.

Fifteen copies of this Petition for Rehearing and Rehearing En Banc with white covers have been delivered via Federal Express to:

David J. Smith, Clerk
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St. N.W.
Atlanta, GA 30303

/s/ Terry J. Harmon
**TERRY J. HARMON**

**COPY OF OPINION SOUGHT TO BE REHEARD**

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13592

_____

D.C. Docket No. 3:17-cv-00739-TJC-JBT

DREW ADAMS,
a minor, by and through his next friend and mother, Erica Adams Kasper,

Plaintiff - Appellee,

versus

SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 14, 2021)

Before WILLIAM PRYOR, Chief Judge, MARTIN and JILL PRYOR, Circuit
Judges.

MARTIN, Circuit Judge:

On the day the original panel decision issued in this appeal, an active

member of this Court withheld issuance of the mandate.  In an effort to get broader

support among our colleagues, we vacate the opinion issued on August 7, 2020, Adams ex rel. Kasper v. School Board of St. Johns County, 968 F.3d 1286 (11th Cir. 2020), and replace it with this one. This revised opinion does not reach the Title IX question and reaches only one ground under the Equal Protection Clause instead of the three Equal Protection rulings we made in the August 7 opinion.

Drew Adams is a young man and recent graduate of Nease High School in Florida's St. Johns County School District (the "School District"). Mr. Adams is transgender, meaning when he was born, doctors assessed his sex and wrote "female" on his birth certificate, but today Mr. Adams knows "with every fiber of [his] being" that he is a boy. While Mr. Adams attended Nease High School, school officials considered him a boy in all respects but one: he was forbidden to use the boys' restroom. Instead, Mr. Adams had the option of using the multi-stall girls' restrooms, which he found profoundly "insult[ing]." Or he could use a single-stall gender-neutral bathroom, which he found "isolati[ng]," "depress[ing]," "humiliating," and burdensome. After unsuccessful negotiations with the School District over his bathroom use, Mr. Adams brought suit against the St. Johns County School Board (the "School Board")[1] through his next friend and mother, Ms. Erica Adams Kasper. He asserted violations of his rights under Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and the

---

[1] The School Board is the School District's governing body and comprises five members.

Fourteenth Amendment to the U.S. Constitution.  After a bench trial, the District Court entered judgment in favor of Mr. Adams on both claims, awarding him injunctive relief and damages as well.

We affirm the District Court's judgment.  We conclude the School District's policy barring Mr. Adams from the boys' restroom violates the Constitution's guarantee of equal protection, because the School District assigns students to sex-specific bathrooms in an arbitrary manner.  We affirm the District Court's award of damages because Mr. Adams undoubtedly suffered harm as a result of this violation.

## I

The District Court developed a thorough factual record after a three-day bench trial of Mr. Adams's claims.  See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty., 318 F. Supp. 3d 1293, 1298–1310 (M.D. Fla. 2018).  We recite those facts here, as necessary.

Drew Adams was born in 2000.  At birth, doctors examined Mr. Adams and recorded his sex as female.  That female designation vexed Mr. Adams throughout his young life.  When Mr. Adams entered puberty, he suffered significant anxiety and depression about his developing body, and he sought the help of a therapist and a psychiatrist.  In the eighth grade, Mr. Adams came out to his parents as transgender.  He explained to his parents that he was a boy.  At trial, his mother

3

acknowledged that, when she heard this, she "knew that things were going to get difficult for him. It's not a great world to live in if you're different, if you're transgender." But she described noticing an "absolutely remarkable" change in Adams after he told his parents that he was transgender. She observed that he "went from this quiet, withdrawn, depressed kid to this very outgoing, positive, bright, confident kid. It was a complete 180." At the time of trial, Mr. Adams was excelling academically, was a member of the National Honor Society, and spent his summers volunteering.

Together, Mr. Adams and his family met with mental health professionals, who confirmed Adams was transgender. In time, Mr. Adams's psychiatrist diagnosed him with gender dysphoria, a condition of "debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." The sex assigned to Mr. Adams at the time of birth was female, but his consistent, internal sense of gender is male.

To treat and alleviate Mr. Adams's gender dysphoria, the psychiatrist recommended Adams socially transition to living as a boy. This included cutting his long hair short, dressing in more masculine clothing, wearing a chest binder to flatten breast tissue, adopting the personal pronouns "he" and "him," and using the men's restroom in public. Mr. Adams embraced these changes. Socially transitioning to using the men's restroom, Mr. Adams explained at trial, is "a

4

statement to everyone around me that I am a boy.  It's confirming my identity and
confirming who I am, that I'm a boy.  And it means a lot to me to be able to
express who I am with such a simple action."  Mr. Adams's course of treatment
reflects the "accepted standard of care for transgender persons suffering from
gender dysphoria."  Modern medical consensus establishes that "forc[ing]
transgender people to live in accordance with the sex assigned to them at birth" is
ineffective and "cause[s] significant harm."  The Pediatric Endocrine Society
maintains that "not allowing students to use the restroom matching their gender
identity promotes further discrimination and segregation of a group that already
faces discrimination and safety concerns."

The psychiatrist also supported Mr. Adams's request for medical treatment
for his gender dysphoria.  Mr. Adams began a birth control regimen to end his
menstrual cycle and met with social workers and endocrinologists to obtain a
prescription for testosterone to masculinize his body.  About a year after his
diagnosis with gender dysphoria, Mr. Adams also had gender affirming surgery.

The transition process took about a year.  At trial, Mr. Adams described
steps in his medical and social transition as a "rigorous process" through which
"medical providers, me, and my parents [agreed] that this was the right course of
action."  Mr. Adams said transitioning led to "the happiest moments of my life,"
"finally figuring out who I was," and being "able to live with myself again."

5

Alongside his social and medical transition, Mr. Adams amended his legal documents to reflect his male sex. Following Florida agencies' established procedures, Mr. Adams updated the sex marker on his learner's driving permit (which became his driver's license) and his birth certificate. Both now read "male" or "M." At the time of trial, Mr. Adams had not yet changed the sex listed on his U.S. passport but testified he could easily do so by presenting a letter from his physician stating he was being clinically treated for gender transition.[2]

In 2010, Mr. Adams enrolled in St. Johns County schools in the fourth grade. In 2015, he entered the ninth grade at Nease High School, which is in the same school district. By this point, Mr. Adams was already presenting as a boy and transitioning. Before Mr. Adams started the ninth grade, his mother informed the school that Adams was transgender, undergoing the transition process, and should be considered a boy student. She did not discuss Adams's bathroom use with the school. For his first six weeks as a ninth grader, Mr. Adams used the boys' restroom without incident. One day, however, the school pulled Mr. Adams from class and told him he could no longer use the boys' restroom, because two unidentified girl students who saw Adams entering the boys' restroom had complained. It is unclear why the female students reported Mr. Adams. The

---

[2] See Change of Sex Marker, U.S. Dep't of State, https://travel.state.gov/content/travel/en/passports/need-passport/change-of-sex-marker.html (last visited July 13, 2021).

6

School District did confirm, however, that neither of the female students expressed privacy or safety concerns. The School District also confirmed it was unaware of a single negative incident involving a transgender student using a restroom. There were no complaints from boy students who shared bathroom facilities with Mr. Adams. Regardless, school officials gave Mr. Adams two choices: use a single-stall bathroom in the school office, or use the girls' bathroom.

In issuing this warning to Mr. Adams, Nease High School administrators were acting to enforce the School District's unwritten bathroom policy. For "as long as anybody can remember," the School District has maintained a policy that, for restroom use, "boys go to boys' rooms, [and] girls go to girls' rooms." But school administrators came to enforce the unwritten bathroom policy against Mr. Adams in September 2015, when he was directed not to use the boys' bathroom. That unwritten policy assigns students to use bathrooms based solely on the sex indicated on a student's enrollment documents.

The unwritten bathroom policy came to be adopted in the context of the School District's reexamination of its policies toward lesbian, gay, bisexual, transgender, and queer (collectively, "LGBTQ") students. Through its research on LGBTQ policies, the School District learned that other school districts—in Florida and in other states—permitted transgender students to use the restroom according to their gender identity, as opposed to the sex assigned to them at birth. But the

7

School District took a different course.  Instead, the District adopted a policy that required that a student use either a designated single-stall restroom or the bathroom corresponding to the sex listed on the student's enrollment documents.  Students who fail to abide by the bathroom policy could be disciplined for violating the student code of conduct.

Because Mr. Adams enrolled in St. Johns County schools in the fourth grade as "female," the School District's policy would not allow him to use the boys' restroom, despite Adams's updated legal documents and verified course of medical treatment.  In other words, the School District rejected Mr. Adams's updated legal documents reflecting his sex in favor of the outdated information in his enrollment package.  And the School District conceded that, because of the policy's exclusive focus on documents provided at the time of enrollment, a transgender male student who provides documents showing his sex as male at the time of enrollment may use the boys' bathroom.

The policy barred Mr. Adams from using the boys' bathroom.  As a result, he felt "alienated and humiliated" every time he "walk[ed] past the boys' restroom on his way to a gender-neutral bathroom, knowing every other boy is permitted to use it but him."  Mr. Adams believed the bathroom policy sent "a message to other students who [saw Adams] use a 'special bathroom' that he is different."  Throughout his freshman and sophomore years, he and his mother asked the

8

School District to allow him to use the boys' restroom, writing letters, meeting with school officials, and petitioning the U.S. Department of Education's Office of Civil Rights.

Unsuccessful, Mr. Adams—through his mother, Ms. Kasper—filed this case in June 2017. He alleged the School Board violated his right to equal protection under the Fourteenth Amendment and his rights under Title IX by barring him from the boys' bathrooms at school. He asked for injunctive, declarative, and monetary relief. The case proceeded to a bench trial in December 2017. The Honorable Timothy J. Corrigan, presiding, toured Nease High School with counsel of the parties to view the bathroom facilities.

After a three-day trial, Judge Corrigan issued detailed findings of fact and conclusions of law, holding that Mr. Adams was entitled to declaratory, injunctive, and monetary relief on his constitutional and Title IX claims. The School Board timely appealed.

## II

After a bench trial, we review <u>de novo</u> the District Court's conclusions of law. <u>Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.</u>, 790 F.3d 1253, 1257 (11th Cir. 2015). We accept the District Court's findings of fact, absent clear error. See <u>id.</u> "We will not find clear error unless our review of the record leaves us with the definite and firm conviction that a mistake has been committed." <u>U.S. Commodity</u>

9

Futures Trading Comm'n v. S. Tr. Metals, Inc., 894 F.3d 1313, 1322 (11th Cir. 2018) (quotation marks omitted).  "[W]e are permitted to affirm the district court where the judgment entered is correct on any available legal ground."  Fioretti v. Mass. Gen. Life Ins. Co., 53 F.3d 1228, 1230 (11th Cir. 1995).

## III

Mr. Adams and the School Board both recognize that intermediate scrutiny applies to the School District's bathroom policy, which categorizes on the basis of sex.  We agree that heightened scrutiny applies, because Supreme Court and our circuit precedent require this level of scrutiny in cases involving sex discrimination.

### A.

The Fourteenth Amendment promises "the equal protection of the laws." U.S. Const. amend. XIV, § 1.  When state actors draw distinctions using sex or gender, this constitutional mandate "call[s] for a heightened standard of review." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S. Ct. 3249, 3254 (1985).  Because sex or gender "generally provide[] no sensible ground for differential treatment," id., the Equal Protection Clause tolerates only "exceedingly persuasive" classifications based on sex or gender, United States v. Virginia ("VMI"), 518 U.S. 515, 534, 555, 116 S. Ct. 2264, 2276, 2286 (1996) (quotation marks omitted).  "A gender classification fails unless it is substantially related to a

10

sufficiently important governmental interest." <u>Cleburne</u>, 473 U.S. at 441, 105 S.

Ct. at 3255. "Ever since the Supreme Court began to apply heightened scrutiny to

sex-based classifications, its consistent purpose has been to eliminate

discrimination on the basis of gender stereotypes." <u>Glenn v. Brumby</u>, 663 F.3d

1312, 1319 (11th Cir. 2011). To pass muster under the Fourteenth Amendment, a

governmental gender classification must "be reasonable, not arbitrary." <u>Reed v.

Reed</u>, 404 U.S. 71, 76, 92 S. Ct. 251, 254 (1971) (quotation marks omitted).

B.

The School Board says the government interest behind its bathroom policy is

student privacy. Undoubtedly, protecting the bodily privacy of young students is

an important government interest. <u>See</u> <u>Whitaker ex rel. Whitaker v. Kenosha

Unified Sch. Dist. No. 1 Bd. of Educ.</u>, 858 F.3d 1034, 1052 (7th Cir. 2017)

(holding a school district had "a legitimate interest in ensuring bathroom privacy

rights are protected"), <u>abrogated on other grounds as recognized by</u> <u>Ill. Republican

Party v. Pritzker</u>, 973 F.3d 760, 762 (7th Cir. 2020); <u>cf.</u> <u>New Jersey v. T.L.O.</u>, 469

U.S. 325, 338–39, 105 S. Ct. 733, 740–41 (1985) (observing, in the Fourth

Amendment context, that a "search of a child's person" at school "is undoubtedly a

severe violation of subjective expectations of privacy"); <u>Beard v. Whitmore Lake

Sch. Dist.</u>, 402 F.3d 598, 604 (6th Cir. 2005) (noting that "[s]tudents of course

have a significant privacy interest in their unclothed bodies" against strip searches

11

at school). Furthermore, we recognize that the government may promote its interest in protecting privacy by maintaining separate bathrooms for boys and girls, men and women.

## C.

Having set out the level of scrutiny we must apply, as well as the government interest at issue, we turn to evaluate whether the policy satisfies intermediate scrutiny. To be clear, Mr. Adams does not challenge the existence of sex-segregated bathrooms and does not question the ubiquitous societal practice of separate bathrooms for men and women. See also infra at 20, 22–24. Thus, this opinion needs not and does not address the larger concept of sex-segregated bathrooms. Rather, the issue before us is whether the challenged policy passes intermediate scrutiny in assigning students to bathrooms based solely on the documents the School District receives at the time of enrollment.

We see at least two ways in which the policy fails heightened review. First, the policy relies on information provided in a student's enrollment documents to direct the student to use the boys' or girls' bathroom. This targets some transgender students for bathroom restrictions but not others. Second, the policy necessarily rejects current government documents in favor of outdated documents in assigning students to bathrooms. We address each problem in turn.

12

To begin, the policy fails heightened scrutiny because it targets some transgender students for bathroom restrictions but not others.  In this way, the policy is arbitrary and fails to advance even the School District's purported interest.  The School District directs students to use boys' and girls' bathrooms based on the sex indicated on the students' enrollment documents.  Even if a student later provides the District with a birth certificate or driver's license indicating a different sex, the original enrollment documents control.  The enrollment forms, however, say nothing about a student's assigned sex at birth or transgender status.  They ask only whether a student is male or female.  As the District Court expressly found, the School Board conceded at trial that if a transgender student enrolled with documents updated to reflect his gender identity, he would be permitted to use the restroom matching his legal sex.  The School District acknowledges that its policy does not fit its purported goal of ensuring student privacy, to the extent that some of the District's transgender students may be using school restrooms that match their legal sex.  See Oral Arg. Recording at 12:05–12:43 (Dec. 5, 2019) (School District agreeing that "[t]here's . . . a bit of arbitrariness, because depending on when somebody arrives at your school, they are treated differently . . . based on how far into the transition process they are."); see also id. at 4:34–4:52 ("Let's suppose there was a transgender boy . . . who transfers into the school district, moves from another state, in ninth grade, with the

13

box checked as 'M.' The School District would accept that he is a boy for the purposes of restroom usage, is that right?" School District: "That's correct."). But a transgender student like Mr. Adams, who transitions after enrolling in the School District, is not allowed to use the boys' bathroom. In this way, the bathroom policy does not apply to all transgender students equally.

This arbitrariness of the policy means it does not pass intermediate scrutiny. The Supreme Court struck down an arbitrary sex-based policy like this in Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451 (1976). See id. at 204, 97 S. Ct. at 460. Craig addressed an Oklahoma statute that outlawed the sale of 3.2% beer to young men under the age of 21 and to young women under the age of 18, purportedly as a means to promote traffic safety. Id. at 191–92, 199, 97 S. Ct. at 454, 458. Considering the constitutionality of the statute, the Court first cast doubt on the strength of the statistical evidence that young men drink and drive more frequently than young women. See id. at 200–01, 97 S. Ct. at 458–59. The Court concluded that the statistical evidence did not demonstrate that gender was a "legitimate, accurate proxy for the regulation of drinking and driving." Id. at 202, 204, 97 S. Ct. at 459–60. Then, even setting aside the problematic correlation of gender and drinking behavior, the Court observed that the statute as written did not even prevent young men from driving under the influence. This was because the law "prohibits only the selling of 3.2% beer to young males and not their drinking the

14

beverage once acquired (even after purchase by their 18-20-year-old female companions)." Id. at 204, 97 S. Ct. at 460.  Thus, the Court decided that the statute violated the Fourteenth Amendment because its terms did not achieve its statutory objective.  Id.

The same is true here.  We set aside for now that the policy treats transgender students differently than non-transgender students.  And we will assume for the sake of argument that students' privacy interests are advanced by preventing transgender students from using the bathrooms corresponding to, like in Mr. Adams's case, their governmentally-recognized legal sex.[3]  The policy still runs afoul of the Fourteenth Amendment because it does not even succeed in treating all transgender students alike.  It is arbitrary that some transgender students—like Mr. Adams—are restricted by the bathroom policy, while others are beyond its reach.  Just as the statute in Craig did not prevent young men from driving after drinking 3.2% beer, the bathroom policy fails to exclude every transgender student from the restroom in the way the School District seeks to do.  The designation of a student's sex on his school enrollment documents is not a "legitimate, accurate proxy" for assigning a student to a particular bathroom to protect student privacy.  See id. at 204, 97 S. Ct. at 460; Clark v. Jeter, 486 U.S.

---

[3] The School District's privacy concerns are not borne out by the record.  The District could not point to a single incident of a transgender student using a restroom acting in a manner that invaded another student's privacy.  See also infra at 22–24.

456, 464, 108 S. Ct. 1910, 1916 (1988) (invalidating a statute of limitations on

paternity actions under heightened scrutiny because the limitation prescribed was

"not substantially related to [the state's] interest in avoiding the litigation of stale

or fraudulent claims"); Frontiero v. Richardson, 411 U.S. 677, 689–91, 93 S. Ct.

1764, 1772 (1973) (plurality opinion) (rejecting a gender-based policy as arbitrary

because the government did not show that the policy promoted "administrative

convenience" by actually saving any money or time (quotation marks omitted));

Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 620 (4th Cir. 2020) (Wynn, J.,

concurring) (agreeing in the judgment affirming that the challenged bathroom

policy violated equal protection, because the policy "is arbitrary and provides no

consistent reason" for assigning certain students to certain bathrooms), as amended

(Aug. 28, 2020), rehearing en banc denied, 976 F.3d 399 (4th Cir. 2020), cert.

denied, ___ S. Ct. ___, 2021 WL 2637992 (June 28, 2021); Whitaker, 858 F.3d at

1054 (noting that the school district's documentation requirement behind its

challenged bathroom policy, with its internal inconsistencies, "demonstrates the

arbitrary nature of the policy").

        We also conclude the policy is impermissibly arbitrary in another way.  The

policy requires, without justification, that the School District reject information on

current government records in favor of outdated information provided at the time

the student enrolled.  The record shows that the School District "will not change

16

the official school records" based on any government documentation provided after enrollment indicating the student's sex.  In other words, the policy requires that a student's enrollment package prevail over current government records, even though those government-issued documents constitute controlling identification for any other purpose.  Presumably, federal and state governments allow for a process for updating or correcting this type of personal information for a reason: to reflect and promote accuracy.

The School District gives no explanation for why a birth certificate provided at the time of enrollment takes priority over the same document provided at the time the bathroom policy is applied to the student.  And we have come up with no explanation of our own.  Mr. Adams has a birth certificate and a driver's license issued by the state of Florida stating that he is male.  But the School District refuses to accept for the purposes of the bathroom policy Mr. Adams's sex listed on those current government-issued documents.  This kind of irrationality does not satisfy intermediate review.  See Reed, 404 U.S. at 76, 92 S. Ct. at 254 ("A classification must be reasonable, not arbitrary." (quotation marks omitted)); Craig, 429 U.S. at 215, 97 S. Ct. at 466 ("The [sex-based] disparity created by these Oklahoma statutes amounts to total irrationality.") (Stewart, J., concurring in the judgment).

The School District failed to show a substantial, accurate relationship between its sex classification and its stated purpose. And the Fourteenth Amendment requires a substantial, accurate relationship between a gender-based policy and its stated purpose. See Cleburne, 473 U.S. at 441, 105 S. Ct. at 3255; Craig, 429 U.S. at 198, 97 S. Ct. at 457; see also Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074–75 (2000) (noting that the "purpose of the equal protection clause of the Fourteenth Amendment is to secure . . . against intentional and arbitrary discrimination, whether occasioned by express terms of a [policy] or by its improper execution" (quotation marks omitted)). Because the bathroom policy is arbitrary and does not do what it was designed to do, the School Board cannot show the requisite substantial relationship.

Therefore, we conclude the School District's bathroom policy violates the Equal Protection Clause.[4]

---

[4] We note that the Fourth and Seventh Circuits, the only other circuits to consider challenges to bathroom policies brought by transgender students, along with the majority of district courts that have addressed the issue, have also ruled that the challenged policies violate equal protection, albeit on different or additional grounds. See Whitaker, 858 F.3d at 1051–54 (holding a transgender boy demonstrated likelihood of success on the merits of his equal protection claim to use the boys' restroom, because the policy was based on "sex-based stereotypes," because the policy was based on a privacy rationale founded on "sheer conjecture and abstraction," and because the policy was "arbitrary"); Grimm, 972 F.3d at 606–15 (affirming grant of summary judgment to transgender boy on equal protection claim, because the policy subjected him to sex discrimination for failing to "conform to the sex stereotype propagated by the [p]olicy," because transgender people constitute a "quasi-suspect class," and because the policy was "marked by misconception and prejudice" against the transgender student (quotation marks omitted)); see also A.H. ex rel. Handling v. Minersville Area Sch. Dist., 408 F. Supp. 3d 536, 576–78 (M.D. Pa. 2019) (granting summary judgment to transgender girl on equal protection claim for access to girls' restroom, because the school district lacked an "exceedingly

D.

We now turn to the dissent. Insofar as the dissent suggests this opinion opens the floodgates for vast societal change, it is only because the dissent has decided to reframe the issue in this way. This case is only about Mr. Adams's as-applied challenge to the School District's policy denying him the ability to use the boys' bathroom at Nease High School. The dissent also spills much ink over the former (now vacated) panel opinion. The majority of the pages in the dissent are directed at an opinion no longer in existence.[5] Indeed much of the dissent continues to shadowbox with an opinion we never wrote. We view the dissent's recycling of outdated arguments as an apt metaphor for its analytical approach.

We begin by setting the record straight on a few issues. The dissent argues that "relying on enrollment documents is not an arbitrary means of determining sex." Dissenting Op. at 41 (cleaned up). We understand the dissent to be making three subsidiary claims in support of that assertion. First, the dissent says our

---

persuasive justification for th[e] sex-based discrimination"); Evancho v. Pine-Richland Sch. Dist., 237 F. Supp. 3d 267, 293 (W.D. Pa. 2017) (holding transgender students showed likelihood of success on equal protection claim to access restrooms consistent with their gender identity, because "there is insufficient record evidence of any actual threat to any legitimate privacy interests of any student by the [students'] use of [common] restrooms consistent with their gender identity"); Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ., 208 F. Supp. 3d 850, 877 (S.D. Ohio 2016) (holding transgender girl showed likelihood of success on equal protection claim to access bathroom matching her gender identity, because the defendants failed to show that the "discriminatory policy is substantially related to their interests in privacy or safety" and because the policy rested on hostility toward transgender students).

[5] Specifically, only the first sixteen pages of the dissenting opinion address the now-vacated majority opinion. See infra at 39–54.

opinion rules on the constitutionality of sex-segregated bathrooms and will have far-reaching consequences.  Id. at 39–41, 53–54.  Second, the dissent says the challenged policy "does not exist" and that we misconstrue the parties' arguments.  Id. at 48–53.  Third, the dissent says the challenged policy is not arbitrary because it is largely "accurate."  Id. at 42–48.  None of these arguments is availing.  We address each in turn.

1. *The Dissent Is Wrong to Say This Ruling Addresses the Constitutionality of Sex-Segregated Bathrooms or Any Other Issue Involving Student Privacy*

Contrary to the dissent's assertion, this case is not about challenging sex-segregated bathrooms.  Mr. Adams does not challenge or even question the ubiquitous societal practice of separate bathrooms for men and women.  See Appellee's Br. at 41.  Everyone in this case, including Mr. Adams, "agrees that boys should use the boys' restroom at Nease and that girls should use the girls' restroom."  The School Board itself stated this point in its brief before us:  "Indeed, Adams did not challenge the School Board's ability to separate boys and girls into different bathrooms on the basis of sex, and the District Court did not hold that such separation was impermissible."  Appellant's Br. at 15.  The District Court emphasized—and we do as well—that the ruling in Mr. Adams's case "will not integrate the restrooms between the sexes," because there is "no evidence to suggest that [Adams's] identity as a boy is any less consistent, persistent and

insistent than any other boy." R. Doc. 192 at 47.[6]

The dissent's reliance on dictionary definitions, see Dissenting Op. at 42, fails to provide an adequate response to the policy's arbitrariness. Dictionaries naturally capture the differing usages of the term "sex." See, e.g., Sex, Black's Law Dictionary (11th ed. 2019) ("1. The sum of the peculiarities of structure and function that distinguish a male from a female organism; gender."). But we mean "sex" the way the state of Florida does. And as a court of law, we cannot simply ignore the legal definition of sex the state has already provided us, as reflected in the official documentation of Mr. Adams's sex as male on his driver's license and birth certificate. Contra Dissenting Op. at 41–42. In any event, the ruling in this opinion does not turn on which definition of sex one adopts—ours or the dissent's—because the School District's policy is arbitrary either way. As we've

---

[6] It is unfortunate that the dissent appears to liken Mr. Adams's use of the boys' bathroom as somehow comparable to people who "commit tax fraud, evade the draft, and report inaccurate information on the census," Dissenting Op. at 44—in short, those who lie, deceive, and demonstrate "evasion." Id. Mr. Adams has been nothing but honest. Mr. Adams says he is a boy, and he has the legal documentation to support it. He has plainly and forthrightly self-reported. Even if one does not take Mr. Adams at his word, surely one must defer to the status given him by the state of Florida.

In response, the dissent goes so far as to say that Mr. Adams's government-issued documents provide "inaccurate information." Id. at 47. The dissent again ignores that the School District's policy itself accepts and relies on government-issued documentation provided at the time of enrollment. Meanwhile, the dissent argues without any apparent trace of irony that a system of "self-reporting" and relying on "supporting legal documentation" should be an "accurate method" for the schools to assign bathroom use by sex. Id. at 43–44, 48.

In other words, the dissent appears to say both that government-issued documents are "inaccurate" while saying elsewhere that "legal documentation" is "accurate." We submit that the contradictory positions taken by the dissent are reflective of the policy's arbitrariness.

explained, the policy fails to treat even all transgender students within the School

District the same.  See supra at 12–16.  The policy turns solely on the information

provided at the time of enrollment, and a transgender student who updates his

documents prior to enrollment would not be barred from using the bathroom

matching the sex on his legal documents.  This, of course, is in contrast to the

treatment Mr. Adams received.

Despite the dissent's imagined parade of horribles, this opinion does not

resolve any other issue of student privacy.  First, we reiterate that this policy does

not do more than rule on whether Mr. Adams has shown that the policy was

arbitrary as applied to him.  Second, we reject the dissent's characterization of our

opinion as not acknowledging students' interest in "avoiding the exposure of their

bodies to members of the opposite sex."  Dissenting Op. at 67.  To the contrary, we

recognize student privacy interests as "[u]ndoubtedly . . . important."  See supra at

11.  However, the point here is that the School District has never shown how its

policy furthers that interest, as this record nowhere indicates that there has ever

been any kind of "exposure" in the bathrooms at Nease High School, which all

contain separate stalls with doors that close and lock.  See R. Doc. 151-17 at 12

(School Board admitting that "all multi-user boys' restrooms and girls' restrooms

at Nease High School have one or more stalls in them with doors that close and

lock"; that "all students who use a girls' restroom at Nease High School must use a

stall when relieving themselves"; and that "any student who desires more privacy can use a single-user restroom"); R. Doc. 137 at 26 (when using the restroom, Mr. Adams "uses a stall to relieve himself, washes his hands, and leaves"). Again, nothing in the record suggests Mr. Adams or any other transgender student ever threatened another student's privacy. Indeed, the School District confirmed it was unaware of a single negative incident involving a transgender student using a restroom, even as Mr. Adams used the boys' bathroom for several uneventful weeks. R. Doc. 162 at 16; R. Doc. 192 at 25. And at a recess during proceedings before the District Court, at which Mr. Adams testified as a witness, Adams used the men's bathroom in the courthouse without incident.

Next, despite the dissent's apparent obsession with locker rooms, see Dissenting Op. at 41, 53–54, 65, this case is not a locker room case. Mr. Adams did not bring a claim for access to the boys' locker rooms at Nease High School and has never asserted he is entitled to such access. This record shows that Mr. Adams did not register for physical education classes; Nease High School locker rooms are only available to students taking physical education classes; and, even so, "no student at Nease High School is required to shower after physical education classes." We offer no opinion on any claims relating to locker rooms, which, contrary to the dissent's stark warnings, would entail a separate analysis of the means-ends fit in light of the particular interests at stake. The dissent simply

23

manufactures a problem where none exists.

Our ruling is a narrow one that addresses only whether Mr. Adams's as-applied challenge to the School Board's unwritten bathroom policy survives intermediate scrutiny.  In arguing that this opinion reaches further than it actually does, the dissent relies on sheer conjecture and a rewriting of the record.  But the Supreme Court has reiterated time and time again that a sex-based "classification must substantially serve an important governmental interest today," not in some past or hypothetical world.  Sessions v. Morales-Santana, 582 U.S. __, 137 S. Ct. 1678, 1690 (2017).  In its attempts to meet this test, the dissent is forced to rewrite the facts, because the evidence actually before us shows that Mr. Adams had used the boys' bathroom at Nease High School without any problems: student privacy, safety, or otherwise.

2.  *The Dissent Wrongly Claims the Challenged Policy "Does Not Exist" and Misconstrues the Parties' Arguments*

The dissent newly takes the position that a "policy does not exist" that defers to enrollment forms.  Dissenting Op. at 48.  The dissent's rewriting of the policy at hand is inconsistent with both its prior position in this case and the record.  The dissent previously recognized the factual basis describing how the policy works.  See Previous Dissenting Op. at 58 (recounting without factual disagreement that "the school district determines each child's sex by looking to the enrollment forms that the student provides when the student enrolls, which includes the student's

24

birth certificate" and that "a transgender student who changed the sex on his birth

certificate before enrolling could use the bathroom matching" that updated

information).[7]

---

[7] We also pause to correct the record on another distortion by the dissent. The dissent says the School District bases its bathroom assignments on "a pre-enrollment physical examination performed by the student's doctor." Dissenting Op. at 43. There are at least two things wrong with the dissent's assertion. First, there is no record support for the dissent's apparent assumption that Mr. Adams—or any student in the School District—is required to provide a medical report of a physical examination. The dissent relies on Florida Statute § 1003.22(1), but that statute merely requires that "each child . . . present a certification of a school-entry health examination performed within 1 year before enrollment in school." (Emphasis added). Here, the record shows that the School District merely tells enrolling students to comply with Florida law's requirement to undergo a "health examination" and self-report their sex by writing it into a box on the enrollment health form. The record shows nothing more. Instead, the evidence shows that self-reporting of medical information is all that is required. As the School District's lawyer who advised it on its bathroom policy testified, "As a statutory condition of enrollment, a student is required to have a physical conducted by a doctor. So that report is part of the enrollment package." R. Doc. 162 at 50 (emphasis added); see also R. Doc. 192 at 4 n.6 (identifying Frank D. Upchurch as a long-time School Board attorney who advised the Board on its "Best Practices Guidelines" and "who is well familiar with School Board policies"). The "report" the School Board's lawyer spoke of is a self-provided account of the student's medical history, which, when it comes to sex, requires only that a student self-report that information. See R. Doc. 162 at 50 (Upchurch testifying: "There is a -- two boxes on that -- sort of the cover sheet of the form. And it says M/F. And the student checks -- the student's parent checks one."). The dissent can point to no evidence saying otherwise.

Second, there is no record support for the dissent's apparent assumption that the School District actually bases its bathroom assignments on a health examination, as opposed to the self-reporting of the student's sex in the enrollment documents. The record merely shows that the School District's lawyer "speculated" that students could have had a physical, but he never said the School Board enforces its bathroom policy using information from a physical. In any event, we cannot discern from this record how the dissent got the idea that a certification of a routine "health examination," which is all that is required under Florida law, requires that a doctor examine, much less report to a school about, a child's genitalia.

We think the School District's "health exam form speaks for itself, and contains no indicator" for a doctor's examination; "it simply includes a blank box for the child's sex." It is undisputed that the School District does not inspect students' anatomy before they use District bathrooms. The School District relies solely on the information provided by the students to enforce its bathroom policy, and the dissent has not pointed to any evidence to the contrary. Rather than accept the record, the dissent continues to push its reimagining of the facts, which even the School District did not advance. See Oral Arg. Recording at 5:43–6:22 (Dec. 5, 2019) (Chief Judge Pryor: "I thought that there was also a state-mandated physical examination for

The dissent's newfound view that the policy does not "exist" also ignores the extensive work the District Court undertook to clarify the policy at issue. The court documented, for instance, that it had been "repeatedly told that it was an unwritten policy that prohibited [Mr. Adams] from using the boys' bathroom," and, in order to hold the School Board liable, the court needed to know if the Board stood behind that unwritten policy as its official policy. R. Doc. 198 at 8. For that reason, the District Court requested that the chair of the School Board appear in court, and asked him: "Is the rule that prohibits Drew Adams from using the boys' bathrooms at Nease High School the official policy of The School Board of St. Johns County, Florida?" Id. at 11–12. The School Board chair responded, "Yes, it is, Your Honor." Id. at 12; see also id. at 82 (the District Court noting "the school board has today, in open court, adopted" the unwritten policy).[8] Rather

---

enrolling students. Is that not true? And that that would also be evaluated as part of the policy?" School District: "Your Honor, I'm not certain on that point. I'm not certain if that was part of the record or not." Chief Judge Pryor: "At trial Frank Upchurch testified, I thought, in addition to the birth certificates, that the School Board also uses the state-mandated physical examination. You don't recall that?" School District: "No, Your Honor, I don't recall that.").

[8] The School Board confirmed that the policy separates students solely on the basis of information provided at the time of their enrollment. One discussion between the District Court and Terry Harmon, counsel for the School Board, is particularly instructive:

> District Court: "I thought that when [previous witnesses] were asked what the reason for the policy was, I thought they cited things like safety, privacy."

> Counsel: "The unwritten policy . . . has to do with a boy and what bathroom a boy can use and a girl and what bathroom a girl can use."

> District Court: "[I]f you're saying the whole policy is boys have to use the boys' restroom and girls have to use the girls' restroom, the

26

than engage with the legality of the policy, the dissent rewrites the record and argues against a policy that never existed.

The dissent ignores the record in an apparent attempt to save the School District from itself.  Dissenting Op. at 44–45.  The School District told the District Court and us on appeal that its policy ties a child's bathroom designation to their enrollment documents.  And the School District repeatedly conceded that its policy would allow a transgender male student to use the boys' bathroom as long as he provided documents at the time of enrollment that reflected his sex as male.  The dissent says, however, that these repeated admissions are of no moment because the School Board also said they would "re-examine" the reliance on the "self-identified" enrollment information if "abiding by [that] data became a problem."

St. Johns County School Board has to be making a value judgment, based on something, that Drew Adams is a girl, because otherwise they'd let him use the boys' bathroom, right?"

Counsel: "Yeah, and the value judgment comes in the form of the enrollment materials, which is, what are you when you enroll in the school district?"

District Court: "All right.  Well, let's talk about that. . . .  What happens if the person's already transitioned before they come to your school and so the paperwork says boy? . . .  I think [a School Board witness] said, 'Well, then we would treat him like a boy until we had reason not to,' or something like that."

Counsel: "Yeah.  That's correct."

District Court: "But I'm not exactly sure what that means.  So if the value judgment is made at the time of the enrollment -- and what is it based on? It's based on --"

Counsel: "The enrollment material."

R. Doc. 198 at 5, 82–83 (quotation marks omitted).

27

See id.  But the School Board's statement that it would seek to revisit the arbitrariness of a policy if squarely confronted with it simply proves the point.  A policy that fails to accomplish what it purports to do is the definition of arbitrary.  See Craig, 429 U.S. at 208–09, 97 S. Ct. at 463 ("[T]he principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities concerning the [relevant] tendencies of aggregate groups.").  And an arbitrary policy that is left to the whims of the enforcer to correct is no less arbitrary.  Though the School Board says it would reexamine its policy once its arbitrariness becomes overwhelmingly obvious, we also know the Board is not actively collecting the information that would allow it to make that determination.  As the School District's witness testified:  "The district does not play bathroom cop."  In this case, the School District was alerted to Mr. Adams's otherwise uneventful use of the boy's bathroom, not because any boy or any boy's parents complained.  It only took action as a result of two unidentified female students reporting that they had seen Mr. Adams entering the boys' restroom.  But those female students were not asserting a privacy interest.  Nor could they.  Mr. Adams was using the boys' bathroom and not the bathroom used by the girls.  The School District even confirmed that neither of the female students expressed privacy or safety concerns. R. Doc. 162 at 16–17.  Forcing students to suffer under an arbitrary policy until the School District decides, if at

all, to "re-examine" the policy is precisely the kind of arbitrary harm equal protection prohibits.

The dissent also claims we "strike[] out on [our] own" and set aside the parties' presentation of the issues. Dissenting Op. at 50. But it is the dissent that eschews party presentation by dispensing with the record and wrestling instead with hypotheticals and new and entirely separate issues. Here, Mr. Adams has consistently argued that the challenged policy violates the Equal Protection Clause because it does not substantially fit with the School District's purported goals. See R. Doc. 137 at 10, 16–17 (Mr. Adams noting that he was instructed not to use the boys' bathroom "pursuant to an unwritten policy, and a written set of guidelines entitled ['Best Practices']"; that the policy is based on students' information "designated in their enrollment paperwork, in the student's birth certificate, and in other school records"; that "[t]he school does not undertake any protocol or effort to verify the student's sex as it appears in the enrollment paperwork and the student's records"; and that "[t]he District does not routinely keep records of, or ask students to identify, their chromosomes, external sex organs, or internal sex organs"); see also R. Doc. 116 at 2 (Mr. Adams stating in the joint pretrial submission that he challenged the policy that was based in part "on a Best Practices Guideline"); Appellee's Br. at 34–45 (arguing the policy excluding him from the boys' bathroom failed intermediate scrutiny). That the policy enforced

29

against Mr. Adams was never written down does not make it any less arbitrary—and indeed may make it even more so.  Cf. Whitaker, 858 F.3d at 1039 n.2 ("We will refer to the School District's decision to deny [the plaintiff] access to the boys' restroom as a 'policy,' although any such 'policy' is unwritten and its exact boundaries are unclear.").

We relied on this reasoning regarding this issue in our now-vacated opinion as well, see Previous Majority Op. at 15–18, and the dissent to that opinion never claimed the issue was not presented.  See generally Previous Dissenting Op.  As further indication that the issue we address on appeal was fully presented, we note that both the District Court and this panel asked the School Board about the arbitrariness of the policy, providing ample notice of the issue and affording the School District ample opportunity to rebut it.  See R. Doc. 198 at 82–83 (District Court asking what happens if a person has already transitioned before enrolling in the School District); Oral Arg. Recording at 12:01–12:43 (Dec. 5, 2019) ("There's . . . a bit of arbitrariness, because depending on when somebody arrives at your school, they are treated differently . . . based on how far into the transition process they are.").  But it did not.  The School Board confirmed its unwritten bathroom policy relies solely on the information provided by a student at the time of enrollment.  R. Doc. 198 at 83–84 (confirming this is how the policy works); Oral Arg. Recording at 12:40–12:43 (Dec. 5, 2019) (same); see also id. at 4:34–4:52

("Let's suppose there was a transgender boy . . . who transfers into the school district, moves from another state, in ninth grade, with the box checked as 'M.' The School District would accept that he is a boy for the purposes of restroom usage, is that right?"  School District: "That's correct.").  It is not right for the dissent to now make arguments the School Board never made for itself by claiming the issues being decided today were not properly teed up.  They were.  They were addressed in this litigation repeatedly through the standard course of record development, briefing, and oral argument.  Today's ruling falls squarely within the ordinary course of appellate review, and we may undoubtedly affirm the District Court's ruling based on the Equal Protection Clause after our independent review of the law.  See Tartell, 790 F.3d at 1257.

3.  *The Dissenting Opinion Wrongly Relies on Statistics for Its Equal Protection Analysis*

The dissent's insistence that the policy passes heightened review because it is "accurate," Dissenting Op. at 45, misapprehends intermediate scrutiny.[9]  The

---

[9] The dissent agrees that intermediate scrutiny applies if a policy treats people differently on the basis of sex.  Dissenting Op. at 50.  To the extent the dissent now claims that rational basis review applies because "the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex," id., the dissent misunderstands the policy, which does more than "determine" an individual's sex.  It assigns students to bathrooms on the basis of sex using the information provided at the time of enrollment.  Intermediate scrutiny undoubtedly applies in this case.  Neither party has said otherwise.  As the School Board said, "Here, intermediate scrutiny applies."  Appellant's Brief at 21; see also Oral Arg. Recording at 3:25–3:56 (Dec. 5, 2019) (Chief Judge Pryor: "Segregating the bathrooms on the basis of sex is a sex-based classification, right?"  School District: "Sure. Sure, it is."  Chief Judge Pryor: "So the question is, . . . can that classification survive, for the constitutional claim, can it survive intermediate scrutiny, right?"  School District: "Correct, Your

dissent suggests the constitutionality of a policy turns on the soundness of the statistical correlation supporting it, when the Supreme Court in <u>Craig</u>, following a long line of precedent, rejected that precise premise.

In <u>Craig</u>, the Supreme Court invalidated a sex-based regulation despite the fact that men in the relevant age group were <u>over 11 times</u> more likely than women of the same age group to be arrested for driving under the influence of alcohol. 429 U.S. at 201, 97 S. Ct. at 459. Other statistics recounted in <u>Craig</u> showed that 78% of drivers in a relevant geographic area who were under the age of 20 were male, and 84% of men expressed a preference for beer. <u>Id.</u> at 203 n.16, 97 S. Ct. at 460 n.16. This too was not enough to save the challenged regulation. The Court warned of the regulations that would be blessed "if statistics were to govern the permissibility of state [action] without regard to the Equal [P]rotection Clause as a limiting principle." <u>Id.</u> at 208 n.22, 97 S. Ct. at 463 n.22. "Indeed," the Court wrote, "prior cases have consistently rejected the use of sex as a decisionmaking factor even though the statutes in question certainly rested on <u>far more predictive empirical relationships</u> than" the one in <u>Craig</u>. <u>Id.</u> at 202, 97 S. Ct. at 459

---

Honor."). Nor did the previous dissenting opinion ever raise the possibility of applying rational basis review, even though our previous majority opinion stated exactly the same rationale in determining the bathroom policy arbitrary. <u>Compare</u> Previous Majority Op. at 15–18, <u>with</u> Previous Dissenting Op. at 47 (applying intermediate scrutiny).

In any event, the dissent cannot now claim on the one hand that the majority's holding on the School Board's policy somehow decides the constitutionality of sex-segregated bathrooms (which this appeal does not), while also asserting that we should be applying rational basis review. The dissent cannot have it both ways. <u>See</u> Dissenting Op. at 50.

(emphasis added).  For instance, the Court noted that in <u>Reed</u>, Idaho's "premise that women lacked experience in formal business matters (particularly compared to men) would have proved to be accurate" in many cases, particularly in 1967 when the facts giving rise to <u>Reed</u> came to pass.  <u>Id.</u> at 202 n.13; 97 S. Ct. at 459 n.13; <u>see also Reed</u>, 404 U.S. at 76–77, 92 S. Ct. at 254 (invalidating provision of Idaho code reflecting the kind of "arbitrary legislative choice forbidden by the Equal Protection Clause," despite whatever statistical accuracy underlay it).

Supreme Court decisions "following <u>Reed</u> similarly have rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications." <u>Craig</u>, 429 U.S. at 198, 97 S. Ct. at 457.  As <u>Craig</u> recognized, the Supreme Court had in other Equal Protection cases "expressly found appellees' empirical defense . . . unsatisfactory." <u>Craig</u>, 429 U.S. at 202 n.13, 97 S. Ct. at 459 n.13 (citing <u>Frontiero</u>, 411 U.S. at 688–91, 93 S. Ct. at 1771–72; <u>Weinberger v. Wiesenfeld</u>, 420 U.S. 636, 645, 95 S. Ct. 1225, 1231–32 (1975)).  Thus the Court invalidated sex-based regulations despite empirical assertions of "the financial position of servicewomen and working women" even before <u>Craig</u>.  <u>Id.</u> at 198–99, 97 S. Ct. at 457–58 (citation omitted); <u>see also Frontiero</u>, 411 U.S. at 688–89, 93 S. Ct. at 1771 (recounting how, in 1973, "the Government maintain[ed] that, as an empirical matter, wives in our society frequently are dependent upon their husbands, while husbands rarely are dependent

upon their wives").

The Supreme Court in Craig acknowledged that statistics and numbers have surface appeal.  But the Court also knew it was "unrealistic to expect either members of the judiciary or state officials to be well versed in the rigors of experimental or statistical technique."  429 U.S. at 204, 97 S. Ct. at 460.  The easy manipulation of statistics by parties, and the possibility of being fooled by them, "illustrate[] that proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause."  Id.

We view the dissent's reliance on a figure of 99.96 percent as a prime example of the folly of relying on statistics in equal protection analysis. Dissenting Op. at 44–47, 58.[10]  The relevant inquiry in this case is not what percentage of St. Johns students are transgender, but whether the challenged policy furthers the important goal of student privacy.  And on that point, the dissent offers no statistics.  Nor could it.  When it comes to actual reported invasions of privacy

---

[10] The dissent defends its reliance on its 99.96 percent figure by pointing to instances where the Supreme Court recounted statistics outside of the context of an Equal Protection analysis.  These cases are inapposite.  See Dissenting Op. at 46–47 (citing Birchfield v. North Dakota, 579 U.S. __, 136 S. Ct. 2160, 2193 n.10 (2016) (Sotomayor, J., concurring in part and dissenting in part) (writing in a Fourth Amendment case); Cent. R.R. Co. of Pa. v. Pennsylvania, 370 U.S. 607, 610 n.2, 82 S. Ct. 1297, 1301 n.2 (1962) (recounting the number of railroad cars located on out-of-state railroads in the facts section of a case concerning capital stock tax)).  No one is saying members of the judiciary are unable to do simple math.  But the Supreme Court has time and again warned against using arithmetic to supply pat resolutions to sex discrimination cases.

34

in restrooms by a transgender student, the School Board conceded there were zero such incidents. Thus, there is no evidence of a correlation between the incidents of invasions of privacy at St. Johns School District and the sex of the student. If anything, the dissent's insistence that 99.96 percent of students in St. Johns are not, like Mr. Adams, transgender, simply underscores how limited the ruling today is, which again applies only to Adams.

## IV

We affirm the District Court's award of compensatory damages because there is no doubt Mr. Adams suffered harm. Medical professionals explain that many transgender people experience debilitating distress and anxiety from gender dysphoria, which is alleviated by using restrooms consistent with their gender identity. Medical opinion also concludes that "forc[ing] transgender people to live in accordance with the sex assigned to them at birth" both "fail[s]" to change transgender people from who they are and "cause[s] significant harm."

True to medical opinion, Mr. Adams described that he suffered anxiety and depression from walking past the boys' restroom on his way to the single-stall bathroom, knowing every other boy is permitted to use it but him. He testified to feeling "alienated" and "humiliat[ed]" as a result of the policy. Mr. Adams testified that, because of the policy, "I know that the school sees me as less of a

person, less of a boy, certainly, than my peers." This is so, despite as the District

Court noted in its findings of fact supporting damages, that Mr. Adams

> has undergone social, medical, and legal transitions to
> present himself as a boy. Adams wears his hair short; he
> dresses like a boy; his voice is deeper than a girl's; his
> family, peers, classmates and teachers use male pronouns
> to refer to him; he takes hormones which suppress
> menstruation and make his body more masculine,
> including the development of facial hair and typical male
> muscle development; he has had a double mastectomy so
> his body looks more like a boy; the state of Florida has
> provided him with a birth certificate and driver's license
> which state he is a male; and when out in public, Adams
> uses the men's restroom.

Adams, 318 F. Supp. 3d at 1326.[11]

Mr. Adams also suffered harm because he was separated from his peers in

single-stall restroom facilities. Mr. Adams had little choice in this matter.

The evidence at trial indicated that using the girls' restroom at school hindered Mr.

Adams's clinical treatment for gender dysphoria. As such, because of the

bathroom policy, Mr. Adams had to use single-stall restrooms at school.[12] Mr.

Adams explained it felt like a "walk of shame" when he had to walk past the

---

[11] The dissent appears to overlook the fact that the District Court's damages award was based on its review of the full record developed at trial, which includes recognition of Mr. Adams's social, medical, and legal transition. See Dissenting Op. at 49.

[12] The evidence at trial also showed that the School District expected this outcome. The School District official who developed the bathroom policy testified that she would prefer a transgender student to use the gender-neutral single-stall facilities instead of the restroom of his sex assigned at birth. This employee also acknowledged that a transgender student who, like Mr. Adams, presents as a boy, could face "safety, security, and privacy concerns" while using the restroom of his sex assigned at birth.

communal restrooms for a single-stall, gender-neutral restroom.  It heightened the stigma he felt for being transgender.

Based on this evidence, the District Court found that Mr. Adams "suffered emotional damage, stigmatization and shame from not being permitted to use the boys' restroom at school."  Adams, 318 F. Supp. 3d at 1327.  The consequences Mr. Adams suffered are well-recognized as injurious.  See Whitaker, 858 F.3d at 1045–47 (affirming a finding of irreparable harm because excluding a transgender student from the boys' restroom "stigmatized" the student and caused him "significant psychological distress" including "depression and anxiety" (quotation marks omitted)); Dodds v. U.S. Dep't of Educ., 845 F.3d 217, 221–22 (6th Cir. 2016) (per curiam) (affirming a finding of irreparable harm because excluding a young transgender student "from the girls' restrooms has already had substantial and immediate adverse effects on the daily life of an eleven-year-old child (i.e. multiple suicide attempts prior to entry of the injunction)").

## V

This record demonstrates that the School Board has not met its "demanding" constitutional burden by showing a substantial relationship between its policy for excluding transgender students from certain restrooms and student privacy.  See VMI, 518 U.S. at 533, 116 S. Ct. at 2275.  We therefore affirm the District Court's grant of relief to Mr. Adams under the Fourteenth Amendment.

Having concluded that Mr. Adams prevails on his equal protection claim, which fully entitles him to the relief granted by the District Court, see <u>Adams</u>, 318 F. Supp. 3d at 1326–27 & n.58, we decline to reach his Title IX claim.

*    *    *

The record developed in the District Court shows that the School Board failed to honor Mr. Adams's rights under the Fourteenth Amendment.  The judgment of the District Court is therefore **AFFIRMED.**

WILLIAM PRYOR, Chief Judge, dissenting:

Not long ago, a suit challenging the lawfulness of separating bathrooms on the basis of sex would have been unthinkable. This practice has long been the common-sense example of an acceptable classification on the basis of sex. And for good reason: it protects well-established privacy interests in using the bathroom away from the opposite sex. Although the Supreme Court recently considered the relationship between transgender status and sex in the context of claims of employment discrimination under Title VII, it declined to consider the permissibility of sex-separated bathrooms. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1753 (2020); *see also id.* at 1739 (assuming that "sex" refers "only to biological distinctions between male and female"). After all, context matters. As the late Justice Thurgood Marshall once put it, "A sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part).

Against this backdrop, the St. Johns County School Board has long enforced a policy that separates the bathrooms in its elementary and secondary schools by sex. Last year, the majority issued an opinion ruling that this policy violated federal law regulating schools and was unconstitutional. As I pointed out then, its opinion distorted the policy, misunderstood the legal claims asserted, and rewrote

well-established precedent. The majority now tacitly concedes that its opinion could not withstand scrutiny.

The majority accordingly has withdrawn its earlier opinion. But its new opinion fares no better than the last. It distorts the challenged policy in a brand-new way, and it invents a legal claim the parties never presented. And its new opinion still fails to identify a violation of the law.

The majority's new position is as wrong as its old position. I first explain the errors in its revised opinion. The parties litigated the case as a challenge to the lawfulness of sex-segregated bathrooms, and the district court decided it on that basis. But on appeal, the majority identifies a new policy as unconstitutional: the schools' practice of relying on self-reported sex and supporting documentation to determine the sex of its students. The majority's new reasoning relies entirely on eliding that practice and the policy Adams actually challenged—the policy of separating bathrooms by sex.

I then explain why the majority is right to retreat from its previous position. By failing to address head-on the lawfulness of sex-separated bathrooms in schools, the majority recasts the school policy as classifying students on the basis of transgender status. And based on this recasting, it reached the remarkable conclusion that schoolchildren have no sex-specific privacy interests when using the bathroom.

The new majority opinion continues its earlier pretense that its reasoning applies only to plaintiff Drew Adams and that it does not decide that sex-separated locker rooms are unconstitutional. But the majority's assurances ring hollow. The logic of this decision, no different from the last opinion the majority issued, would require all schoolchildren to use sex-neutral bathrooms and locker rooms. I dissent.

### A. *Relying on Enrollment Documents Is Not an Arbitrary Means of Determining Sex.*

The new majority opinion identifies a single problem with the actions of the schools. It concludes that Adams should prevail because the policy of "assigning students to bathrooms based solely on the documents the School District receives at the time of enrollment" is arbitrary and fails to advance the schools' interests in privacy. Majority Op. at 12. It reaches this conclusion because a student could evade the sex-separated bathroom policy by enrolling as a member of the opposite sex, and because, "without justification," the schools "reject information on current government records in favor of outdated information." *Id.* at 15–17. The majority frames the issue incorrectly in at least two ways.

For one thing, the majority follows Adams in using the word "sex" as a synonym for "gender identity." *E.g.*, *id.* at 6 ("Mr. Adams amended his legal documents to reflect his male sex."). As Adams put it, "[t]ransgender persons are people whose gender identity diverges from the sex they were assigned at birth," and a "transgender boy's sex is male (even though he was assigned the sex of

41

female at birth).” But the schools use “sex” in its ordinary, traditional sense, and they use “biological sex” as a synonym. *See, e.g.*, *Sex*, *The American Heritage Dictionary of the English Language* (New College ed. 1979) (“The property or quality by which organisms are classified according to their reproductive functions.”); *Sex*, *The American Heritage Dictionary of the English Language* (4th ed. 2006) (similar); *Sex*, *The Random House College Dictionary* (rev. ed. 1980) (“either the male or female division of a species, esp. as differentiated with reference to the reproductive functions”); *Sex*, *Shorter Oxford English Dictionary* (6th ed. 2007) (“Either of the two main divisions (male and female) into which many organisms are placed on the basis of their reproductive functions or capacities”); *see also* Am. Psychiatric Ass’n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (“This chapter employs constructs and terms as they are widely used by clinicians from various disciplines with specialization in this area. In this chapter, *sex* and *sexual* refer to the biological indicators of male and female (understood in the context of reproductive capacity) . . . .”). I too use the word “sex” in its ordinary, traditional sense.

The majority’s linguistic sleight of hand plays into its second framing mistake. It misunderstands what the schools ascertain from enrollment documents. The schools determine students’ sex based on what the students report on their enrollment forms and on the supporting documentation the students submit in the

42

form of birth certificates or other government-issued identification, and a pre-enrollment physical examination performed by the student's doctor. *See* Fla. Stat. § 1003.22(1) ("Each district school board . . . shall require that each child who is entitled to admittance . . . present a certification of a school-entry health examination performed within 1 year before enrollment in school."). The schools then require each student to use the restroom matching the sex determined through that process. They do not accept new documents to supersede the documents provided at the time of enrollment.

There is nothing wrong with the schools' approach. No evidence suggested the schools' method of identifying the sex of their students has *ever* produced an inaccurate result. Indeed, school officials confirmed that their method of determining students' sex has not been a problem, and that they would change their method if it did not work well. More generally, self-reporting is often a reliable method for gathering information. It is good enough for filing tax returns, selective service registration, and the census. And the schools supplement students' self-reported information by requiring support in the form of official documents.

Nor is there any reason for the schools to accept updates. A student's sex does not come with an expiration date, and it does not require periodic updates to confirm its continuing accuracy. The object of the schools' practice with respect to the enrollment documents is to determine students' sex, not their gender identity.

43

Even Adams admitted that the schools sought to sort students in this manner. In a state that allows a minor to conform legal documents to the minor's gender identity, as Adams did, accepting updated documents would make the schools' records *less* likely to reflect a student's sex.

This correct understanding of the schools' practices sweeps away the majority's newfound concerns about how the schools determine the sex of their students. The majority first identifies a hypothetical situation that purportedly proves the schools arbitrarily treat some transgender students differently than other transgender students. It imagines that a student who identifies as a member of the opposite sex, and who has conformed his legal documents to that identity, could report his gender identity instead of his sex on the enrollment forms and could provide his legal documents as support. Majority Op. at 13–14. The schools acknowledged that if a student took this strategy, they would unwittingly allow the student to use the restrooms of the opposite sex without realizing the student was using the restroom of the opposite sex. But that hypothetical, minor shortcoming is far from fatal.

The possibility of evasion does not render unconstitutional the schools' reliance on self-reporting and legal documentation to determine students' sex. People can commit tax fraud, evade the draft, and report inaccurate information on the census without creating constitutional infirmities in those systems. And keep in

mind that the district court found that only 16 of the school district's 40,000 students were transgender. Even if every single transgender student successfully enrolled as a member of the opposite sex, the school district would still be 99.96 percent accurate at identifying the sex of its students. This near-perfect result is certainly enough to satisfy intermediate scrutiny, even if the majority is correct that intermediate scrutiny applies. Intermediate scrutiny does not "require[] that the [policy] under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen v. Immigr. & Naturalization Serv.*, 533 U.S. 53, 70 (2001); *see also Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (plurality opinion) ("The relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been . . . ."). Nor does it "require that [the policymaker] elect one particular mechanism" to accomplish its goals, "even if that mechanism arguably might be the most scientifically advanced method." *Nguyen*, 533 U.S. at 63. This point also undermines the majority's reliance on the decision of the Supreme Court in *Craig v. Boren*, 429 U.S. 190 (1976). *See* Majority Op. at 14–16. In that decision, the Supreme Court held that a correlation of two percent between maleness and drunk driving made Oklahoma's higher drinking age for men "an unduly tenuous 'fit'" with its goal of reducing drunk driving. *Craig*, 429 U.S. at 201–02. It takes no more explanation to see that *Craig* does not control here.

The majority fails to understand this analysis or to appreciate the privacy interests at stake. As the majority notes, the Supreme Court has cautioned that it is "unrealistic to expect either members of the judiciary or state officials to be well versed in the rigors of experimental or statistical technique." *Id.* at 204. The majority contends that "rel[ying] on a figure of 99.96 percent [is] a prime example of the folly of relying on statistics in equal protection analysis." Majority Op. at 34. To be clear, the figure of 99.96 percent comes from subtracting the number of transgender students in the district (16) from the total number of students (40,000) and then dividing that number by the total number of students (40,000). Respectfully, basic subtraction and division are not "rigor[ous] . . . experimental or statistical technique[s]" beyond the capabilities of federal judges. *Craig*, 429 U.S. at 204; *see, e.g.*, *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2193 n.10 (2016) (Sotomayor, J., concurring in part and dissenting in part) ("Seven thousand annual arrests divided by 82 judges and magistrate judges is 85.4 extra warrants per judge and magistrate judge per year. And 85.4 divided by 52 weeks is 1.64 extra warrants per judge and magistrate judge per week."); *Cent. R.R. Co. of Pa. v. Pennsylvania*, 370 U.S. 607, 610 n.2 (1962) ("If [605,678 car days are] divided by 365, the quotient (1,659) represents the average number of cars located on [out-of-state] railroads on any one day during [that year]."). And contrary to what the majority asserts, the Supreme Court has never said that simple arithmetic cannot be used to

evaluate claims brought under the Equal Protection Clause. Majority Op. at 34 n.10. The majority also contends that the figure of 99.96 percent "simply underscores how limited the ruling today is, which . . . applies only to Adams." *Id.* at 35. To the contrary, all students—not only Adams or the 0.04 percent of students who are transgender—are potentially affected by a ruling that forces them to share bathrooms with individuals of the opposite sex.

The majority's feigned outrage on behalf of Adams likewise misses the point. The majority asserts that comparing Adams's attempted use of the boys' restroom to committing tax fraud, evading the draft, or reporting inaccurate information on the census is "unfortunate" because "Adams has been nothing but honest." *Id.* at 21 n.6. But Adams's honesty has nothing to do with the issue at hand. The school district asks students to report their sex, not their gender identity or "governmentally-recognized legal sex." *Id.* at 15. So if Adams reports gender identity or "governmentally-recognized legal sex" instead of sex, then Adams has reported inaccurate information. And it is irrelevant that Adams has supporting legal documentation because the school district is not asking students to report their "governmentally-recognized legal sex."

The majority's second reason that the schools' method of determining students' sex is impermissibly arbitrary is similarly unpersuasive. "[W]ithout justification," it says, the schools prefer older documents to newer documents,

47

even though newer documents are "[p]resumably" more accurate. *Id.* at 16–17. The majority says it can "come up with no explanation" for the schools' preference for students' older documents. *Id.* at 17.

The majority is bewildered only because it closes its eyes to the record, not to mention biological reality. The schools separate restrooms by sex, not (as the majority thinks) by "governmentally-recognized legal sex." *Id.* at 15. Because a student's sex does not change over time, the schools have no need to accept updates. They instead determine sex once, using the ordinarily accurate method of self-reporting and supporting legal documentation. The majority's assertion that newer documents are "[p]resumably" better evidence of sex than older documents, *id.* at 17, makes sense only on the view that "sex" means the same thing as "gender identity." But the terms do not share the same meaning.

The majority's reasoning depends on distorting two policies by eliding them into one. It says the "unwritten bathroom policy" requires "that a student use either a designated single-stall restroom or the bathroom corresponding to the sex listed on the student's enrollment documents." *Id.* at 7–8. That policy does not exist. The parties were clear that the schools require a student to use a gender-neutral restroom or the restroom corresponding to his sex, as opposed to his gender identity. The district court reached the same conclusion, finding that "the unwritten School District bathroom policy was that boys will use the boys' restrooms at

48

school and girls will use the girls' restrooms at school, using those terms as traditionally defined based on biological traits." The majority is also wrong when it says the school had a policy of requiring students to use the restroom associated with their "governmentally-recognized legal sex." *Id.* at 15. The schools *use* government documents as evidence of the students' *actual* sex, and they require each student to use the bathroom associated with his sex. Even the majority understood this point in its last opinion. Vacated Majority Op. at 12. The majority transforms the schools' sensible way of ascertaining sex and unassailable way of separating restrooms into a single, irrational policy that is unsupported by the record and would be unrecognizable to the parties.

Another point further undermines the majority's reimagination of the school policies. Under the majority's second theory, the school district did not begin to violate Adams's rights until it refused to accept documents designating Adams as male. But nothing about this lawsuit turns on when Adams obtained an updated birth certificate or driving permit or when the school district refused to accept them. Adams obtained both documents and provided them to the school district well after the events that prompted the lawsuit. And Adams obtained damages reflecting "emotional damage, stigmatization and shame from not being permitted to use the boys' restroom at school," not limited to the time after the school district refused to accept the documents identifying Adams as male.

49

Only by framing the *means* of ascertaining students' sex as being the *goal* of the schools' separation of bathrooms does the majority turn the schools' reliance on enrollment papers into a sex-based classification to which intermediate scrutiny could apply. Intermediate scrutiny applies only if the policy treats people differently on the basis of sex. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Otherwise, rational-basis review would apply. *Armour v. City of Indianapolis*, 566 U.S. 673, 680–81 (2012). Separating bathrooms by sex treats people differently on the basis of sex: it instructs boys to use one set of facilities and girls to use another. By contrast, the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex. To be clear, the distinction should make no difference here. The schools' practice of relying on self-reported sex and supporting documentation survives either form of review. The distinction matters only for the majority's decision to affirm the judgment of the district court by applying the wrong kind of constitutional scrutiny.

The majority's theory not only misrepresents the record as it stands and applies the wrong form of scrutiny. It also was not litigated by the parties before the district court or before us. In this important case, involving some of the most pressing legal issues of the day, the majority eschews the briefs and strikes out on its own. *But cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In

50

our adversarial system of adjudication, we follow the principle of party presentation.").

Adams was clear throughout the proceedings in the district court that the policy under review was the schools' policy of separating bathrooms by sex, as opposed to by gender identity. Adams's complaint represented that the lawsuit "challenge[d] . . . [the schools'] policy of excluding transgender students from the single-sex facilities that match their gender identity." Adams employed that understanding of the complaint in later filings seeking to exclude the schools' evidence as irrelevant, too, representing that "the issue in this case is narrow, limited solely to whether [the schools'] policy prohibiting transgender students . . . from using the restroom consistent with their gender identity is discriminatory," and that the "actual case being tried" was about "whether [the schools'] policy excluding [Adams] . . . from using the restroom associated with his gender identity is discriminatory." The joint pretrial statement likewise represented that Adams contended that the schools violated the law by not allowing transgender students to "access facilities that match their gender identity." And after trial, Adams framed the issue in precisely the same way. Adams's proposed findings of fact and conclusions of law again challenged the schools' "policy [that] requires students to use restrooms that match their 'biological sex'" and "bar[s] transgender students from the restrooms consistent with their gender identity." And Adams argued the

school discriminated by treating Adams "differently (i) from other boys, who can use restrooms that match their male gender identity; and (ii) from non-transgender students, since the policy in effect relegates him to a gender neutral restroom." Adams never relied on the sole rationale on which the majority now rests its conclusion: that the school acts arbitrarily because it treats transgender students differently from each other and because it prefers older documents to newer ones. For all these reasons, the majority's new rationale does no better than its old one.

The majority distorts what I have said both here and in my earlier dissent. For example, the majority wrongly insists that I previously agreed with its understanding of the schools' policy. Majority Op. at 24–25. Although I acknowledged the finding that the school district determines each student's sex by looking at enrollment forms, Vacated Dissenting Op. at 58, I never asserted or implied that the school district requires students to use the bathroom corresponding to their "governmentally-recognized legal sex," Majority Op. at 15. I have always understood the school district's policy to be that students are required to use the bathroom corresponding to their sex. The majority also asserts that I stated, without record support, that newly enrolled students must receive a physical examination in which a doctor examines their genitalia. *Id.* at 25 n.7. But I said no such thing. Both Florida law and the record make clear that students who enroll in a Florida school system are required to present a certification of a physical

examination performed within one year before enrollment. *See* Fla. Stat. § 1003.22(1). The majority imagines assertions that I never made.

It is bad enough that the majority twists both the record and my dissent, but it compounds its errors by failing to consider the ramifications of its ruling. I warned in my previous dissent that the majority's view would have consequences far beyond the confines of this appeal. The logic of its retracted opinion would invalidate all government policies that separate bathrooms—or locker rooms and showers, for that matter—by sex. To be sure, the majority "assume[d]" that the government can promote privacy interests by separating bathrooms by sex, and it insisted that the lawfulness of sex-separated locker rooms was not before it. Vacated Majority Op. at 8 n.3, 14. The majority offers similar cold comfort in its new opinion. But anyone can take advantage of the majority's demolition of sex-specific bathroom privacy.

Moreover, the new majority opinion continues its earlier pretense of invalidating the policy it considers—then, the policy of separate bathrooms for the sexes; now, the schools' method of determining students' sex—only as it applies to Adams. Its earlier attempt at limiting itself to an as-applied challenge changed nothing. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). The earlier majority opinion and the new one alike do not offer a meaningful way to distinguish this appeal from one that challenges sex-separated bathrooms and

53

locker rooms. That high school teenagers are not required to shower after physical education classes is not an adequate response to concerns about student privacy. Majority Op. at 23.

The majority insists that these other issues are not before it. "Do not believe it." *Lawrence v. Texas*, 539 U.S. 558, 604 (2003) (Scalia, J., dissenting). Future plaintiffs can still leverage the majority's narrow view of privacy. Ultimately, if the privacy interest at stake is untethered from using the bathroom away from the opposite sex or from biological differences between the sexes, then no justification exists for separating bathrooms—or any related facility—by sex.

B. *The Statutory and Constitutional Challenges Raised by Adams Fail.*

The majority has now retreated from its agreement with the statutory and constitutional challenges Adams presented. Indeed, the majority now puzzlingly asserts that its previous opinion "no longer . . . exist[s]," Majority Op. at 19, even though that opinion—though vacated—can still be found in the Federal Reporter, *see Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286 (11th Cir. 2020). Regardless, I address the statutory and constitutional challenges Adams presented because, unlike the majority's newly invented theory of the case, those issues were actually decided by the district court. I begin with the equal-protection arguments challenging the schools' policy of separating bathrooms on the basis of sex. Then I turn to Adams's Title IX challenge.

1.  The Bathroom Policy Does Not Violate the Equal Protection Clause.

Because the Equal Protection Clause "does not make sex a proscribed classification," a policy that classifies on the basis of sex is constitutional if it survives the two requirements of intermediate scrutiny. *Virginia*, 518 U.S. at 533. The government first must prove that the "classification serves important governmental objectives." *Id.* (internal quotation marks omitted). For an objective to be "important," it cannot stem from "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* The objective must also be "genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* In addition to proving that its policy serves important objectives, the government must prove that "the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks omitted).

Under this well-established standard, this appeal is not complicated. Although the schools' sex-separated bathrooms policy classifies on the basis of sex, it serves the important objectives of protecting the interests of children in using the bathroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex. The policy also fits tightly with both interests in privacy. By requiring students to use the bathroom away from the opposite sex, the policy directly protects the first interest and eliminates one of the most likely

opportunities for a violation of the second interest. In short, it easily satisfies intermediate scrutiny, and even if questions remained, the Supreme Court has long required that we defer to the judgment of public-school officials in this context.

The schools' first objective—to protect students' interest in using the bathroom away from the opposite sex—is important. As then-Professor Ruth Bader Ginsburg explained, "Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21. Indeed, "[a]cross societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated*, 137 S. Ct. 1239 (2017). Separating bathrooms based on sex "dates back as far as written history will take us." W. Burlette Carter, *Sexism in the "Bathroom Debates,"* 37 Yale L. & Pol'y Rev. 227, 287–88 (2018); *see also id.* at 258–61 (documenting sex-separated bathrooms in feudal Japan and in ancient Egypt, Greece, and Rome).

Unsurprisingly, the Supreme Court and our sister circuits have long acknowledged a privacy interest in using the bathroom away from the opposite sex. Even as it ordered the Virginia Military Institute to enroll women, the Supreme Court acknowledged that "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *Virginia*, 518 U.S. at 550 n.19 (citing Brief for Petitioner at 27–29 (arguing that integrating the institute would not require the sexes to be together "when sleeping, dressing and using the bathroom")). Our sister circuits have likewise accepted that "the law tolerates same-sex restrooms . . . to accommodate privacy needs." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010); *accord Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993); *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982); *see also, e.g.*, *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) ("[S]egregation of inmates by sex is unquestionably constitutional."). This privacy interest has long been "appropriately harmonized" with the principle of equality. Ginsburg, *Equal Rights Amendment*, *supra*.

The schools' policy is also "substantially related to the achievement" of its objective to protect this privacy interest. *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Indeed, the policy is a mirror image of its objective—it protects students from using the bathroom with the opposite sex by separating

57

bathrooms on the basis of sex. The policy "is not a means to some greater end, but an end in itself." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572 (1991) (plurality opinion). Intermediate scrutiny is satisfied when a policy directly achieves the objective itself. *See id*.

This conclusion would stand even if the district court were correct that gender identity, not biology, determines a person's sex—that is, if the school policy should have assigned the school district's 16 transgender students to the bathroom that aligned with their gender identity. The policy would still assign the rest of the district's 40,000 students to the right bathrooms, so it would still be 99.96 percent accurate in separating bathrooms by sex. As discussed already, this near-perfect result is certainly enough to satisfy intermediate scrutiny. *Nguyen*, 533 U.S. at 70; *see also Michael M.*, 450 U.S. at 473 (plurality opinion).

Nor does it matter that Adams brings an as-applied challenge to the bathroom policy. "[C]lassifying a lawsuit as facial or as-applied . . . does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew*, 139 S. Ct.at 1127. And, to reiterate, intermediate scrutiny does not "require[] that the [policy] under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Demanding that the policy satisfy its privacy interests as to each plaintiff who brings an as-applied challenge would disregard intermediate scrutiny by

58

demanding a perfect fit between the sex-based classification and the government

interest at issue.

The school policy also substantially advances its objective to protect

children from exposing their unclothed bodies to the opposite sex. Courts have

long understood that the "special sense of privacy" that individuals hold in

avoiding bodily exposure is heightened "in the presence of people of the other

sex." *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (internal quotation

marks omitted); *accord, e.g.*, *Cookish v. Powell*, 945 F.2d 441, 446 (1st Cir. 1991);

*Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016); *Doe v. Luzerne County*, 660 F.3d

169, 177 (3d Cir. 2011); *Strickler v. Waters*, 641 F.2d 1375, 1387 (4th Cir. 1993);

*Moore v. Carwell*, 168 F.3d 234, 236–37 (5th Cir. 1999); *Brannum v. Overton*

*Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *Canedy v. Boardman*, 16 F.3d

183, 185 (7th Cir. 1994); *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135,

1141 (9th Cir. 2011) (en banc); *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir.

1995). And separating bathrooms by sex eliminates one of the most common

opportunities for exposure to the opposite sex. The district court acknowledged the

undisputed testimony that students at Adams's school change clothing outside

bathroom stalls and that bathrooms are ordinarily unsupervised. By separating

bathrooms by sex, the policy eliminates the risk of bodily exposure where it is

most likely to occur, which satisfies intermediate scrutiny. *See Nguyen*, 533 U.S. at

70 (holding that a policy that "seeks to foster the opportunity" for a government objective "has a close and substantial bearing on" that objective).

Even if any doubt remained about whether the bathroom policy survives scrutiny, we must resolve that doubt in favor of the Board because the policy governs student conduct in public schools. The Supreme Court has long held that the constitutional rights of students, including "Fourteenth Amendment rights, are different in public schools than elsewhere." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). Schools have a "custodial and tutelary" power over minor students, "permitting a degree of supervision and control that could not be exercised over free adults." *Id.* at 655. For that reason, the Supreme Court has long deferred to the decisions of school districts in a variety of constitutional contexts, including when determining whether a suspicionless drug search was reasonable under the Fourth Amendment, *id.* at 665, whether the censorship of certain speech was acceptable under the First Amendment, *Morse v. Frederick*, 551 U.S. 393, 403–06, 409–410 (2007) (collecting decisions), and whether corporal punishment was cruel and unusual under the Eighth Amendment, *Ingraham v. Wright*, 430 U.S. 651, 681–82 (1977).

The bathroom policy falls squarely within the Board's authority to "prescribe and control conduct" in its schools. *Id.* at 682 (internal quotation marks omitted). "[I]n a public school environment . . . the State is responsible for

maintaining discipline, health, and safety." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 830 (2002); *see also* Fla. Stat. § 1001.42(8)(a) (making school boards responsible for the "control of students at school, and for proper attention to health, safety, and other matters relating to the welfare of students"). This responsibility is so weighty that school districts can be liable for sexual assault and harassment between students. *See Miami-Dade Cnty. Sch. Bd. v. A.N.*, 905 So. 2d 203, 203–04, 206 (Fla. Dist. Ct. App. 2005) (upholding a jury verdict against a school for failing to protect a student who was sexually assaulted in a bathroom by another student); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1299 (11th Cir. 2007). And bathrooms, one of the few areas in a school that are unsupervised, plainly pose risks to student "discipline, health, and safety." *Earls*, 536 U.S. at 830; *see also A.N.*, 905 So. 2d at 203–04, 206. The Board's assessment of the privacy risks its students face and the effectiveness of its policy in mitigating those risks deserves deference.

The since-withdrawn majority opinion elided this entire analysis by misunderstanding both the classification and privacy interests at issue. It contended that the policy triggers heightened scrutiny not because it separates bathrooms by sex but because it purportedly imposes "differential treatment" on transgender students. Vacated Majority Op. at 12. In doing so, the majority misstated the

school policy, conflated sex-based classifications with transgender-based classifications, and contravened Supreme Court precedent. Compounding its errors, the majority then ignored fundamental understandings of why bathrooms are separated on the basis of sex by rejecting long-standing privacy rationales for sex-separated bathrooms. This conclusion led it to fault the objective underlying the school policy as both hypothetical and based on impermissible stereotypes. After misconstruing both the classification and the privacy interests at issue—the only two ingredients of intermediate scrutiny—the majority opinion then concluded that the schools' classification does not substantially advance a valid objective. I take each of these errors in turn.

The majority's now-vacated conclusion that the school policy classifies on the basis of sex because it "singles out transgender students" was both central to its analysis and wrong. *Id.* The previous majority opinion reached this incorrect conclusion by pointing to a provision of the school policy that does not have that effect. The former majority opinion said the school policy targets transgender students because of the following provision: "*Transgender* students will be given access to a gender-neutral restroom and will not be required to use the restroom corresponding to their biological sex." *Id.* But this provision only offers the option of using gender-neutral bathrooms as an *alternative* to the bathroom that matches a child's sex. It is an *accommodation* for transgender students, not a special *burden*.

62

What Adams actually challenges is the requirement that students cannot use the bathrooms of the opposite sex, which long predates the provision that accommodates transgender students. It is this policy that "prohibit[s] . . . transgender students from using the restrooms matching their gender identity." *Id.* at 14. Because this policy divides bathrooms by sex, not transgender status, it does not facially classify on the basis of transgender status.

The decision of the Supreme Court in *Geduldig v. Aiello*, 417 U.S. 484 (1974), is instructive. There, the Court held that a state insurance policy that excluded coverage for pregnancies did not classify on the basis of sex. *Id.* at 495–97. It explained that the classification at issue created two groups—pregnant and nonpregnant people. *Id.* at 496 n.20. Although "the first group is exclusively female," the Court explained, "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.*; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) (reaffirming this reasoning). This analysis applies with equal force here. The bathroom policy creates two groups—students who can use the boys' bathroom and students who can use the girls' bathroom. Both groups contain transgender students and non-transgender students, so a "lack of identity" exists between the policy and transgender status. *Geduldig*, 417 U.S. at 496 n.20.

At most, the policy has a disparate impact on transgender students, which is not enough to create a sex-based classification. Facially neutral policies trigger intermediate scrutiny only if "invidious gender-based discrimination" motivated them. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Adams cannot argue that a discriminatory purpose against transgender students motivated the policy. Although the district court found that the Board acted with discriminatory intent because it failed to update its policies when it became "aware of the need to treat transgender students the same as other students," the Supreme Court has repeatedly held that "[d]iscriminatory purpose . . . implies more than . . . awareness of consequences." *E.g.*, *Bray*, 506 U.S. at 760 (internal quotation marks omitted); *Feeney*, 442 U.S. at 279 (internal quotation marks omitted). It instead requires the Board to act "at least in part 'because of,' not merely 'in spite of,' . . . adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. The district court found that the "School Board did not have transgender students in mind when it originally established separate multi-stall restrooms for boys and girls," which precludes a finding of discriminatory intent.

The decision of the Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731, is not to the contrary. To be sure, *Bostock* clarified that "discrimination

based on homosexuality or transgender status necessarily entails discrimination based on sex" in the context of employment discrimination under Title VII. *Id.* at 1747; *see also Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011) (holding that discrimination based on gender nonconformity constitutes sex discrimination regardless of whether the victim is transgender or not). But this appeal concerns the converse question: whether discrimination on the basis of sex necessarily entails discrimination based on transgender status. Of course, a policy can classify on the basis of sex without also classifying on the basis of transgender status. *See, e.g.*, *Nguyen*, 533 U.S. at 60. Indeed, *Bostock* expressly disclaimed reaching any conclusion on the permissibility of sex-separated bathrooms and locker rooms. *See* 140 S. Ct. at 1753.

The now-withdrawn majority opinion's misunderstanding of the classification at issue infected its constitutional inquiry. Intermediate scrutiny turns on the relationship between the classification at issue and the government's objectives—that is, whether a sex-based classification is substantially related to the government's objectives. *See Nguyen*, 533 U.S. at 60. So the relevant question is whether excluding students of one sex from the bathroom of the other sex substantially advances the schools' privacy objectives. The question is not, as the majority framed it, whether excluding transgender students from the bathroom of their choice furthers important privacy objectives. The majority's

misunderstanding of the classification as based on transgender status

gerrymandered its analysis to the second question.

      In addition to misunderstanding the classification at issue, the now-vacated

majority erroneously redefined the privacy interests at stake. Although the majority

conceded that protecting bathroom privacy, in some abstract sense, is an important

objective, it rejected both of the privacy interests that the school policy protects.

For the first interest, the majority asserted that the Board incorrectly decided that

its students had any privacy interest in using the bathroom away from "students

who do not share the same birth sex." Vacated Majority Op. at 21 (internal

quotation marks omitted). And although the former majority opinion appeared to

acknowledge that students have a privacy interest in not exposing their bodies, it

did not accept that this interest can be sex-specific—that the interest is heightened

when exposure is to the opposite sex. Instead, it asserted not only that Adams's

"anatomical differences" from boys are "irrelevant" to bathroom privacy, *id.* at 24,

but also that thinking otherwise is an unconstitutional stereotype, *id.* at 25–28.

      The new majority opinion repeats the second mistake. It devotes less than a

page to the legitimacy of the government interests at stake. Majority Op. at 11–12.

It acknowledges an abstract interest in "protecting the bodily privacy of young

students," and it "recognize[s]" that the government can permissibly protect

privacy by "maintaining separate bathrooms for boys and girls, men and women."

*Id.* It does not explain what it means by those terms, and it again does not acknowledge that students can have a heightened interest in avoiding the exposure of their bodies to members of the opposite sex.

The majority's understanding of each interest contravenes precedent. Its decision to limit students' privacy interest to bodily exposure ignores that children also have a distinct privacy interest in using the bathroom away from the opposite sex. *See, e.g.*, *Virginia*, 518 U.S. at 550 n.19; *Chaney*, 612 F.3d at 913; *Faulkner*, 10 F.3d at 232; *Cumbey*, 684 F.2d at 714; *see also Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) (concluding that urination is "an excretory function traditionally shielded by great privacy"). Similarly, the majority's continued failure to acknowledge that the privacy interest in avoiding bodily exposure is heightened when children of the opposite sex are present ignores longstanding precedent, not to mention common sense. *See, e.g.*, *Fortner*, 983 F.2d at 1030; *Harris*, 818 F.3d at 59; *Luzerne County*, 660 F.3d at 177; *Brannum*, 516 F.3d at 494; *Canedy*, 16 F.3d at 185.

Finally, the former majority opinion's alternative contention that the privacy interests at issue are invalid because they rest on impermissible sex stereotypes remains incorrect. According to the former majority opinion, the school policy "presumed every person deemed 'male' at birth would act and identify as a 'boy' and every person deemed 'female' would act and identify as a 'girl.'" Vacated

67

Majority Op. at 26. It also faulted the policy for indulging in the purportedly unconstitutional stereotype that "one's gender identity and expression should align with one's birth sex." *Id.* Neither of these arguments has merit.

The majority never explained how the school policy "presume[d] every person deemed 'male' at birth would act and identify as a 'boy' and every person deemed 'female' would act and identify as a 'girl.'" Nor could it. The policy does not turn on how students "act and identify." It assigns bathrooms by sex, which is not a stereotype. *See Nguyen*, 533 U.S. at 73 ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real."); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) ("Use of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes.").

The withdrawn majority opinion's other contention—that believing "one's gender identity and expression should align with one's birth sex" is an unconstitutional stereotype—fares no better. The Supreme Court has long grounded its sex-discrimination jurisprudence in reproductive biology. *See, e.g.*, *Nguyen*, 533 U.S. at 73 ("The difference between men and women in relation to the birth process is a real one . . . ."); *Geduldig*, 417 U.S. at 496 n.20 ("[I]t is true that only women can become pregnant . . . ."); *see also Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: [T]he two

68

sexes are not fungible . . . ." (internal quotation marks omitted)). Indeed, the Court's justification for giving heightened scrutiny to sex-based classifications makes sense only with reference to physiology.

In one of its foundational sex-discrimination decisions, the Court justified heightened scrutiny this way: "since sex . . . is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate the basic concept of our system that legal burdens should bear some relationship to individual responsibility." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (internal quotation marks omitted). In other words, the Court endorsed heightened scrutiny because laws "distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women." *Cleburne*, 473 U.S. at 441. To say that it is an unconstitutional stereotype to believe that "one's gender identity and expression should align with one's birth sex," the majority must not only rewrite the Supreme Court's physiological rationale for heightened scrutiny of sex-based classifications, but also hold that many of the Court's sex-discrimination decisions turned on an impermissible stereotype. *See Nguyen*, 533 U.S. at 73; *Virginia*, 518 U.S. at 533; *Geduldig*, 417 U.S. at 496 n.20; *Frontiero*, 411 U.S. at 686. We, of course, cannot take either of those actions.

The majority's narrow construction of bathroom privacy skewed the intermediate-scrutiny analysis in favor of Adams. Policies that separate bathrooms on the basis of sex arise from the understanding that privacy interests are sometimes sex specific. By failing to acknowledge any sex-specific privacy interest, the majority demands the impossible: a justification for sex-separated bathrooms that does not involve sex. To be sure, the since-withdrawn majority suggested that a different trial record—one that contained evidence that Adams or other transgender students "harass[ed] or peep[ed] at" other students in the bathroom—might support the bathroom policy. Vacated Majority Op. at 21. But that evidence would not justify a sex-based classification. If voyeurism is equally problematic whether it occurs between children of the same or opposite sex, then separating bathrooms by sex would not advance any interest in combatting voyeurism. Only single-stall bathrooms could address that concern. Further, under intermediate scrutiny, an invidious stereotype about members of a suspect class cannot justify a discriminatory policy "even when some statistical support can be conjured up for the generalization." *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 139 n.11 (1994). So evidence that children of a particular sex—or transgender students under the majority's perspective—are likely to "harass or peep at" members of the opposite sex could not justify sex-separated bathrooms.

Only after it replaced both of the inquiries relevant to intermediate scrutiny—the "discriminatory means employed" by the policy and the privacy interests at issue, *Virginia*, 518 U.S. at 533 (internal quotation marks omitted)—did the defunct majority opinion conclude that the school policy does not substantially advance its objective to protect privacy. The end result was an opinion on sex discrimination that looked nothing like an intermediate-scrutiny inquiry into whether a sex-based classification satisfies the Equal Protection Clause. The majority's impulse to try again is understandable.

When shorn of misunderstandings of the school policy and the legal standards that govern sex-based classifications, this appeal is straightforward. The school policy protects longstanding privacy interests inherent in using the bathroom, and it does so in an ancient and unremarkable way—by separating bathrooms on the basis of sex. That policy is not unconstitutional.

## 2. The Bathroom Policy Does Not Violate Title IX.

The majority no longer addresses Adams's statutory challenge to the schools' policy, but I explain why the policy is permissible. Title IX mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). But an important qualification tempers this mandate: "nothing contained herein shall be

71

construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.* § 1686. The implementing regulations clarify that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Whether the Board violated Title IX turns on the answer to one question: what does "sex" mean in Title IX? Regardless of whether separating bathrooms by sex would otherwise constitute discrimination "on the basis of sex," 20 U.S.C. § 1681(a), the bathroom policy does not violate Title IX if it falls within the safe harbor for "separate toilet . . . facilities on the basis of sex." 34 C.F.R § 106.33. And if the school policy is valid under Title IX, then Title IX also permits the schools to require all students, including Adams, to follow that policy. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied." (quoting 1 James Kent, *Commentaries on American Law* *464)).

Contrary to Adams's arguments, the Supreme Court did not resolve this question in *Bostock*. Far from it. Not only did the Court "proceed on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and

female," it disclaimed deciding whether Title VII allows for sex-separated bathrooms. *Bostock*, 140 S. Ct. at 1739, 1753. And any guidance *Bostock* might otherwise provide about whether Title VII allows for sex-separated bathrooms does not extend to Title IX, which permits schools to act on the basis of sex through sex-separated bathrooms. *See* 20 U.S.C. § 1686; 34 C.F.R. § 106.33.

Turning to the provisions at issue, this question is not close. As used in Title IX and its implementing regulations, "sex" unambiguously is a classification on the basis of reproductive function. We must, of course, give words in statutes the ordinary meaning they conveyed when Congress enacted them. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019); Scalia & Garner, *Reading Law* §§ 6–7, at 69–71, 78–79. And "sex" has never meant gender identity. *See, e.g.*, *Sex*, *The American Heritage Dictionary of the English Language* (New College ed. 1979) (defining "sex" by reference to reproductive functions); *Sex*, *The Random House College Dictionary* (rev. ed. 1980) (same); *see also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (similar).

That "sex" did not mean gender identity is unsurprising. When Congress enacted Title IX in 1972, psychiatric literature conflated sexual orientation with gender identity. *See* Jack Drescher, *Transsexualism, Gender Identity Disorder and the DSM*, 14 J. Gay & Lesbian Mental Health 109, 111 (2010). And as with

73

homosexuality, a common belief among psychiatrists was that "trans people [were] severely mentally disturbed." *See id.* at 114, 116–17. Indeed, the American Psychiatric Association first classified "Gender Identity Disorders" as psychosexual disorders in which a person's internal sense of gender did not align with his or her anatomy. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 261 (3d ed. 1980). Consistent with this view, "[m]ainstream medical thinking" when Title IX became law was firmly opposed to sex-reassignment surgery. Drescher, *supra*, at 111–12. Even among its proponents, "[s]ex reassignment was . . . considered not a cure, but a palliative treatment." Dallas Denny, *A Selective Bibliography of Transsexualism*, 6 J. Gay & Lesbian Psychotherapy 35, 38 (2002). It is untenable to construe transgender status, which even the medical community saw as a departure from the norm, as altering the norm itself among the general public.

In deciding otherwise, the vacated majority opinion erroneously concluded that the safe harbor for bathrooms does not apply because Title IX and its regulations do not "declare" whether "sex" as applied to Adams is the "sex identified at birth"—female—or the sex listed on Adams's amended birth certificate and driver's license—male. Vacated Majority Op. at 40–41 (quoting *Bostock*, 140 S. Ct. at 1746). But the ordinary meaning of "sex" in the safe-harbor provision does not change when a plaintiff is transgender. *See Cochise*

74

*Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). And as explained above, the ordinary meaning of "sex" when Congress enacted Title IX turned on reproductive function. That Congress did not define "sex" does not change this conclusion. *See United States v. Sepulveda*, 115 F.3d 882, 886 n.9 (11th Cir. 1997) ("[A] statute is not ambiguous merely because it contains a term without a statutory definition."). And under the unambiguous meaning of "sex" in the safe-harbor provision, the Board did not violate Title IX when it prohibited Adams from using the boys' bathroom.

Instead of grappling with the meaning of "sex," the now-vacated majority opinion abdicated its duty to interpret the law. According to that opinion, it is unnecessary to delve into the meaning of "sex" in Title IX because the safe harbor "does not dictate how schools should approach transgender students' restroom use." Vacated Majority Op. at 42. But courts regularly apply general standards of law to particular facts, and the Board asks this Court to apply the safe-harbor provision to the facts in this appeal. By declaring it not "necessary" to interpret the safe-harbor provision, the majority abandoned statutory interpretation in favor of legislating a transgender exception to the safe-harbor provision. This approach offends basic principles of statutory interpretation. *See* Scalia & Garner, *Reading Law* § 8, at 93 ("The principle that a matter not covered is not covered is so

75

obvious that it seems absurd to recite it. The judge should not presume that every

statute answers every question . . . . Nor should the judge elaborate unprovided-for

exceptions to a text . . . ."); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct.

2028, 2033 (2015) ("We construe [a statute's] silence as exactly that: silence.").

Indeed, the previous opinion turned Title IX on its head by requiring a clear

statement from Congress that the safe harbor protects the Board. Because Congress

enacted Title IX under its Spending Clause power, U.S. Const. art. I, § 8, cl. 1, the

Board's violation must be unambiguous to trigger liability. Although the Spending

Clause allows Congress to "attach conditions on the receipt of federal funds,"

*South Dakota v. Dole*, 483 U.S. 203, 206 (1987), "[t]he legitimacy of Congress'

power to legislate under the spending power . . . rests on whether the State

voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State*

*Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In other words, "if Congress

intends to impose a condition on the grant of federal moneys, it must do so

unambiguously." *Id.* This requirement unquestionably applies when courts

interpret Title IX. *See Davis ex rel. D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629,

649–50 (1999). It also applies when the appellant fails to press the issue in the

district court. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018)

("[P]arties cannot waive the application of the correct law."). So even if "sex" were

ambiguous, Title IX still would not prohibit the Board's actions. Instead, the Board

would lose the protection of the bathroom safe harbor only if the meaning of "sex" unambiguously did *not* turn on reproductive function.

For its part, the district court ruled that the Board violated Title IX for different but equally flawed reasons. It first ruled that the meaning of "sex" in Title IX was ambiguous because the statute did not define the term and dictionary definitions of "sex" were not "so universally clear" at the time. It then held that our decision in *Glenn v. Brumby*, 663 F.3d 1312, and the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality opinion), supported its conclusion that "sex" in Title IX "includes 'gender identity' for purposes of its application to transgender students."

A statutory term is not ambiguous solely because a statute does not define it or because an isolated dictionary suggests a divergent meaning. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context . . . ."). Further, the only purportedly competing definition the district court found—that "sex" means "the character of being either male or female," *Sex*, *American College Dictionary* (1970)—supports a biological meaning of sex. That dictionary defined "female" and "male" in physiological, reproductive terms. *See Female*, *American College Dictionary* (1970) ("a human being of the sex which conceives and brings forth young; a woman or girl"); *Male*, *American College Dictionary* (1970) ("belonging to the sex

77

which begets young, or any division or group corresponding to it"). The district court had no reason to conclude that the term was ambiguous.

The decision to resolve the purported ambiguity as applied to transgender students with *Price Waterhouse* and *Glenn* fares no better. The district court erred by assuming that "sex" could have different meanings as applied to transgender and non-transgender persons. *See Cochise Consultancy*, 139 S. Ct. at 1512. Further, neither *Price Waterhouse* nor *Glenn* redefined the meaning of "sex." They held only that when an employer acts against a member of one sex for failing to conform to stereotypes associated with that sex—for example, dressing like the opposite sex—that employer has acted because of sex. *See Price Waterhouse*, 490 U.S. at 250 (holding that an employer discriminated on the basis of sex when he "act[ed] on the basis of a belief that a woman cannot be aggressive, or that she must not be"); *Glenn*, 663 F.3d at 1318–19 ("All persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype. . . . Because these protections are afforded to everyone, they cannot be denied to a transgender individual."). Whether or not the Board based its policy on sex stereotypes does not matter for this claim because that question would determine only whether the Board acted "on the basis of sex." 20 U.S.C. § 1681(a). Title IX and its regulations expressly allow the Board to do so to provide separate bathrooms. *See id.* § 1686; 34 C.F.R. § 106.33.

78

The district court also failed to grapple with the fact that Congress enacted Title IX under its Spending Clause power. As explained above, the district court could impose liability only if it concluded that the meaning of "sex" in Title IX unambiguously did not turn on reproductive function. In other words, even if the district court were correct that "sex" was ambiguous and that the best interpretation of "sex" when Congress enacted Title IX was gender identity—and, to reiterate, it was not on either count—Title IX still would not prohibit a school from separating bathrooms on the basis of sex.

*    *    *

In its last attempt to resolve this appeal, the majority transformed an appeal that it should have resolved with straightforward applications of intermediate scrutiny and statutory interpretation into something unrecognizable. It misunderstood the policy at issue, ignored decades of precedent, dismissed any sex-specific interest in bathroom privacy, and flouted foundational principles of statutory interpretation. In the process, it issued a holding with radical consequences for sex-separated bathrooms. Almost no aspect of its analysis emerged unscathed. Even the majority now tacitly acknowledges that its opinion could not withstand scrutiny.

The new majority opinion is shorter, but it is no less wrong. Instead of merely misunderstanding the policy at issue, the majority now substitutes the

policy it wishes Adams had challenged, misconstrues it, and continues to discount students' sex-specific privacy interests. But once again, for all of its errors, the majority opinion cannot obscure what should have been the bottom line of this appeal all along: there is nothing unlawful, under either the Constitution or federal law, about a policy that separates bathrooms for schoolchildren on the basis of sex.

I dissent.